**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MORGAN STANLEY & CO., INC. AUCTION RATE SECURITIES DERIVATIVE LITIGATION ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ This Document Relates To: ALL ACTIONS ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) ) ) ) ) ) ) ) ) ) |

Lead Case No. 08 Civ. 7587 (AKH)

(Derivative Action)

**JURY TRIAL DEMANDED**

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Louisiana Municipal Police Employees Retirement System and Terry G. Thomas ("Plaintiffs"), by their undersigned attorneys, submit this Consolidated Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant Morgan Stanley ("Morgan" or the "Company") against certain officers and directors of Morgan ("Defendants") for misconduct occurring between February 13, 2007 and the present (the "Relevant Period"). Plaintiffs base their allegations on actual knowledge as to their own acts and on information and belief as to all other allegations after due investigation.

**SUMMARY OF THE ALLEGATIONS**

1.       This action arises from Defendants' misconduct in manipulating the market for auction rate securities ("ARS"), which misled the Company's own customers and will lead to **billions of dollars in losses and liabilities** at Morgan.

2.       Morgan Stanley has been a household name for generations. One of the leading providers of financial services in the world (with tens of millions of customer accounts), Morgan depends for its success on the identity of its brand – and its reputation for honesty and integrity.

3.       Today – through the misconduct of Defendants – Morgan's reputation lies in tatters. Defendants – as well as their counterparts at approximately one dozen other brokerage houses,

including Citigroup, UBS, Merrill Lynch, and Bank of America – participated in an industry-wide pattern of misconduct in the ARS market whereby retail and institutional customers alike were induce to purchase tens of billions of dollars' worth of highly illiquid and unmarketable securities.  It will take years to recover investors' confidence destroyed by Defendants' illegal and improper conduct, and it will cost Morgan alone **billions of dollars in settlements, fines, reimbursements to ARS issuers**, repurchases of ARS from customers, losses on "monoline" insurance exposure related to ARS, consequential damages, lost business, legal fees, and other repercussions.

4.      The Company was the target of an administrative proceeding relating to ARS by the United States Securities and Exchange Commission ("SEC") in 2006 – and again in 2008, **for the same misconduct**.  The New York Office of Attorney General and several other states also commenced their own investigations or legal proceedings against the Company in 2008.

5.      To head off those proceedings, Defendants agreed to several onerous settlements, including one requiring the Company to pay **a fine of $35 million, and repurchase approximately $6.4 billion worth of ARS from customers**.[1]

6.      The ARS that Morgan has acquired and will acquire from customers through the agreed repurchase are substantially unmarketable, as established by the Company's recent SEC filings, and will require Morgan to book losses in the billions of dollars.  Morgan's revenue pipeline from ARS – which had represented a substantial percentage of the entire Company's revenues and profits – has been transformed into a staggering *liability*.

---

[1] The amount of ARS which the Company was obligated to repurchase was initially estimated at $4.5 billion.  Subsequently, the Company disclosed that the amount of ARS eligible for repurchase had increased to $6.4 billion.

**Auction Rate Securities**

7.       ARS are municipal bonds, corporate bonds, and preferred stocks with no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.  First developed in 1984, by 2008 the market for ARS had grown to well over $300 billion annually.

8.       ARS represented a large and lucrative portion of Morgan's overall profits, and the Company depended substantially on its ability to sell such securities to its corporate, institutional, and individual customers.    Historically, Morgan's inventory from supporting auctions was relatively steady and fit comfortably within balance sheet limits that Defendants set for the amount that the Company could use to purchase the ARS necessary to prevent failed auctions.  Indeed, prior to February 2008, no public auction of ARS at Morgan had ever been reported to have failed.

9.       From 1984 to 2006, the ARS market had grown to more than $200 billion annually, and the fees collected by the ten or so broker-dealers who dominated the market exceeded $600 million annually.

10.      The success of the ARS market at Morgan – on which Defendants' reputations and bonuses were based – depended upon investors' perception that the market was liquid.  That is because *the target customers for ARS were investors with short-term investment goals or cash-equivalent needs*.  Any hint that the ARS market was not liquid had the potential to trigger a sell-off by investors flocking to safer, more stable securities.  A failed auction, or even the rumor of one, was something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

11.     In spite of this danger, however, during the Relevant Period, in practice, the ARS auctions as a whole were not nearly liquid enough to support the billions of dollars' worth of these securities that Defendants caused or allowed Morgan to market to customers on a daily basis.

### Manipulation of the ARS Market

12.     Beginning in 2007, tightening credit began to reduce the number of purchasers of ARS, resulting, over time, in there being an inadequate number of purchasers to support the auctions. Against this backdrop, Defendants – to continue selling Morgan's inventory of ARS, to protect the profits the Company made on them, and to enhance their own positions and compensation – labored to create the materially false illusion that the ARS repurchase market was liquid and guided customers to believe that it would remain liquid.

13.     Moreover, throughout the Relevant Period, Defendants knew, or were reckless or negligent in not knowing, that the ARS market could not sustain itself, and that Defendants could not continue to inflate, sustain, and subsidize that market while they attempted to liquidate the Company's positions.  Defendants also knew that if they allowed Morgan to walk away from the market, customers would be left holding billions of dollars in illiquid securities – and it was foreseeable to Defendants that, if this happened, the market would collapse.

14.     Throughout the Relevant Period, Defendants caused or allowed Morgan to engage in illegal and improper conduct – designed to inflate, sustain, and manipulate the ARS Market prior to abandonment – in part, as follows:

        (a)     take over its own customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders*;

        (b)     bid for its own accounts without disclosing that fact to customers;

(c)   engage in a process of "netting" of customers' buy and sell orders so as to favor certain customers at the expense of others;

(d)   allow for rampant submission or revision of bids *after* the expiration of deadlines set by the ARS market;

(e)   collaborate with certain customers by asking them to bid at auctions and then compensating them in the secondary market with rates that were higher than the official clearing rate set at auction; and

(f)   give inconsistent and contradictory indications to customers regarding the likely range at which particular auctions would clear.

15.   Despite Defendants' attempt to prop up the market, the illiquidity in the ARS market eventually overwhelmed their efforts.

16.   By August 2007, the credit crisis had created significant balance sheet stress for Morgan.  That stress affected Morgan's ability to purchase additional assets, including ARS, because Morgan would have had to use its capital resources for those purchases.  At the same time, the ARS market was deteriorating.

17.   Moreover, as Morgan increasingly must purchase ARS inventory to prevent failed auctions, the dollar amount of the Company's inventory reached the internal balance sheet limits set for that inventory.  This fact was well known to Defendants, each of whom was in a position to, and did, monitor the Company's revenues from ARS operations and/or disregarded clear "red flags" that would have put her on notice of the problems.

18.   Thus, beginning no later than August 2007, Defendants embarked on an illegal course of conduct whereby they caused or allowed Morgan to sell as many of  its ARS as it could to unsuspecting customers – by disseminating false and misleading information about ARS to

customers before the auction market collapsed entirely.  Defendants' misrepresentations and omissions took the form of intensified efforts to market ARS to customers as "safe" and "liquid" securities, equivalent to "money market instruments," when Defendants knew, or were reckless or negligent in not knowing, that this was false and materially misleading.

19.     Moreover, Defendants caused or allowed the Company to pursue this goal through high-pressure sales efforts and through the publication of statements to customers which were false and materially misleading.  This also enabled Defendants to illegally and improperly liquidate billions of dollars of ARS to unsuspecting investors immediately prior to the market collapse in February 2008.

20.     By February 2008, Defendants had accomplished their goal of divesting the Company of billions of dollars of ARS onto unsuspecting investors.  Thereafter, Defendants caused Morgan to withdraw entirely from the ARS market.  Prior to that time, however, these officers were able to liquidate over $76 million of their privately held Morgan stock while in possession of material, adverse, non-public information about the ARS market and Defendants' participation therein, as well as the Company's foreseeable liability for losses and liabilities related thereto.

**Defendants Cause Massive Harm and Damage to the Company**

21.     After they had caused Morgan to "walk away" from the ARS market – which precipitated the immediate collapse of that market – the Company became the target of investigations by the SEC, the New York Office of the Attorney General, the Securities Department of the Illinois Secretary of State, and several other state agencies, that soon required the Company to incur billions of dollars in obligations, losses, and other liabilities.  In addition, Morgan has been sued for violations of the federal securities laws arising out of the ARS misconduct in *Miller v. Morgan Stanley & Co., Inc., et. al.*, No. 08-3012, *Jamail v. Morgan Stanley & Co., Inc., et. al.*, No.

08-3178, and *Bartholomew v. Morgan Stanley & Co., Inc., et. al.*, No. 08-4910. all pending in this Court.  A partial list of the proceedings brought by various governmental agencies and private parties pertaining to ARS is set forth in Exhibit A hereto.

22.     On August 14, 2008, Defendants settled the proceedings brought by New York and Illinois, agreeing to a rigorous settlement that, among other things, required the Company to ***pay a fine of $35,000,000*** and to ***repurchase approximately $6,400,000,000 of ARS*** from customers over a period of time.[2] ***As of today's date, Morgan has repurchased approximately $1,400,000,000 of such securities and booked over $500,000,000 of losses against their diminished value.***

23.     Defendants' actions have caused untold harm to Morgan.  The Company is exposed to billions of dollars in losses, settlements, damages, and other liability that it would not have been exposed to had Defendants not engaged in the misconduct.   In addition, the Company faces irremediable damages to its reputation from various investigations by state and federal agencies, including the SEC.

## The Citigroup Complaint

24.     The SEC recently filed a complaint in a civil case pertaining to misconduct in the ARS market against another broker-dealer, Citigroup Global Markets, Inc. ("Citigroup").  The complaint against Citigroup was filed simultaneously with the SEC's announcement that the settlement with Citigroup was finalized.  (The SEC had reached a preliminary settlement with Citigroup in August 2008.)  A copy of the SEC complaint against Citigroup is attached hereto as Exhibit B.

---

[2] *See supra*, footnote 1.

25.    The complaint in the SEC civil action against Citigroup is based on misconduct similar or identical to that alleged here of Defendants.  *See* Exhibit B.  Specifically, the SEC alleges that Citigroup knowingly concealed from its customers the growing illiquidity in the ARS market while simultaneously assuring them that ARS were safe and liquid investments.  *See* Exhibit B ¶¶ 20-72.  Moreover, the SEC complaint alleges that no later than August 2007, as credit markets deteriorated, the true facts concerning the ARS market were made unmistakably clear to senior management.  *See id.* ¶¶ 32-34.  Finally, the SEC alleges that Citigroup nonetheless instructed its brokers to sell as much ARS inventory as possible, which would leave customers holding billions of dollars in illiquid securities.  *See id.* ¶¶ 40-54.

26.    The SEC complaint against Citigroup, with its identical allegations of misconduct to those here against Defendants, confirms why the misconduct at issue herein was not in any sense a new violation of the securities laws but was merely the resumption and exacerbation of the same pattern of misconduct that had led the SEC to fine and censure Morgan in 2006.  *See* Exhibit B. Indeed, the SEC made clear in the Citigroup complaint that, among other things, although Citigroup had duly "posted its ARS practices on its website" pursuant to the 2006 settlement, "these disclosures were inadequate and did not negate Citigroup's marketing of ARS as liquid investments that were an alternative to money market instruments."  *Id.* ¶ 20.

27.    Defendants' acts and omissions constituted material breaches of their fiduciary duties to shareholders and the Company, in the following ways, among others:

(a)    Marketing ARS to customers as highly liquid cash alternatives when, in fact, the ARS market in 2007 had become anything but liquid;

(b)      Failing to disclose that, starting in 2007, the ARS market was only "liquid" to the extent that Defendants had caused or allowed Morgan to *create* an artificial market for ARS;

(c)      Failing to disclose that they caused or allowed Morgan to purchase ARS for its own account to avert auction failures and that, but for these and other interventions, most auctions would have failed, due to the lack of non-affiliated buyers;

(d)      Manipulating the market for ARS by various methods and thereby exposing the Company to criminal and civil investigations and liability, as well as the obligation to repurchase ARS and maintain large inventories of ARS that now are unmarketable;

(e)      Failing to implement or maintain adequate internal controls to ensure that the Company's transactions in ARS were legal, honest, and fair to customers;

(f)      Favoring issuer clients, to the disadvantage of investor clients, in setting lower-than-market default rates for ARS in the event of a failed auction;

(g)      Co-opting the Company's own supposedly independent research department into the cause of selling illiquid ARS to unsuspecting customers, employing various practices of undue influence that violated federal law, industry standards, and the Company's own policies and procedures;

(h)      Abruptly abandoning the ARS market after promising investors and the public to support it, leaving those investors stranded with billions of dollars in illiquid and unmarketable securities;

(i)      Failing to cause the Audit Committee of the Board of Directors to focus on the risks to the Company from its activities in various types of derivative securities, such as

ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation;

(j)    Paying themselves lavish salaries, bonuses, stock awards, and other compensation at a time when they had caused Morgan to face exposure in the billions of dollars for their wrongdoing; and

(k)    Enriching themselves at the expense of Morgan through their sale of Company stock based on material, non-public information.

28.    The harm to Morgan caused by Defendants' misconduct will be immense.  The Company has already booked losses of **$2.3 billion** related to the ARS misconduct, and total losses could go as high as **$6.6 billion**, not even counting secondary effect such as lawsuits, increased costs of capital, and lost business.[3]

## JURISDICTION AND VENUE

29.    This Court has original jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between each of the Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

30.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts

---

[3]    Moreover, as set forth above, the SEC's recent complaint against Citigroup, with its identical allegations of misconduct to those here against Defendants, confirms why the misconduct at issue herein was not in any sense a new violation of the securities laws but was merely a resumption and intensification of the same misleading practices that had led the SEC to fine and censure Morgan in 2006. *See* Exhibit B.

with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) Morgan maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiffs

32.     Plaintiff Retirement System is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana.  The Retirement System was an owner of the common stock of Morgan throughout the Relevant Period and remains so today.  The Retirement System is an instrumentality of the State of Louisiana and a citizen thereof.

33.     Plaintiff Thomas is, and was during the Relevant Period, an owner and holder of the common stock of Morgan Stanley and remains so today.  Plaintiff is a resident of State of Maryland.

### Nominal Defendants

34.     Nominal defendant Morgan is a leading global financial services company, with more than 600 offices in 37 countries and total assets under management of almost $1 trillion.  The Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1585 Broadway, New York City, New York.

### Defendants

35.     Defendant John J. Mack ("Mack") has been the Chairman of the Board of Directors (the "Board") of Morgan, as well as the Chief Executive Officer of the Company, since June 2005.

He also serves as Chairman of the Board of Trustees of New York-Presbyterian Hospital, the University Hospital of both Columbia and Cornell, and as a Trustee of the Doris Duke Charitable Foundation.  In July 2005, Mack, citing time commitments, resigned from the Board of Directors of Cousins Properties.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Mack was awarded $41.8 million* in salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation in fiscal 2007, of which $36.2 million was in the form of restricted stock units that vest based on the passage of time, not the achievement of any performance goals.  Since February 13, 2007, based upon his knowledge of material, non-public information about the Company, Mack has *sold approximately 207,000 shares of Morgan stock for  $17 million*.  Mack is a citizen of New York.

36.    Defendant Roy J. Bostock ("Bostock") has been a member of the Board since September 2005.  He is a member of the Nominating and Governance Committee of the Board. He is a member of the Boards of Directors of Delta Air Lines, Inc. and Yahoo! Inc. and a Trustee Emeritus of Duke University.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Bostock in fiscal 2007 was paid $335,000 in fees,* stock awards and other compensation.  Bostock is a citizen of New York.

37.    Defendant Erskine B. Bowles ("Bowles") has been a member of the Board since December 2005.  He is a member of the Compensation, Management Development and Succession Committee of the Board  ("Compensation Committee").  Bowles is the President of the University of North Carolina System and also sits on the Boards of General Motors; Cousins Properties, a publicly traded, $1 billion land developer in Atlanta; and the North Carolina Mutual Insurance Co. The *Triangle Business Journal* reports that:  "The four board positions alone have, in sum, 37 meeting dates attached to them during any given year.  Moreover, GM and North Carolina Mutual

are companies in turnaround mode.   Morgan Stanley, with a tumbling share price, slumping quarterly earnings and a New York state investigation into its role in auction-rate securities sales, is a firm with big headaches."   In addition, Bowles has been a Senior Advisor to Carousel Capital, a private investment firm, since September 2001.   In exchange for his purported trust, loyalty, and fidelity to Morgan, ***Bowles in fiscal 2007 was paid $335,000 in fees,*** stock awards and other compensation.   Bowles is a citizen of North Carolina.

38.      Defendant Sir Howard J. Davies ("Davies") has been a member of the Board since January 2004.  He is a member of the Audit Committee of the Board.  He has been Director of the London School of Economics and Political Science since September 2003, and he is currently a Trustee of the Tate Gallery in London and a director of Paternoster plc, a British pension fund insurance company.   Davies served as Chairman and Chief Executive of the United Kingdom Financial Services Authority, which regulated Morgan's operations in the United Kingdom, from 1997 to 2003.  In exchange for his purported trust, loyalty, and fidelity to Morgan, ***Davies in fiscal 2007 was paid $340,000 in fees***, stock awards and other compensation.  Davies is a citizen of the United Kingdom.

39.      Defendant C. Robert Kidder ("Kidder") has been a member of the Board since 1993. He is Chair of the Compensation Committee of the Board.  He is a director of Schering-Plough Corporation, Chairman of the Board of Trustees of Children's Hospital (Columbus), President of the Wexner Center Foundation Board (a nonprofit partner of The Ohio State University Board of Trustees that oversees the Wexner Center for the Arts), and a member of the Board of Trustees of Ohio University.   In exchange for his purported trust, loyalty, and fidelity to Morgan***, Kidder in fiscal 2007 was paid $376,733 in fees,*** stock awards and other compensation.  Kidder is a citizen of Ohio.

40.     Defendant Donald T. Nicolaisen ("Nicolaisen") has been a member of the Board since 2006.  He is a member of the Compensation Committee of the Board.  Nicolaisen served as Chief Accountant for the SEC from September 2003 to November 2005.  Nicolaisen currently serves on the Board of Directors of MGIC Investment Corporation, Verizon Communications Inc. and Zurich Financial Services.  In exchange for his purported trust, loyalty, and fidelity to Morgan, **Nicolaisen in fiscal 2007 was paid $350,000 in fees,** stock awards and other compensation.  Nicolaisen is a citizen of New Jersey.

41.     Defendant Charles H. Noski ("Noski") has been a member of the Board since September 2005.  He is Chair of the Audit Committee of the Board.  He is a member of the Boards of Directors of Microsoft Corporation, Air Products and Chemicals, Inc., and Automatic Data Processing, Inc.  In exchange for his purported trust, loyalty, and fidelity to Morgan, **Noski in 2007 was paid $355,000 in fees**, stock awards and other compensation.   Noski a citizen of California.

42.     Defendant Hutham S. Olayan ("Olayan") has been a member of the Board since 2006.  She is a member of the Nominating and Governance Committee of the Board.  Olayan is a senior executive and director of a private multinational enterprise, The Olayan Group, a leading diversified business in Saudi Arabia, and also serves as president and chief executive officer of Olayan America Corporation, a Group affiliate based in New York.  She serves as a director of the Peter G. Peterson Institute for International Economics, as a trustee of American University of Beirut, an overseer of the Memorial Sloan-Kettering Cancer Center, and an advisory council member of The Brookings Institution, Carnegie Middle East Center, Rockefeller University, US-Middle East Project, and The Conference Board.  She is a Founding Member of the Arab Bankers Association of North America. In exchange for her purported trust, loyalty, and fidelity to Morgan,

*Olayan in fiscal 2007 was paid $335,000 in fees,* stock awards and other compensation.  Olayan is a citizen of New York.

43.     Defendant Charles E. Phillips, Jr. ("Phillips") has been a member of the Board since June 2006.  He is a member of the Audit Committee of the Board.  He is President and Director of Oracle Corporation.  Before joining Oracle in May 2003, Phillips served as a Managing Director at Morgan Stanley in Equity Research, where he was a noted software company analyst who covered Oracle.  Phillips also is a Board member of Viacom, Inc., Jazz at Lincoln Center in New York City, and New York Law School.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Phillips in fiscal 2007 was paid $340,000 in fees*, stock awards and other compensation.  Phillips is a citizen of North Carolina.

44.     Defendant O. Griffith Sexton ("Sexton") has been a member of the Board since September 2005.  He is a member of the Boards of Directors of Investor AB, a publicly traded Swedish investment company, and Hamilton Lane, a privately held asset-management company based in Philadelphia.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Sexton in fiscal 2007 was paid $325,000 in fees*, stock awards and other compensation.  Sexton is a citizen of Florida.

45.     Defendant Laura D. Tyson ("Tyson") has been a member of the Board since 1997.  She is Chair of the Nominating and Governance Committee of the Board.  Tyson also serves as Board member of Eastman Kodak Company and AT&T Inc., and was the National Economic Adviser to President Clinton.  In exchange for her purported trust, loyalty, and fidelity to Morgan, *Tyson in fiscal 2007 was paid $346,733 in fees*, stock awards and other compensation.  Since February 13, 2007, while in possession of material, non-public information about the Company,

Tyson has sold approximately 15,000 shares of Morgan stock for $1.1 million.   Tyson is a citizen of California.

46.     Defendant Walid Chammah ("Chammah") is Co-President of Morgan.  Chammah is a citizen of New York.

47.     Defendant James P. Gorman ("Gorman") has been Co-President of Morgan since December 2007 and Co-Head of Strategic Planning since October 2007.  He was President and Chief Operating Officer of the Company's Global Wealth Management Group from February 2006 to April 2008.  Since February 13, 2007, while in possession of material, non-public information about the Company, Gorman has *sold approximately 53,779 shares of Morgan stock for $2.3 million*.  Gorman is a citizen of New York.

48.     Defendant Kenneth M. deRegt ("deRegt") is Chief Risk Officer of Morgan. DeRegt is a citizen of Connecticut.

49.     Defendant Roberto Hoornweg ("Hoornweg") is Global Head of Interest Rates, Currencies and Credit.  Hoornweg is a citizen of New York.

50.     Defendant Colm Kelleher ("Kelleher") is Executive Vice-President, Chief Financial Officer, and Co-Head of Strategic Planning of Morgan.   In exchange for his purported trust, loyalty, and fidelity to Morgan, *Kelleher in fiscal 2007 was paid $26.2 million* salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation.  Since February 13, 2007, while in possession of material, non-public information about the Company, Kelleher has *sold approximately 11,425 shares of Morgan stock for $544,000*.  Kelleher is a citizen of New York.

51.     Defendant Michael Petrick ("Petrick") is Global Head of Institutional Sales and Trading of Morgan.  Petrick is a citizen of Connecticut.

52.     Defendant Ellyn A. McColgan was the President and Chief Operating Officer of Global Wealth Management from April 2008 until January 31, 2009.  McColgan is a citizen of Massachusetts.

53.     Defendant Andy Saperstein ("Saperstein") is Head of National Sales at Morgan. Saperstein is a citizen of Connecticut.

54.     Defendant David H. Sidwell ("Sidwell") was the Chief Financial Officer of Morgan until October 31, 2007.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Sidwell in fiscal 2007 was paid $23.7 million* in salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation.  Sidwell is a citizen of New York.

55.     Defendant Robert W. Scully ("Scully") was the Co-President of Morgan during part or all of the Relevant Period.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Scully in fiscal 2007 was paid $28.0 million* in salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation.  Scully is a citizen of New York.

56.     Defendant Zoe Cruz ("Cruz") was the Co-President of Morgan until November 29, 2007.  Cruz was in charge of the Company's Fixed Income Sales and Trading department.  Since February 13, 2007, while in possession of material, non-public information about the Company, Cruz has *sold over 30,712 shares of Morgan stock for $1,931,000*.  Cruz is a citizen of New York.

57.     Defendant Gary G. Lynch ("Lynch") is the Chief Legal Officer of Morgan.  In exchange for his purported trust, loyalty, and fidelity to Morgan, *Lynch in 2007 was paid $19.8 million* in salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation.  Since February 13, 2007, while in possession of material, non-public information about the Company, Lynch has *sold over 67,000 shares of Morgan stock for $3.3 million*.  Lynch is a citizen of New York.

58.     Defendant Thomas R. Nides ("Nides") is the Chief Administrative Officer of Morgan.  In exchange for his purported trust, loyalty, and fidelity to Morgan, **Nides in 2007 was paid $9.7 million** in salaries, bonuses, fees, benefits, stock options, stock awards, restricted stock units, and other compensation.  Since February 13, 2007, based upon his knowledge of material, non-public information about the Company, Nides has sold over 19,000 shares of Morgan stock for $1.0 million.   Nides is a citizen of the District of Columbia.

**Definitions of Groups**

59.     The defendants who served on Morgan's Board during the events complained of named in paragraphs 35-45 hereof are referred to as the "Director Defendants."

60.     The defendants who served as officers of the Company during the events complained of named in paragraphs 35 and 46-58 hereof are referred to as the "Officer Defendants."

61.     The defendants who sold Morgan stock based on insider information named in paragraphs 35, 45, 47, 50, 56, 57, and 58 hereof (*viz.*, Mack, Lynch, Tyson, Cruz, Gorman, Kelleher, and Nides) are referred to as the "Insider Selling Defendants."

## DERIVATIVE ALLEGATIONS

62.     Plaintiffs bring this action derivatively in the right and for the benefit of Morgan to redress injuries suffered, and to be suffered, by Morgan as a direct result of the breaches of federal and state law and fiduciary duties, insider selling, unjust enrichment, and waste of corporate assets by Defendants.  Morgan is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

63.     Plaintiffs will adequately and fairly represent the interests of Morgan in enforcing and prosecuting its rights.

64.     Plaintiffs were owners of Morgan common stock at all relevant times and continue to own Morgan stock at this time.

65.     Prosecution of this action, independent of the Morgan Board, is in the best interests of the Company.

## DEMAND IS FUTILE AND THEREFORE EXCUSED

66.     Demand upon the Morgan Board that they institute this action in the Company's name would be entirely futile, and is therefore excused.

67.     First, the Board is sterilized from fairly assessing a pre-suit demand because the Company has been named as a defendant in several securities fraud class actions arising out of the same conduct as alleged herein, and the Board cannot allow this action to go forward since it might prove or help to prove liability as against the Company. As such, the Board can not exercise its independent, disinterested judgment with respect to the claim herein.

68.     Second, the Board of Morgan consists of eleven (11) individuals:  Defendants Mack, Sexton, Noski, Davies, Nicolaisen, Phillips, Bostock, Olayan, Bowles, Kidder, and Tyson.    A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein, and each faces a substantial likelihood of personal liability:

(a)     **Mack** and **Sexton** are high-level, highly-compensated executive officers of Morgan, and the Company has conceded in its 2008 Proxy Statement filed with the SEC pursuant to Form 14A and dated February 28, 2008, that they are not independent under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.

(b)     **Noski, Davies, Nicolaisen, and Phillips** sit on the Audit Committee, which allowed Morgan to mislead its own customers, manipulate the market for ARS, carry the

ARS on the Company's books at an artificially inflated price, and expose the Company to tens of billions of dollars in damages.  The members and chairman of the Audit Committee have breached their duties to the Company and its shareholders, in part, because they violated the duties specified in Morgan's Audit Committee Charter and in its Code of Ethics and Code of Corporate Conduct and other general duties imposed upon such directors by law, as a result of their Audit Committee positions.  *See infra*, ¶¶ 70, 219-230.

(d)     **Bostock's** son-in-law, Daniel Waters, was not only appointed to a high-level executive position (Managing Director) at the Company in 2006, but also received a large sign-on bonus and cash for his stock in an acquired company.  Defendant Bostock's son-in-law received fiscal 2007 compensation of approximately $4.2 million.  Because of the economic dependency of defendant Bostock to Mack and the remaining members of the Board for the continued financial support of his children, defendant Bostock is not independent and will not challenge the illegal and improper actions of the Company's officers or his fellow Board members.

(e)     Defendants conceded that the Company has significant existing commercial relationships with entities that **Bowles, Davies, Olayan, Phillips, and Tyson** (or their family members) serve as executive officers or employees.  These Board members are thus conflicted from suing other Board members because of the harm that would ensue to their entities' relationships with Morgan, for example:  (i) **Phillips**, a former Morgan software industry analyst, is the current President of Oracle Corp., which has a longstanding investment banking relationship with Morgan; further, Morgan Stanley is a large customer of Oracle, and the Company provides analyst ratings on Oracle's securities, upgrading Oracle's rating to "Overweight" in December 2007;  and (ii) **Olayan** is a principal in The Olayan

20

Group, a Saudi Arabian business conglomerate which provides services to Morgan's joint venture (known as Morgan Stanley Saudi Arabia) with another Saudi Arabian concern, The Capital Group.

(f)      Defendants conceded that the Company made significant charitable contributions to organizations led by **Bostock, Bowles, Davies, Kidder, Noski, and Tyson**, for example:   (i) Morgan gave $50,000 to the Partnership for a Drug-Free America (**Bostock**); (ii) Morgan is a Major Donor, highlighted as such, of the Wexner Center Foundation of Ohio State University (**Kidder**); (iii) Morgan gave between $250,000 and $499,000 to the Memorial Sloan-Kettering Cancer Center (**Olayan**); (iv) Morgan is a major donor, and gives its name, to the Morgan Stanley Children's Hospital of New York (**Kidder**); and (v) Morgan funds exhibits at the Tate Gallery in London (**Davies**).   These directors know that further donations to their charities by Morgan depends implicitly on their carrying out their corporate duties in ways that are agreeable to management.

(g)      **Sexton, Phillips, Olayan, Noski, Nicolaisen, Bowles, and Bostock** joined the Board in 2005 or later, after Mack had become Chairman and CEO, were hand picked by Mack, and are beholden to him for their positions.

(h)      **Kidder, Noski, and Davies** sat on the Company's Audit Committee when, and consciously approved of and acquiesced in, Mack's 2005 directive to weaken the status and independence of the Company's risk management functions.  Among other things, these Defendants substantially assisted Mack in having the Company's Chief Risk Officer report to Co-President Cruz, who led Fixed Income Sales and Trading, rather than to the CEO; these and other moves allowed Mack to plunge the Company headlong into reckless risk-taking and leverage, including investments in subprime assets and manipulating the ARS

21

market as alleged herein.  As principal wrongdoers of these and other material breaches of fiduciary duty alleged herein, these directors cannot be expected to be disinterested and independent in connection with rectifying the same.

(i)    The **other directors** are dominated and controlled by Mack, the Chairman of the Board, who has spent years in high-level executive positions at Morgan and controls the compensation and other benefits paid to the other directors, what committees they sit on, what role they will play in governance, and other processes.

(j)    Based on their knowledge of material, non-public information, defendants **Mack** and **Tyson**, while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost **$18 million** in Morgan stock since February 13, 2007; these directors cannot be expected to objectively consider a demand that the Board take action against the Insider Selling Defendants and the other Defendants.

(k)    **Nicolaisen**, who is one of Mack's hand-picked cronies on the Board, plays a disproportionately large role in the governance of Morgan because he sits on a majority of the committees of the Board.

(*l*)    **Bowles, Kidder,** and **Olayan** collectively serve as directors or senior executive officers of ***19 other companies*** or major institutions (five, four, and 10, respectively), substantially and improperly dissipating their resources to serve as Board members of Morgan with due diligence.

### Substantial Threat of Liability for Breach of Duties

69.    Third, as set forth herein, Defendants face a substantial threat of liability for their manipulation of the ARS and misleading of Company customers.  Indeed, the various Committees of

the Board were specifically tasked with monitoring the Company's business practices, reputation, and compliance with securities laws and regulations.  Each of Defendants sat on at least one – and in most cases, several – of the Board Committees during the Relevant Period and thus had direct responsibility for ensuring various aspects of the integrity of the ARS market at Morgan.  Yet each of these defendants disregarded multiple "red flags" that would have led any director discharging his or her duties in good faith to investigate, determine that substantial wrongs were being committed, and institute immediate measures to stop them.

### Breach of Specific Duties of the Audit Committee

70.    As members of the Audit Committee of the Morgan Board, **Noski, Davies, Nicolaisen, and Phillips** had the ultimate responsibility for the effectiveness of the Company's system of internal controls and compliance with legal and regulatory requirements.  This mission is defined in Morgan's 2008 Proxy Statement as "(o)verse(ing) the integrity of the Company's consolidated financial statements, system of internal controls, risk management and compliance with legal and regulatory requirements."  The mission is encapsulated in the following explicit duties of the Audit Committee:

- *"[d]iscuss, as appropriate, the adequacy of the Company's internal controls* with the internal and independent auditors and management";

- *"[r]eview and discuss, as appropriate, any major issues as to the adequacy of the Company's internal controls* and any special audit steps adopted in light of material control deficiencies";

- *"[e]stablish procedures for:  (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting, controls, or auditing matters*; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters";

-  "[r]eview or discuss, as and when appropriate:  (i) the types of information to be disclosed and the type of presentation to be made in earnings press releases, including the use of "pro forma" or

"adjusted" non-GAAP information and any reconciliation to GAAP information, that have been, or will be, issued by the Company, as well as financial information and earnings guidance that have been provided to analysts and rating agencies; and (ii) *the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's consolidated financial statements*";

- "*review with the Company's Chief Legal Officer, or appropriate delegates, legal, disclosure or other matters that may have a material impact on the Company's consolidated financial statements or on the Company's compliance policies*";

- "*[o]btain, review and evaluate reports from management with respect to the Company's policies and procedures regarding compliance with applicable legal and regulatory requirements, and the Company's Code of Ethics and Business Conduct*"; and

- "*[d]iscuss with management and the independent auditor any correspondence with regulators or governmental agencies* and any external or employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies." [Emphases added.]

71.    The Audit Committee met 10 times during 2007.  Indeed, the Audit Committee specifically stated in the Company's 2008 Proxy Statement that it "(r)eviewed and discussed reports from management on the Company's policies regarding applicable legal and regulatory requirements."  The Audit Committee met a similar number of times in 2008.

72.    The members of the Audit Committee breached their duties, and face a substantial threat of liability for those breaches, in that, among other things, they:  (a) failed to discuss with management, or direct management to address, the Company's continued manipulation of the ARS market after the 2006 administrative proceeding and the growing illiquidity in the ARS market which rendered the Company's statements to customers concerning that market false and misleading; (b) failed to discuss with the Company's legal or compliance staff, or direct them to address, the overvaluation of the Company's earnings and assets, and the understatement of its exposure to losses and liabilities, caused by Defendants' manipulation of the ARS market; (c) failed

to review and discuss with management the deficiencies in the Company's internal controls whereby Defendants continued to manipulate the ARS market and misstate the Company's exposure thereto as well as its overall results; (d) failed to cause the Company to receive, evaluate, and act upon complaints received from the SEC and other parties concerning the Company's practices in the ARS market; (e) failed to ensure that the Company was complying with legal, regulatory, and internal ethical requirements regarding ARS; and (f) failed to discuss the effect of regulatory and accounting initiatives related to ARS on the Company's consolidated financial statements, or implement necessary changes associated therewith.

**Breach of Specific Duties of the Compensation Committee**

73.     As members of the Compensation Committee of the Morgan Board, **Kidder, Bowles and Nicolaisen** had the ultimate responsibility at Morgan to determine the "compensation of the Company's executive officers, to produce an annual report on executive compensation for inclusion in the Company's annual proxy statement, [and] to oversee plans for management development and succession."  This mission was encapsulated in the following duties, among others:

- *"[r]eview and approve corporate goals and objectives relevant to the compensation of the Chairman and CEO, evaluate his or her performance in light of those goals and objectives, and determine his or her compensation level based on that evaluation*";

- *"[a]pprove the compensation of executive officers and such other officers as the Committee determines appropriate*";

- "[p]roduce an annual Compensation Committee Report to be included in the Company's annual report and proxy statement.  In connection with the Report, review and discuss with management the Compensation Discussion and Analysis section, and based on such review and discussion, recommend to the Board that the Compensation Discussion and Analysis section be included in the Company's annual report and proxy statement"; and

- *"[o]versee the evaluation of management*".

74.     The Compensation met seven times during 2007.  The committee met a similar number of times in 2008.

75.     The members of the Compensation Committee breached their duties, and face a substantial threat of liability for those breaches, in that, among other things, they:  (a) approved over *$150 million* in compensation, in fiscal 2007 alone, of defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides, at a time when the Company itself was becoming exposed to multiple billions of dollars in losses and liabilities related to ARS; (b) failed to review and approve appropriate goals and objectives relevant to the compensation of these defendants; and (c) failed to evaluate the performance of these defendants in light of appropriate goals and objectives and set their compensation accordingly.

### Breach of Specific Duties of the Nominating Committee

76.     As members of the Nominating and Governance Committee of the Morgan Board, **Tyson, Bostock, and Olayan** had the ultimate responsibility at the Company to identify and recommend "candidates for the Board," to establish "procedures for its oversight of the Board," to recommend "director compensation and benefits," to review "corporate governance policies," and to review and approve "related person transactions in accordance with the Company's Related Person Transaction Policy."  This mission was encapsulated in the following duties, among others:

- "[o]versee the annual evaluation of the Board and its committees";

- "review and assess the adequacy of the Company's Corporate Governance Policies and, if appropriate, recommend changes to the Corporate Governance Policies to the Board"; and

- "[r]eview and approve related person transactions in accordance with the Company's Related Person Transactions policy and associated disclosure.  Report approved related person transactions to the Board."

77.    The Nominating and Governance Committee met five times during 2007.  The committee met a similar number of times in 2008.  The members of the Nominating and Governance Committee breached their duties, and face a substantial threat of liability for those breaches, in that, among other things, they:  (a) failed to establish procedures for oversight of the Board; (b) failed to prevent the Insider Selling Defendants named herein from selling shares of Company stock while in possession of material, nonpublic information, thereby damaging the Company; and (c) approved over *$45.2 million* in compensation, in 2007 alone, to the various members of the Board, at a time when the Company itself was becoming exposing to multiple billions of dollars in losses and liabilities related to ARS.

## **Additional Factors Establishing Demand Futility**

78.    The Morgan Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Morgan or its shareholders.

79.    The present Board of Directors of Morgan has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including **Mack** and **Sexton**, are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, and the other claims alleged, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the Morgan Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Morgan.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)     The Morgan directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured"

exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

80.     As a result of their illegal and improper conduct, many of the directors and managers of Morgan held onto their positions of power, prestige and profit at the Company.  Indeed, while Morgan has suffered substantial damage and losses due to the misconduct of Defendants, Defendants have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. Defendants have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their incompetent performance and deceptive activities.

81.     Thus, the Director Defendants will also take no action against one another or against any member of the Board because each member of the Board received hundreds of thousands of dollars per year in compensation in exchange for their purported trust, loyalty and fidelity and as compensation for serving as a member of the Board and as member of the committees thereof. Taking action against themselves or the other members of the Board of Directors of Morgan would place compensation in jeopardy at least as follows: over ***$41 million*** in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Mack** in fiscal 2007; over ***$335,000*** in fees, stock awards and other compensation paid to defendant **Bostock** in fiscal 2007; over ***$335,000*** in fees, stock awards and other compensation paid to defendant **Bowles** in fiscal 2007; over ***$325,000*** in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Sexton** in fiscal 2007; over ***$340,000*** in fees, stock awards and other compensation paid to defendant **Davies** in fiscal 2007; over ***$376,733*** in fees, stock awards and other compensation paid to defendant **Kidder** in fiscal 2007; over ***$350,000*** in fees, stock awards and other compensation paid to defendant **Nicolaisen** in fiscal 2007; over ***$355,000*** in fees, stock awards and other compensation paid to

defendant **Noski** in fiscal 2007; over *$340,000* in fees, stock awards and other compensation paid to defendant **Olayan** in fiscal 2007; over *$340,000* in fees, stock awards and other compensation paid to defendant **Phillips** in fiscal 2007; and over *$346,733* in fees, stock awards and other compensation paid to defendant **Tyson** in fiscal 2007.

### FACTUAL BACKGROUND RELEVANT TO
### DEFENDANTS' IMPROPER AND ILLEGAL CONDUCT IN THE ARS MARKET

82.     Morgan is divided into three fundamental businesses, Global Wealth Management, Asset Management, and Institutional Securities.   The Global Wealth Management Group ("GWMG") "provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and other insurance products; credit and other lending products; cash management services; retirement services; and trust and fiduciary services."  The ARS issued, sold, and marketed by Morgan were all transacted within GWMG.

### The ARS Market

83.     ARS are securities which have no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.

84.     First developed in 1984, by 2008 the market for ARS had grown to well over $300 billion annually.  Traditionally, the market was limited to institutional investors, but the minimum investment in ARS was reduced to $25,000, placing these securities within the reach of individual investors.

85.     ARS are auctioned at the "par" value – i.e., a specific dollar amount worth of securities.  The pricing variable consists of the interest rate or dividend yield that the auction process

determines.  The rate or yield on any ARS is supposed to be set by a "Dutch" auction in which bids

with successively higher rates are accepted until all of the securities in a particular auction are sold.

86.     Investors typically can submit only the following types of orders:

(a)     a "hold" order, which is the default order for current investors (i.e., the order

that is entered for a current holder if the holder takes no action), where a current investor will

keep the securities at the rate at which the auction clears;

(b)     a "hold-at-rate" bid, where a current investor will only keep the securities if

the clearing rate is at or above the specified rate;

(c)     a "sell" order, where a current investor will sell the securities regardless of the

clearing rate; or

(d)     a "buy" bid, where a prospective investor (or current investor who desires

additional securities) will buy securities if the clearing rate is at or above the specified rate.

87.     As stated by disclosure documents (such as prospectuses) issued with respect to each

ARS, an investor's order is irrevocable.  The final rate at which all of the securities are sold is the

"clearing rate" that applies to all of the securities in the series until the next auction.  Bids with the

lowest rate and then successively higher bids are accepted until all of the sell orders are filled.  The

clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the action.[4]

---

[4] Here is a simplified example of such an auction.  Suppose $75,000 par value of securities were for
sale and the auction received four buy bids.  Bid 1 was for $25,000 at 3.05%.  Bid 2 was for $25,000
at 3.10%.  Bid 3 was for $35,000 at 3.10%.  Bid 4 was for $20,000.  In these circumstances, the
"clearing rate" would be 3.10%, meaning all of the securities in the series would pay an interest rate
(or yield, as the case may be) of 3.10% until the next auction.  Bid 1 would be allocated $25,000.
Bids 2 and 3 would receive pro-rata allocations of the remaining $50,000 worth of securities in
proportion to the ratio of the par value bid for in each to the total par value bid for in both.  Bid 4
would receive nothing.

88.     If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with some minor exceptions. If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate, referred to as the "all-hold" rate, is a below-market rate set by a different formula.

89.     The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers. Morgan was one of the largest broker-dealers participating in the ARS market.

90.     The issuer pays an annualized fee to each broker-dealer, such as Morgan, engaged to manage an auction. The fee is typically 25 basis points (i.e., 25% of 1%) for the par value of the securities managed by that broker-dealer.

91.     The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction. Investors must submit orders for an auction to the broker-dealer by a specified deadline. Many broker-dealers have an internal deadline by which investors must submit their orders to them.

92.     This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent. Other broker-dealers allow investors to submit orders up to the submission deadline, i.e., the deadline for all broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

93.     After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction. If there is only one broker-dealer, however, as

was the case in many of the auctions managed by Morgan, the broker-dealer can discern the clearing

rate before submitting orders to the auction agent.

94.     The auction agent allocates the securities to the broker-dealers based on the orders

they submitted.  The auction procedures generally state that orders are filled in the following order:

hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a

rate at the clearing rate, and buy bids with a rate at the clearing rate.

95.     When there are more bids for securities at the clearing rate than securities remaining

for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the

buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy

in allocating the securities to their customers.

**"Red Flags" Put Defendants on Notice**
**of Control Deficiencies and Improper Practices in the ARS Market**

96.     It was in order to conceal the illiquidity of the ARS market caused by deteriorating

credit conditions and an absence of new buyers, that Defendants (and their counterparts at other

broker-dealers) caused or allowed Morgan to engage in various undisclosed practices designed to

inflate and sustain the market long enough to allow them to cause Morgan to dispose of its

inventories of ARS.

97.     In fact, the illegal acts and practices complained of herein are not entirely new to

Defendants, or the Company.  As early as May 2006, in an administrative proceeding dated May 31,

2006, the SEC found that Morgan and other broker-dealers had engaged in various illegal practices

in order to make it appear that ARS auctions were successful and legitimate when, in fact, they were

not.  These actions, and the SEC's findings, were the direct and foreseeable consequence of

Defendants' having caused or allowed the Company to engage in the illegal conduct and practices

complained of herein.  The misconduct at issue in 2006 was a direct precursor of Defendants'

conduct during the Relevant Period – involving manipulation of the market for ARS and failure to disclose the true facts concerning that market to customers.

98.     For example, in the prior settlement, Morgan and others who acted as broker-dealers were found to have routinely taken over their customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders.*  This practice caused Morgan to bestow discounts on certain customers at the direct expense of other customers, and also to manipulate the clearing rates of auctions.

99.     In addition to the foregoing, it was also determined that Morgan had been caused or allowed by Defendants to bid for its own accounts when purporting to act as a broker for the same clients, without disclosing this fact to such affected customers.  It was determined that Morgan was caused to ask customers to change orders, so as to:

(a)     prevent auctions from failing, thereby creating the false impression that the ARS market was very liquid and no auction had ever failed for want of orders; and

(b)     set artificial "market" rates, at levels essentially dictated solely by Morgan itself.

100.    The SEC also found that Morgan was caused to rearrange bids through a process of "netting" of in-house buy and sell orders ahead of actual auctions, in order to change the priority of bids.  Thus, before submitting bids to the auction agent, Morgan was caused to change or "prioritize" customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization, as well as a similar practice known as "cross-trading," certain bids were secretly moved up in the disclosed hierarchy for the order in which bids of various types would be filled.  In many instances, those practices resulted in certain customers' bids displacing other customers' bids

when the auction was oversubscribed, which falsely affected the clearing rate and did not conform to the disclosed procedures.

101.    The SEC also found that Morgan and other broker-dealers caused or allowed the rampant submission or revision of bids after external and/or internal deadlines.  In addition, Morgan was also found to have been caused to submit and/or revise bids *after* these deadlines.  This improper and illegal practice favored those who bid after a deadline by displacing other investors' bids and thereby adversely affected the clearing rate.  Again, this did not conform to the disclosed procedures.

102.    The SEC also found that Morgan also had been caused to collaborate with certain customers by asking them to bid at auction, and then compensating them in the secondary market with rates that were higher than the clearing rate on the auction itself.  For example, it was also reported that Morgan was caused to submit bids at lower rates than the customers actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction at the clearing rate, and then selling the securities back to the investor at the same rate but below par value.  At times, such "straw man" bids were dispensed with and, instead, Morgan was caused to simply displace those customers' bids, and then sell them securities at below par value in the secondary market.  The SEC also determined that some broker-dealers such as Morgan provided higher returns to certain customers by delaying settlement dates for those customers.

103.    Finally, the SEC found that Morgan was caused or allowed to provide different "price talks"[5] to different customers, thereby placing certain customers at an advantage over others.

---

[5] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

104.    The SEC's May 2006 findings demonstrated that Morgan, and other broker-dealers in the ARS market, had caused or allowed ARS auctions to be auctions in name only and, in fact, were an illegal market made and manipulated by Morgan and the broker-dealers themselves.   As a consequence of Defendants' illegal and improper course of conduct in causing Morgan to participate in manipulating the ARS market, the Company was among fifteen broker-dealers, who were fined $13 million, censured by the SEC, and ordered to cease and desist from those practices.   In May 2006, Morgan was also sentenced to a civil penalty of $1,500,000.  The terms of the 2006 cease-and-desist order by the SEC were embodied in an SEC release, dated May 31, 2006, (the "2006 SEC Release") that was promptly made publicly available.   A true and correct copy of the 2006 SEC Release is attached hereto as Exhibit C.

105.    Another abuse in the ARS market at Morgan was that the terms of ARS were structured in a manner that precluded secondary market value in the event of an auction failure. Maximum rates, those interest rates that would be applied in the event of an auction failure, were set at low levels which were favorable to issuer clients of Morgan but, in the case of broad auction failures, provided issuers with little or no incentive to seek alternative financing in order to redeem the ARS shares.

106.    The establishment of low maximum rates directly contributed to issuer clients' efforts in successfully obtaining AAA ratings for their securities from credit rating agencies.  And indeed, Defendants stressed the AAA ratings of the Company's ARS in their marketing efforts, billing them as ultra-conservative investments.   But when Defendants caused or allowed Morgan to stop supporting its auctions, investors came to realize that the low maximum rate which had allowed the securities to receive an AAA rating rendered their holdings unmarketable and illiquid.

107.    On the investor side, interest rates were not high enough to compensate interested investors for their increased liquidity risk.  The Defendants had no incentive to negotiate for higher maximum rates to balance the market interests, *because the Company was collecting significant underwriting fees from issuers at the outset, on the investment banking side.*  Defendants, by causing Morgan to have a dual role in representing both issuers and investors purchasing ARS, created significant and inherent conflicts of interest.

108.    Unfortunately for the Company and investors, however, at no time did Defendants ever adequately resolve these conflicts of interest and, instead, they caused or allowed them to be intensified – placing the Company in violation of its own standards, the standards applicable to the securities industry, and federal and state law.

109.    Despite the fines and cease-and-desist orders previously imposed by the SEC, Defendants caused or allowed Morgan to continue to engage in the same or similar illegal and improper practices, including those set forth above, to artificially bolster the auction markets – the effect of which was to expose the Company to immense losses and liabilities.

110.    Indeed, despite their disregard of the existence of red flags in the ARS market regarding the growing illiquidity in the ARS market by the beginning of 2007, Defendants knowingly or recklessly or negligently caused or allowed Morgan to sell ARS to unsuspecting customers without warning those customers of the inherent risks which they also knew or were reckless or negligent in not knowing.

**After 2007, Defendants Abandon the Auction Market, and It Collapses**

111.    Beginning in 2007, a credit crisis of unprecedented levels swept across the United States economy that continues to roil the nation's financial markets.

112.    By the middle of 2007, banks had stopped financing private equity deals, the prices of U.S. residential real estate had gone into a steep decline, and the mortgage market for sub prime borrowers had essentially shut down.  The collapse of the credit markets forced financial institutions such as Morgan to report billions of dollars in losses and write-downs.  The collapse also began to infect the ARS market.  Morgan was especially hard hit and was forced to seek additional capital infusions.

113.    At or about the same time, demand for ARS by Morgan's corporate and institutional clients evidenced a material deterioration following the publication of a March 21, 2007, decision by the Financial Accounting Standards Board requiring ARS to be listed on investors' balance sheets as "short-term investments," rather than as "cash equivalents."  Corporate investors responded to this FASB accounting change by disposing of their ARS so that their balance sheet cash positions would not be reduced, and their liquidity ratings would not suffer.  As a consequence, Morgan was almost immediately forced to retain more ARS inventory on its books than it could handle financially.

114.    A February 21, 2008, article distributed by *Newstex*, entitled "Did FASB Scupper the Auction-Rate Market?," explained what happened:

> Auction-rate securities certainly don't look very much like cash equivalents these days, as the WSJ shows, citing retail investor Naveen Ahuja, who is unable to sell $665,000 of the things.
>
> For investors like Mr. Ahuja, the unrest in a formerly sedate corner of the credit markets is hitting close to home.  In recent years, auction-rate securities have been sold to finance everything from hospital expansions to student loans.  Issuers liked them because they paid lower rates on an instrument that functioned much like long-term debt, which typically carries higher rates.  Investors liked them because they got higher rates than other so-called cash equivalents,

but they still could be liquidated quickly.  It seemed a marriage made in heaven – until the market failed.

Clearly auction-rate securities aren't "cash equivalents" any more, if they ever were.  So the Financial Accounting Standards Board looks positively prescient for once: way back in March 2007, it announced that the heading "cash equivalents" should be eliminated from balance sheets and cash-flow statements.  And a good thing too: investors don't want to be poring over balance sheets, wondering whether those "cash equivalents" are actually completely illiquid auction-rate securities.

*   *   *

**Corporations responded to [FASB] by moving out of the auction-rate securities so that their balance sheet cash positions would not take a hit.  This meant that many corporations were no longer in the market for the securities.  As corporate demand for auction-rate securities vanished, banks found themselves having to soak up more and more inventory.  The capital commitment required to do this grew at the same time the banks faced challenges from other parts of the credit markets.  Last week they decided that against committing additional capital to supporting the auction, and let them fail.**  [Emphasis added.]

115.    Despite these developments, Defendants struggled to maintain the illusion of a healthy and liquid market for Morgan's ARS, even after March 2007.  Thus, rather than disclose the weakening demand for ARS, Defendants caused or allowed Morgan to *market ARS to customers – even more intensely – as a liquid cash alternative*.  Indeed, Defendants caused or allowed Morgan to represent such securities as "money market and auction instruments" in the Company's monthly account statements to customers.

116.    Defendants caused or allowed Morgan to engage in this conduct, among other reasons, so that they could unload millions of dollars in ARS that they had warehoused within the Company to Morgan's own customers, before they became unmarketable.

117.    By August 16, 2007, several monthly auctions had failed amidst the turmoil in the credit markets.  That month, investors did not show to bid for about 60 auctions worth $6 billion of

ARS.  Also, some credit ratings agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

118.    Thereafter, auctions began failing with regularity, and those few that did succeed would have failed but for the intervention of Morgan and the other broker-dealers themselves. Following that time, Defendants regularly caused or allowed Morgan to continue to intervene so as to prop up the auction market by bidding with knowledge of other bids, by submitting bids after the internal bidding deadlines imposed on investors, and by directly or indirectly influencing or setting the clearing rates.  In short, despite their awareness or reckless or negligent disregard that there was, in fact, no legitimate auction demand for ARS, Defendants continued to cause Morgan to actively market and sell ARS as a liquid cash alternative.

119.    Moreover, after unloading as many ARS as they could from Morgan's inventory onto unsuspecting customers, Defendants directed Morgan to stop supporting auctions altogether and caused the Company to simply "walk away" from the ARS market.  Immediately thereafter, the ARS market collapsed.

120.    Accordingly, on February 13, 2008, a shocking ***87 percent*** of the auctions for ARS failed when Defendants caused Morgan to stop supporting the auctions, and when the other broker-dealers simultaneously abandoned the ARS market.  Immediately thereafter, thousands of investors, holding billions of dollars of ARS purchased from Morgan, were now left with highly illiquid and unmarketable securities.

**Defendants Market ARS to Investors as Safe and
Incentivize Sales Professionals to Move as Much ARS Inventory as Possible**

121.    Defendants worked aggressively throughout the Relevant Period to market ARS to unsuspecting Morgan customers as safe and liquid securities.  Indeed, through the Company's Financial Advisors and sales personnel, Defendants caused Morgan to market ARS to customers as

40

money market alternatives and liquid investments that could be liquidated at the customer's demand on the next auction date.   Monthly account statements sent to customers contained similar characterizations.   As a result, many customers invested in ARS funds that they might need for short-term requirements, such as money to fund business operations or even money intended to be used as a down payment on a house, medical expenses, college tuition, or taxes.   Defendants were aware or were reckless or negligent in not knowing that defendants had caused or allowed the Company to fail to adequately advise these and other customers that any funds invested in ARS could become illiquid, possible for long periods.

122.   As mandated by the terms of the 2006 settlement with the SEC, Defendants were required to cause to be made available to its customers the Company's ARS policies and procedures – including on the Company's website.   Although Defendants caused the Company to disclose certain features of the auction market, including the fact that insufficient bids *could* lead auctions to fail, these disclosures were inconsistent with Defendants' description of ARS as money-market equivalents and inconsistent with the marketing of ARS as liquid, short-term investments.

123.   In addition, Defendants did not disclose the extent to which the liquidity of ARS depended on Morgan itself bidding in the auctions.   Defendants used the Company's support for auctions, and its corresponding record of no failed auctions, to imply safety and liquidity in promoting ARS to Company customers.   Moreover, even if a customer had been informed that there were liquidity risks associated with ARS, that customer would not have been able to know that the liquidity risk, to a significant degree, depended on Morgan's own discretion in bidding to support the auctions.

124. Worse, these practices continued long after the ARS market had begun to be illiquid, and were even intensified. Accordingly, immediately after the first hint of investor concern with the ARS market emerged, Defendants mobilized to counteract any negative news.

125. Defendants were aware of, or recklessly or negligently disregarded, the fact that the Company's FAs and sales personnel were being caused or allowed to improperly market ARS to Morgan's customers as liquid investments and money market alternatives. Indeed, there was never any disclosure or discussion regarding the risk of any type of auction failure, or the possibility that any market dislocation could result in a customer's cash becoming illiquid. There was no discussion about the possibility that Defendants could decide at any time to cause Morgan to stop supporting the ARS market, or otherwise withdrawing from supporting the auctions that it managed. There was no mention of the fact that with the pressures that existed in the credit markets since August 2007, any auction failure by any auction dealer could spread contagion to the rest of the market.

126. Instead, Defendants caused or allowed the Company to understate the risks associated with investing in ARS, and customers were guided to focus only on the potential positives of ARS. At that time, Defendants caused or allowed Morgan to assist in and augment its organized sales campaign with the main purpose of reducing the Company's inventory positions and risks of loss, without regard to the impact on customers. At that time, it was already reasonably foreseeable and Defendants already knew or were reckless or negligent in not knowing of the materially impaired condition of the market – and the effect of Morgan's inevitable withdraw therefrom.

127. Despite reassuring customers, or causing or allowing the Company to publish such reassurances, that the ARS market remained a vibrant and healthy one, Defendants knew or were reckless or negligent in not knowing that the market was illiquid at that time. By no later than August 2007, as ARS auctions failed, Defendants could not ignore either the illiquidity of this

market or the inherent problems and abuses in the ARS sales and marketing operations within Morgan.

128.    For example, negative headlines concerning sub-prime mortgage concerns, asset-backed securities, and other derivative instruments were routinely appearing in the later half of 2007.

129.    In September 2007, for example, SVB Asset Management, a competing brokerage firm, issued an investor alert concerning ARS that addressed volatility in the ARS market, as well as "challenges stemming from a lack of market liquidity."  This report further stated that, market conditions continued to worsen for ARS in the fall of 2007 – a fact which Defendants did not disclose to investors.

130.    Defendants' failure to disclose the additional risk of failure of the ARS market, is further evidenced by the fact that, toward the end of the Relevant Period, Defendants caused or allowed the Company to lower the penalty rate applicable to auction failures.  This sudden modification – which negatively impacted the value of ARS to Morgan's customers – was made at the exact time that Defendants realized but failed to disclose that Morgan might well have to pay, or share in, the penalties.

131.    As Morgan investors (as well as Morgan's ARS customers) ultimately learned, the true condition of the ARS market at that time, which was known to or recklessly or negligently disregarded by Defendants, stood in sharp contrast to the aggressive public sales and marketing campaign touting the safety and quality of the auction market securities that Defendants caused or allowed the Company to promote to its sales staff and investors.[6]

--------------------------------

[6] The following episode provides further evidence of Defendants' lack of oversight and control over the marketing of ARS at Morgan:  During 2007, two Credit Suisse brokers, Eric Butler and Julian Tzolov, were accused of misleading clients about the nature of the ARS bought by those clients.

## HARM TO MORGAN FROM
## DEFENDANTS' ILLEGAL AND IMPROPER CONDUCT

132.    The harm inflicted on Morgan by Defendants is profound and will take years to recover from.

133.    Shortly after Defendants caused Morgan to "walk away" from the ARS market in February 2008, the Company received subpoenas from a number of state agencies, including Massachusetts and New York, relating to its sales of ARS.  Thereafter, the SEC also began  a formal investigation.  At least three federal securities class actions were commenced against the Company and its officers and directors.  *See* Exhibit A.

134.    On August 11, 2008, New York Attorney General, Andrew Cuomo, sent a letter to Morgan Stanley warning that the Company was in "the next group of market participants" to be investigated and urging the Company to begin "immediate talks."  The Attorney General's letter noted that broker-dealers such as Morgan Stanley had made false representations concerning ARS that had harmed "tens of thousands of consumers nationwide," including ***"fail[ing] to disclose to their retail clients and other customers that from August of 2007 up until widespread auction failures, which occurred in the early part of 2008, the auction rate securities market only continued as a result of broker-dealers placing support bids."***  (Emphasis added.)

135.    In response, Defendants proposed to obviate a proceeding by the New York Attorney General by promising only to use their "best efforts" to repurchase ARS from certain

---

According to a regulatory filing by Credit Suisse, the clients said they were told that the securities they purchased were backed by student loans.  In fact, the securities were backed by highly risky collateralized debt obligations, or pools of bonds tied in part to subprime mortgages.  Butler and Tzolov were suspended and resigned on September 7, 2007, with the firm acknowledging that they had "violated their obligations to Credit Suisse and to our clients."  Within days after resigning from Credit Suisse, Butler and Tzolov were *hired* by Morgan.  Only after the U.S. Attorney for the Eastern District of New York commenced a *criminal* investigation, did Morgan take action, firing the two brokers on July 7, 2008.

customers.  The Attorney General rejected that plan outright, as reported in an August 13, 2008,

article in *The Bond Buyer* entitled "Securities Firms: Cuomo Rejects Morgan Stanley ARS Buy-

Back Plan; Lack of Fines at Issue":

> WASHINGTON – Morgan Stanley late Monday became the fourth major securities firm to propose a buy-back of auction-rate securities from retail investors, but the offer was rebuffed by New York Attorney General Andrew Cuomo.
>
> The firm, ranked fourth-largest ARS underwriter according to Thomson Reuters, proposed a series of voluntary actions that would follow the blueprint established in state and federal regulator settlements with Citigroup Global Markets and UBS AG last week, including repurchasing at par $4.5 billion of ARS from retail investors.
>
> Merrill Lynch & Co. Inc. also last week proposed a voluntary ARS buyback program, which Cuomo also criticized for failing to contain certain investor safeguards.
>
> But while Morgan Stanley offered to use its "best efforts" to provide "liquidity solutions" for its institutional investor clients, it did not specify the dollar amount of ARS that those investors hold and it did not offer to pay any fines to state and federal regulators.
>
> Morgan Stanley proposed to repurchase at par the ARS held by retail customers with accounts of $10 million or less, beginning Sept. 30 through Nov. 30.  Citi and UBS agreed in principle to pay regulators $100 million and $150 million in fines respectively and also offered to help provide liquidity for institutional investors holding a specific amount of ARS.
>
> The firm also offered to reimburse the losses of any retail customers who purchased ARS from it before Feb. 12 and sold the securities before Aug. 11.  In addition, Morgan Stanley proposed to provide no-cost loans to investors who need immediate liquidity and to reimburse customers for any interest costs incurred under pervious loans the firm made to them.
>
> Under the proposal, retail clients would be able to contest any consequential damages beyond losses of liquidity in an arbitration process overseen by the Financial Industry Regulatory Authority, and Morgan Stanley would not challenge the existence or amount of those damages.
>
> The firm said it would use its "best efforts" to provide liquidity for institutional investors looking to cash out of their ARS that are still

frozen with the goal of resolving the liquidity concerns by the end of 2009.

136.    Similarly, the *Wall Street Journal*, in an article appearing the next day entitled "Common Sense: Auction-Rate Securities and the Ugly Truth," disclosed that:

> This week, Mr. Cuomo said his probe had been extended to include Morgan Stanley, J.P. Morgan Chase and Wachovia, and there's no indication it will stop there. Monday, Morgan Stanley announced it would buy back $4.5 billion in auction-rate securities – *a move that Cuomo calls "too little, too late."* [Emphasis added.]

137.    Thereafter – in what can only be characterized as an implicit admission of wrongdoing – Defendants announced that they had caused the Company to settle the New York Attorney General's charges.  The settlement announced on August 14, 2008 was particularly onerous and included the following terms:

(a)    By December 11, 2008, Morgan Stanley would purchase at par ARS that were not auctioning from all Morgan Stanley individual investors, small institutions (as defined by the terms of the settlement), and charities that purchased ARS from Morgan Stanley, in the amount of approximately **$4.5 billion par value** (later increased by Morgan to a $6.4 billion obligation);

(b)    Morgan Stanley would pay damages to investors who sold ARS at a loss;

(c)    Morgan Stanley would consent to a public arbitration procedure to resolve claims of consequential damages suffered by retail investors as a result of not being able to access their funds;

(d)    Morgan Stanley would "undertake to expeditiously provide liquidity solutions to all other institutional investors";

(e)    Morgan Stanley would reimburse all refinancing fees to any New York State municipal issuers who issued ARS through the Company since August 1, 2007; and

(f)      Morgan Stanley agreed to pay a **$35,000,000 fine** to the State of New York and the North American Securities Administrators Association.

138.    The New York Attorney General released an announcement which stated in part:

ATTORNEY GENERAL CUOMO
ANNOUNCES SETTLEMENTS WITH JP MORGAN
AND MORGAN STANLEY TO RECOVER BILLIONS
FOR INVESTORS IN AUCTION RATE SECURITIES

*Agreements will Return $7 Billion to Investors by Year's End*

*Morgan Stanley to Pay $35 Million Penalty
and JP Morgan to Pay $25 Million Penalty*

*Total Auction Rate Securities Settlements to Date: Approximately
30 Billion Dollars to More than One Hundred Thousand Investors*

NEW YORK, NY (August 14, 2008) - Attorney General Andrew M. Cuomo today announced another series of agreements to provide liquidity to consumers who purchased auction rate securities.  Under the agreements, JP Morgan Chase & Co. ("JP Morgan") and Morgan Stanley will collectively return over $7 billion to investors across New York State and the nation.  The agreements settle allegations that JP Morgan and Morgan Stanley made misrepresentations in their marketing and sales of auction rate securities.  ***JP Morgan and Morgan Stanley marketed and sold auction rate securities as safe, cash-equivalent products, when in fact they faced increasing liquidity risk.***

Within the past week, Cuomo has signed agreements restoring over $27 billion of liquidity to thousands of investors nationwide.

\*   \*   \*

"Returning billions of dollars back to investors not only protects their interests but also increases confidence in the entire market," said Attorney General Andrew Cuomo. "Today's multi-billion dollar agreements are the latest victories for investors seeking relief from the collapse of the auction rate securities market, which has left a stranglehold on billions of dollars. The industry is taking responsibility for correcting a problem they helped create, and that's a good thing. The fundamental goal has been to return money into the hands of investors, and that's what these deals do."   [Emphasis added.]

139.    In settling with the New York Attorney General, Defendants were unable to effect a settlement with the SEC or other states' regulators.  Shortly after the New York settlement was

reached, Linda Thomsen, the SEC enforcement director, said the agency's investigation of Morgan Stanley was "ongoing."

140.    As reported in an article entitled "JPMorgan, Morgan Stanley Agree to Settle; Firms Join Citi, UBS in Buy-Back Parade" appearing in *The Bond Buyer* on August 15, 2008, Defendants' misconduct in the ARS market had repercussions across the nation and led to enforcement proceedings in several states – proceedings which would not soon be settled:

> WASHINGTON – JPMorgan Chase & Co. and Morgan Stanley yesterday became the latest firms to reach auction-rate securities settlements with New York State Attorney General Andrew Cuomo and other states, agreeing yesterday to buy back at par a total of $7.5 billion of the illiquid securities from retail investors and pay fines of $60 million.
>
> The "agreements in principle" mean the four largest ARS underwriters have now reached tentative settlements over allegations that they misled investors while marketing the ARS as liquid, cash-like investments without disclosing the risks. The four firms have agreed to buy back or provide liquidity for a total of $36.4 billion of ARS and to pay $310 million in fines to New York and other states involved in the investigations.  Citigroup Global Markets and UBS AG reached ARS agreements in principle with state and federal regulators last week.
>
> Cuomo said in a press conference yesterday that "the nightmare will end" for investors who have been unable able to redeem their ARS since February, and that they "will be made whole" under these two latest settlement agreements.
>
> JPMorgan and Morgan Stanley are the third- and fourth-largest ARS underwriters, according to Thomson Financial, who will buy back ARS from retail investors who purchased them before mid-February. Retail investor include individuals, charities, and small businesses with accounts of $10 million or less in assets. JPMorgan agreed to buy back $3 billion by Nov. 12, which includes any ARS that was sold by Bear, Stearns & Co. prior to Feb. 12, and Morgan Stanley will buy back $4.5 billion by Jan. 11.
>
> The other terms in the settlement agreements followed the blueprint established by the Citi and UBS agreements.
>
> Both JPMorgan and Morgan Stanley will consent to an arbitration process, conducted by the Financial Industry Regulatory Authority, that will allow investors to claim consequential damages as a result of

frozen ARS. Both firms agreed to use their "best efforts" to provide "liquidity solutions" for their institutional investors holding ARS by the end of 2009. Those would be investors holding $10 million or more in assets with the firms.

JPMorgan will pay a fine of $25 million to New York and the North American Securities Administrators Association, while Morgan Stanley will pay $35 million. The fines will be divided on a pro rata basis according to the size of ARS holdings in each state, according to Cuomo.

141.    It is now almost half a year later, and still no settlement between Morgan and the SEC is in sight.  Indeed, the Company's Form 10-K Annual Report, filed on January 29, 2009, after disclosing the ARS settlements with state regulators, warns investors:  "*A separate investigation of these matters by the Securities and Exchange Commission ("SEC") remains ongoing.*"  (Emphasis added.)

142.    The amount of monetary penalties that Morgan will owe to the SEC in any settlement with that agency is likely to be very large.

143.    Despite the high cost of these settlements to the Company to date, the reality is that such settlements cover only a fraction of the Company's full liability related to its sale of ARS.  In fact, these settlements only cover Morgan's retail clients – not large corporate customers who constituted the bulk of the Company's ARS business.  For example, *Financial Week* [6/2/08] reported that some corporate investors in ARS backed by collateralized debt obligations would have to take huge charges, as those ARS had become, for all intents and purposes, worthless:

Companies that held auction-rate paper backed by collateralized debt obligations, for example, had little hope of recovering their money and were more likely to take a charge. That happened at Bristol-Myers Squibb, whose ARS have a par value of $807 million. The company has taken $456 million in impairment charges, $300 million of which were permanent.

144.    Moreover, although the settlement requires repurchases at par from the smaller investors, even those investors will have causes of action (e.g., for having had their assets frozen)

against Morgan – exposing it to hundreds of millions of dollars more in potential additional damages.[7]  Further, the settlements do not extend to investors holding ARS through mutual funds or brokerage firms that did not themselves underwrite the debt (as did Morgan).  Either these "downstream" purchasers – or the mutual funds or brokerage firms which directly bought the debt through Morgan – will have additional claims against the Company.  It is reasonable to expect that the amount of these private settlements with customers, or former customers, will far exceed the amount of the Company's settlements with a few state agencies.

145.    The liability to Morgan arising from Defendants' illegal and improper conduct related to causing or allowing Morgan to engage in the manipulation of the ARS market is already immense. The Company, in its annual report on Form 10-K, filed January 29, 2009, disclosed that as of the end of fiscal 2008 on November 30, 3008, it had already incurred some **$640 million** in charges and write-downs associated with the ARS repurchase program:

> *Auction Rate Securities.*    Under the terms of various agreements entered into with government agencies and the terms of the Company's announced offer to repurchase, the Company agreed to repurchase at par certain ARS held by retail clients that were purchased through the Company. In addition, the Company agreed to reimburse retail clients who have sold certain ARS purchased through the Company at a loss.  Fiscal 2008 reflected charges of ***$532 million for the ARS repurchase program and write downs of $108 million associated with ARS held in inventory*** (see Note 9 to the consolidated financial statements).  [Emphasis added.]

146.    Further, Morgan disclosed in the same filing that, as a consequence of repurchasing ARS from customers, it had experienced an additional **$1.7 billion** in losses related to transactions with monoline insurers:

---

[7] Defendants conceded this point in consenting to an arbitration procedure to determine consequential damages.

*Monoline Insurers.*   Monoline insurers ("Monolines") provide credit enhancement to capital markets transactions. ***Fiscal 2008 included losses of $1.7 billion related to monoline exposures.*** The current credit environment severely affected the capacity of such financial guarantors. The Company's direct exposure to Monolines is limited to bonds that are insured by Monolines and to derivative contracts with a Monoline as counterparty. The Company's exposure to Monolines at November 30, 2008 consisted primarily of asset-backed securities ("ABS") bonds of approximately $700 million in the Subsidiary Banks' portfolio that are collateralized primarily by first and second lien subprime mortgages enhanced by financial guarantees, $3.1 billion in insured municipal bond securities and approximately $500 million in net counterparty exposure (gross exposure of approximately $8.0 billion net of cumulative credit valuation adjustments of approximately $3.8 billion and net of hedges). The Company's exposure to Monolines at November 30, 2007 consisted primarily of ABS bonds of $1.5 billion in the Subsidiary Banks' portfolio, $1.3 billion in insured municipal bond securities and $800 million in net counterparty exposure. The Company's hedging program for Monoline risk includes the use of both CDSs and transactions that effectively mitigate certain market risk components of existing underlying transactions with the Monolines. ***The increase in the Company's exposure to Monolines from November 30, 2007 was primarily due to the ARS repurchase program as previously mentioned, as many ARS are insured by Monolines.***   [Emphases added.]

147.    Significantly, the $640 million and $1.7 billion losses set forth above were the result of Morgan repurchasing only $3.8 billion of the $6.4 billion of ARS it was obligated to repurchase from customers.[8]  Assuming that the losses increase linearly with the amounts actually repurchased from customers, such losses will eventually total **$1.1 billion** and **$2.9 billion**, respectively.

---

[8] Indeed, the Company's fourth quarter 2008 earnings release, dated December 17, 2008, stated: "Under the ARS settlement, approximately $6.4 billion of auction rate securities in client accounts were eligible for repurchase. As of November 30, 2008, Global Wealth Management Group repurchased approximately $3.8 billion of these assets."

148.    In the same filing, Morgan admitted that the ARS repurchases, including the effect from monoline transactions, "*significantly affected the Company's results in fiscal 2008 and fiscal 2007.*" (Emphasis added.)

149.    Finally, in the same document, Morgan admitted that, in the worst case, it could be required to book additional losses in the amount of *$2.6 billion* relating to ARS repurchases, *all of them within one year*:

### Guarantees.

The table below summarizes certain information regarding the Company's obligations under guarantee arrangements as of November 30, 2008:

| Type of Guarantee | Maximum Potential Payout/Notional Years to Maturity | | | | | Carrying Amount (Asset)/ Liability | Collateral / Recourse |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Less than 1 | 1-3 | 3-5 | Over 5 | Total | | |
| | | | | (dollars in millions) | | | |
| Notional amount of derivative contracts(1) | $985,276 | $1,098,775 | $1,915,444 | $1,563,384 | $5,562,879 | $659,296 | $ — |
| Standby letters of credit and other financial guarantees issued(2) | 1,102 | 1,813 | 1,977 | 4,445 | 9,337 | 98 | 4,794 |
| Market value guarantees | — | — | — | 658 | 658 | 35 | 144 |
| Liquidity facilities | 3,445 | 658 | 192 | 376 | 4,671 | 24 | 3,415 |
| General partner guarantees | 18 | 236 | 66 | 137 | 457 | 26 | — |
| *Auction rate security guarantees* | *2,572* | *—* | *—* | *—* | *2,572* | *193* | *—* |

(1)  Fair value amounts of derivative contracts are shown on a gross basis prior to cash collateral or counterparty netting.
(2)  Approximately $2.2 billion of standby letters of credit are also reflected in the "Commitments" table above in primary and secondary lending commitments.

The Company has obligations under certain guarantee arrangements, including contracts and indemnification agreements that contingently require a guarantor to make payments to the guaranteed party based on changes in an underlying measure (such as an interest or foreign exchange rate, security or commodity price, an index or the occurrence or non-occurrence of a specified event) related to an asset, liability or equity security of a guaranteed party. Also included as guarantees are contracts that contingently require the guarantor to make payments to the guaranteed party based on another entity's failure to perform under an agreement, as well as indirect guarantees of the indebtedness of others. The Company's use of guarantees is described below by type of guarantee:

*    *    *

*Auction Rate Security Guarantees.* **Under the terms of various agreements entered into with government agencies and the terms of the Company's announced offer to repurchase, the Company has agreed to repurchase at par certain ARS held by retail clients that were purchased through the Company.** In addition, the Company has agreed to reimburse retail clients who have sold certain ARS purchased through the Company at a loss. **The Company's maximum exposure as it relates to these repurchase obligations is based on the Company's best estimate of the outstanding ARS eligible under the repurchase program, which may change as and when more information about retail client auction rate security holdings becomes available.** The Company has recorded a liability at fair value related to these auction rate security purchase obligations. [Emphases added.]

150.    As a result of the foregoing, it is reasonable to expect that the economic impact on Morgan from Defendants' manipulation of the ARS market will be at least **$6.6 billion**.

<u>**Additional Damages To Morgan And Shareholders**</u>

151.    As a result of the Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now subject to drastically increased costs, both of operating in the normal course, and of satisfying extraordinary obligations incurred as a result of Defendants' malfeasance. Such expenditures include, but are not limited to:

(a)    costs incurred in connection with the investigation by the New York Attorney General, as well as the Office of the Illinois Secretary of State, Securities Department;

(b)    costs incurred in connection with the investigation by the SEC;

(c)    costs incurred in connection with the investigation by other state and/or federal agencies;

(d)    costs incurred in connection with defending investor class actions related to the manipulation of the market for ARS, expected to exceed tens or hundreds of millions of dollars in legal fees and settlement costs;

(e)     costs incurred to correct the Company's internal control procedures to remediate material weaknesses in the Company's pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between its Research Department and its sales and trading departments;

(f)     increased costs of capital as a result of a lowered share price and a balance sheet encumbered by billions of dollars of illiquid ARS that the Company should never have acquired in the first place;

(g)     potentially hundreds of millions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(h)     costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the manipulation of the ARS market;

(i)     costs incurred from potential losses of large trading partners who do not want to be associated with brokerages that improperly manipulate markets for securities they sell to customers, improperly fuse their Research and Sales & Trading operations, and lie about the liquidity of the securities they sell and their willingness to support the market for those securities; and

(j)     costs of downgrades of Morgan's debt and securities by financial analysts and creditors, due to concerns about the accuracy and integrity of the Company's financial practices and reporting.

152.     The Defendants' actions have irreparably damaged Morgan's corporate image and goodwill.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS REGARDING DEFENDANTS'
## MANIPULATION OF THE ARS MARKET AND THE IMPACT ON MORGAN

153.    Throughout the Relevant Period, Defendants issued or caused Morgan to issue public statements about the condition of the ARS market as well as the financial condition of the Company, that were false and materially misleading because they omitted to disclose the Company's growing exposure to losses on its inventories of ARS or the apparent illiquidity of the market.

154.    Thus, the Insider Selling Defendants were selling shares of Morgan stock while in possession of material adverse non-public information about the Company's true exposure to the losses and liabilities from ARS market misconduct, and while the Company was being caused to publish false statements about the condition of the ARS market and Morgan's foreseeable financial condition as a result of its dependence thereon.

155.    For example, on March 21, 2007, Defendants caused Morgan to release its earnings for the first quarter of fiscal 2007.  The earnings report stated in part that:

> *record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in the first quarter of 2006.*  Diluted earnings per share from continuing operations were a record $2.40 compared with $1.51 a year ago. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Non-interest expenses of $7.1 billion increased 17 percent from last year. The annualized return on average common equity from continuing operations was 28.8 percent in the current quarter, compared with 21.9 percent in the first quarter of 2006.  [Emphasis added; footnote omitted.]

156.    Defendants caused the release to highlight outstanding results at GWMG:

**Business Highlights**

\*    \*    \*    \*

- Global Wealth Management Group delivered a pre-tax margin of 15 percent and its highest quarterly revenues since 2000, as

financial advisor productivity and client assets per global representative reached all time highs and client assets in our bank deposit sweep program exceeded $16 billion.

157.    The release quoted defendant Mack as stressing the contribution to the Company's

overall results from GWMG:

> Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses. ***Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management.*** We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders. [Emphasis added.]

158.    The first quarter 2007 results were confirmed in the Company's Form 10-Q, filed on

April 6, 2007.  The Form 10-Q stated:

> ***Global Wealth Management Group.*** The Global Wealth Management Group ***recorded income from continuing operations before income taxes of $220 million compared with $15 million in the first quarter of fiscal 2006. Net revenues increased 18% from last year's first quarter to $1,490 million reflecting higher transactional revenues due to increased underwriting activity, higher asset management revenues reflecting growth in fee-based products and higher net interest revenue from the bank deposit sweep program.*** Total non-interest expenses increased 2% from a year ago to $1,270 million. Compensation and benefits expense increased, primarily reflecting higher incentive-based compensation accruals related to higher net revenues, partially offset by Global Wealth Management Group's share ($80 million) of the incremental compensation expense related to equity awards to retirement-eligible employees in the first quarter of fiscal 2006. Non-compensation costs decreased, primarily due to lower costs associated with legal and regulatory matters. ***Total client assets increased to $690 billion, up 11% from last year's first quarter. In addition, client assets in fee-based accounts rose 17% to a record $202 billion at February 28, 2007 and increased to 29% as a percentage of total client assets***

*from 28% a year ago.* At quarter-end, the number of global representatives was 7,993, a decline of 920 from a year ago, resulting largely from planned sales force reductions completed in the second quarter of fiscal 2006 and attrition. [Emphases added.]

159.    The Form 10-Q was signed for the Company by defendant Sidwell, and certified by both Sidwell and Mack.  Mack's certification stated:

I, John J. Mack, certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Morgan Stanley (the "registrant");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

160.    On March 27, 2007, Defendants Sidwell and Cruz presented at the European Banks and Financials Conference in London.  Sidwell stressed Morgan's dramatically increasing revenues, earnings, Return on Equity, and Earnings Per Share, and he highlighted the contributions of GWMG to the Company's results:

**Global Wealth Management Group**
• PBT of $220MM, up 33% from 4Q06
• Revenues of $1.5Bn, up 4% from 4Q06 and the highest quarterly revenue since 2000
• ROE was 32% and PBT Margin was 15%
• Record annualized average FA production of $748k
• Net new assets of $6.7Bn and record average assets per FA of $86MM
• Closed a $1.5Bn fund this quarter, our largest ever
• Sold UK retail business with pre-tax gain of $168MM

161.    June 20, 2007, Defendants caused the company to issue a press release announcing very positive results for the second quarter of fiscal 2007.  Defendants announced "record" earnings

per share from continuing operations, "record" quarterly net revenues of $11.5 billion (up some 32 percent); and "record" quarterly income from continuing operations.  Net income for the quarter was $2.5 billion.

162.   The results at GWMG were especially positive:

> *Global Wealth Management delivered its fifth consecutive quarter of improved performance and achieved a pre-tax margin of 16 percent.*  Client assets per global representative and financial advisor productivity reached all-time highs, and the Firm increased the number of global representatives to 8,137.  [Emphasis added.]

163.   Defendant Mack again touted the Company's results, and its bright future:

> Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term.

164.   The second quarter 2007 results were confirmed in the Company's Form 10-Q, filed on July 10, 2007.  The Form 10-Q stated:

> *Global Wealth Management Group*. The Global Wealth Management Group *recorded income from continuing operations before income taxes of $269 million, a 67% increase from last year's second quarter. Net revenues increased 17% from last year's second quarter to $1,642 million reflecting higher transactional revenues due to increased underwriting activity, higher asset management revenues reflecting growth in fee-based products and higher net interest revenue from growth in the bank deposit program*. Total non-interest expenses increased 11% from a year ago to $1,373 million. Compensation and benefits expense increased, primarily reflecting higher incentive-based compensation accruals due to higher net revenues and investment in the business. Non-compensation costs decreased, primarily due to lower costs associated with legal and regulatory matters. *Total client assets*

> ***increased to $728 billion, up 16% from last year's second quarter.***
> In addition, client assets in fee-based accounts rose 17% to $210
> billion at May 31, 2007 and represented 29% of total client assets. At
> quarter-end, the number of global representatives was 8,137, an
> increase of 46 from a year ago. [Emphases added.]

165.    The Form 10-Q was signed for the Company by defendant Sidwell, and certified by

both Sidwell and Mack.  Mack's certification stated:

> I, John J. Mack, certify that:
>
> 1.      I have reviewed this quarterly report on Form 10-Q of Morgan
> Stanley (the "registrant");
>
> 2.      Based on my knowledge, this report does not contain any
> untrue statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the circumstances
> under which such statements were made, not misleading with respect
> to the period covered by this report;
> 3.      Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the registrant as of, and for, the periods presented in
> this report . . . .

166.    On September 19, 2007, Defendants caused the company to issue a press release

announcing its results for the third quarter of fiscal 2007.  Although earnings were down from the

same period the previous year, Defendants boasted of "record" net revenues and net income for the

first nine months of 2007.  GWMG was again highlighted as a bright spot:

> ***Global Wealth Management delivered its sixth consecutive quarter
> of improved performance – with the third highest quarterly net
> revenues ever and a pre-tax margin of 17 percent***.  Client inflows of
> nearly $15 billion reached all-time highs, and annualized revenue per
> global representative was a record $817,000.  [Emphasis added.]

167.     Defendant Mack singled out GWMG for praise:

> Even with these turbulent markets, Morgan Stanley still delivered
> strong performances across many core businesses and achieved
> record results in our prime brokerage, derivatives and interest rate &
> currencies businesses.  ***In addition, we continued making progress
> in executing our growth plans and vastly improving performance in***

*Asset Management and Global Wealth Management.* [Emphasis added.]

168. The third quarter 2007 results were confirmed in the Company's Form 10-Q, filed on October 10, 2007. The Form 10-Q stated:

> *Global Wealth Management Group.* The Global Wealth Management Group *recorded income from continuing operations before income taxes of $287 million, a 78% increase from last year's third quarter. Net revenues increased 23% from last year's third quarter to $1,683 million reflecting higher transactional revenues due to increased underwriting activity, higher asset management revenues reflecting growth in fee-based products and higher net interest revenue from growth in the bank deposit program.* Total non-interest expenses increased 15% from a year ago to $1,396 million. Compensation and benefits expense increased, primarily reflecting higher incentive-based compensation accruals due to higher net revenues and investment in the business. Non-compensation costs remained flat from a year ago. Total client assets increased to $734 billion, up 14% from last year's third quarter. *In addition, client assets in fee-based accounts rose 15% to $211 billion at August 31, 2007 and represented 29% of total client assets.* At quarter-end, the number of global representatives was 8,341, an increase of 4% from a year ago. [Emphases added.]

169. The Form 10-Q was signed for the Company by defendant Sidwell, and certified by both Sidwell and Mack. Mack's certification stated:

> I, John J. Mack, certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Morgan Stanley (the "registrant");
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

170.    On November 13, 2007, defendants Kelleher and Cruz gave a presentation to the

Merrill Lynch Banking & Financial Services Investor Conference in.   In their presentation,

Defendants again highlighted the Company's growing revenues and earnings, and described GWMG

as a key factor in the Company's success:

> • $734Bn total client assets (as of
> 3Q07), 29% fee based assets
> • 6th consecutive quarter of client
> inflows
> • 71% of total client asset base in
> $1MM-plus households
> • Improved FA productivity:
> − Record $817,000 in 3Q07
> annualized revenue per FA
> (ranking #1 among peers) vs.
> $502,000 per FA in 2005
> − $88MM in client assets per
> FA as of 3Q07 vs. $65MM at
> the end of 2005

171.    On December 19, 2007, Defendants caused the company to issue a press release

announcing its results for the fourth quarter and full fiscal year.   Defendants announced that full-

year net revenues were $28 billion, the second highest in the Company's history.   Net income from

continuing operations for the year was $2.6 billion, although there had been a net loss for the fourth

quarter of $3.6 billion, due in substantial part to write-downs in U.S. subprime and other mortgage-

related assets.   This was the first quarterly loss in the Company's history as a public company.

Defendants nonetheless highlighted GWMG as having enjoyed

> **$6.6 billion and pre-tax income was $1.2 billion, a 127 percent
> increase from 2006. Pre-tax margin for the year and the fourth
> quarter of 17 percent and 21 percent, respectively, were the highest
> annual and quarterly margins since 2000**.   This business also
> achieved record annualized productivity per global representative of
> $853,000 in the quarter while increasing global representatives by 6
> percent over the past year, and generated strong client inflows of $40
> billion in the year. The Firm has also named Ellyn A. McColgan

President and Chief Operating Officer of Global Wealth Management effective April 2008.

172.    Defendant Mack apologized for the write downs but reassured shareholders that "we have moved aggressively to make the necessary changes [including a new leadership team], and these *isolated losses by a small trading team in one part of the Firm* should not overshadow the momentum we see in virtually all of our other businesses." (Emphasis added.)  Defendants further announced a long-term capital infusion of $5.6 billion from offshore investors.

173.    The 2007 results were confirmed in the Company's Form 10-K, filed on January 29, 2008.  The Form 10-K stated:

> ***Global Wealth Management Group.***    Global Wealth Management Group recorded income from continuing operations before income taxes of $1,154 million compared with $1,155 million in fiscal 2007. Fiscal 2008 included a pre-tax gain of $687 million related to the sale of Morgan Stanley Wealth Management S.V., S.A.U. ("MSWM S.V."), the Spanish onshore mass affluent wealth management business (see Note 20 to the consolidated financial statements). Fiscal 2008 also included a charge of $532 million associated with the ARS repurchase program and $108 million associated with subsequent writedowns of some of these securities that have been repurchased (see Note 9 to the consolidated financial statements). Net revenues were $7,019 million, a 6% increase over a year ago, primarily related to the previously mentioned sale of MSWM S.V. and higher net interest revenues from growth in the bank deposit program.  The increase in net revenues was partly offset by lower revenues from asset management, distribution and administration fees and lower investment banking revenues. The decline in asset management revenues reflected a change in the classification of sub-advisory fees due to modifications of certain customer agreements, the discontinuance of the Company's fee-based (fee in lieu of commission) brokerage program in the fourth quarter of fiscal 2007 pursuant to a court decision vacating an SEC rule that permitted fee-based brokerage and asset depreciation. Client assets in fee-based accounts decreased 32% from a year ago to $136 billion and decreased as a percentage of total client assets to 25% from last year's 27%. In addition, total client assets decreased to $546 billion, down 28% from the prior fiscal year-end, primarily due to asset depreciation.

Total non-interest expenses were $5,865 million, a 7% increase from a year ago. Compensation and benefits expense remained flat in fiscal 2008, as severance-related expenses of $41 million and investment in the business were offset by lower incentive-based compensation accruals. Non-compensation costs increased 25%, primarily due to the charge of $532 million for the ARS. In addition, fiscal 2007 included an insurance reimbursement related to a litigation matter. The increase in non-compensation costs was partly offset by a change in the classification of sub-advisory fees due to modifications of certain customer agreements. As of November 30, 2008, the number of global representatives was 8,426.

174.   The Form 10-K was signed for the Company by defendant Kelleher and each of the Director Defendants, including Mack, and certified by both Kelleher and Mack.  Mack's certification stated:

I, John J. Mack, certify that:

1. I have reviewed this annual report on Form 10-K of Morgan Stanley;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

175.   On January 29, 2008, defendants Chammah, Gorman, and Kelleher gave a presentation to the Citigroup Financial Services Conference.   In their presentation, Defendants highlighted the $5.6 capital infusion by Asian investors, which they said had "[s]trengthened [the Company's] balance sheet . . . ."   Defendants also highlighted the performance of GWMG:

**Highlights**
• Year-over-year revenue growth of 20%
• Year-over-year PBT growth of 127%
• Incremental margin on incremental revenues was 58% in 2007
• Grew headcount and productivity per FA

• Recruited(2) $253MM net T-12

176.    On February 6, 2008, defendants Petrick and Kelleher gave a presentation to the Credit Suisse Financial Services Conference.  In their presentation, Defendants summarized the Company's recent financial results and highlighted the Company's renewed focus on controlling risk.

177.    On March 19, 2008, Defendants caused the company to issue a press release announcing its results for the first fiscal quarter 2008.   Defendants announced that net revenues were $8.3 billion, and net income was $1.5 billion.  Once again, GWMG led the way, with

> *net revenues of $1.6 billion, up 6 percent from the first quarter of last year and a pre-tax margin of 16 percent. This business generated net new assets of $11 billion, the second highest on record and our eighth consecutive quarter of client inflows.* [Emphasis added.]

Defendant Mack highlighted the results at GWMG and stated that Defendants were "satisfied with how Morgan navigated the ongoing market turbulence."  Mack referred to "another solid quarter in investment banking and wealth management."

178.    The first quarter 2008 results were confirmed in the Company's Form 10-Q, filed on April 9, 2008.  The Form 10-Q stated:

> ***Global Wealth Management Group***.    Global Wealth Management Group recorded *income from continuing operations before income taxes of $254 million, up 12% from the first quarter of fiscal 2007. Net revenues were $1,606 million, a 6% increase from last year's first quarter*, primarily reflecting higher net interest revenue from growth in the bank deposit program and higher client activity. Total non-interest expenses were $1,352 million, a 5% increase from last year's first quarter.  Compensation and benefits expense increased 10%, primarily reflecting higher incentive-based compensation accruals due to higher net revenues and severance-related expenses. Non-compensation costs decreased 7%, as higher levels of business activity were more than offset by a change in the classification of sub-advisory fees due to modifications of certain customer agreements.  ***Total client assets increased to $722 billion, a 5%***

*increase from last year's first quarter.* In addition, client assets in fee-based accounts decreased 8% from last year's first quarter to $185 billion and decreased as a percentage of total client assets to 26% from 29%. The decline in fee-based assets as a percent of total client assets largely reflected the termination on October 1, 2007 of the Company's fee-based (fee-in-lieu of commission) brokerage program pursuant to a court decision vacating an SEC rule that permitted fee-based brokerage. At February 29, 2008, the number of global representatives was 8,456, an increase of 463 from a year ago. [Emphases added.]

179.    The Form 10-Q was signed for the Company by defendant Kelleher, and certified by both Kelleher and Mack.  Mack's certification stated:

> I, John J. Mack, certify that:
>
> 1.    I have reviewed this quarterly report on Form 10-Q of Morgan Stanley (the "registrant");
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

180.    On May 13, 2008, defendants Gorman and Kelleher gave a presentation to the UBS Global Financial Services Conference.  In their presentation, Defendants painted a highly optimistic picture of the GWMG, stating that it had "Accelerating Growth" and noting its "expense discipline," "product investments," "geographic focus," "talent," "improved client access and reporting," and "Firm of Choice for $1 million producers."

181.    Moreover, there was strong and continually growing "average liquidity reserve" at the Company – growing from $52 billion in the first quarter of 2007, to $68 billion in the second quarter of 2007, to $93 billion in the third quarter of 2007, to $120 billion in the fourth quarter of 2007, to $123 billion in the first quarter of 2008.

182.   On June 18, 2008, Defendants caused the company to issue a press release announcing its results for the second fiscal quarter 2008.   Defendants announced that net revenues were $6.5 billion, a 38 percent decrease from the same period the previous year, and net income was $1.0 billion.   The Company stated that "Global Wealth Management achieved net revenues of $2.4 billion" and that "[t]his business generated net new assets of $13.3 billion, the second highest ever, and our ninth consecutive quarter of client inflows."   Defendant Mack stated that, despite the bad results, "we stayed closed to shore and continued strengthening the Firm's capital and liquidity positions."

183.   The second quarter 2008 results were confirmed in the Company's Form 10-Q, filed on July 9, 2008.   The Form 10-Q stated

> **Global Wealth Management Group recorded income from continuing operations before income taxes of $989 million, as compared with $264 million in the second quarter of fiscal 2007. Net revenues were $2,436 million, a 48% increase from last year's second quarter**, primarily reflecting a gain related to the sale of MSWM S.V. (see Note 15 to the condensed consolidated financial statements).  Excluding the sale of MSWM S.V., net revenues were $1.7 billion, an increase of 4% from a year ago.  The increase in net revenues was primarily due to higher net interest revenue from growth in the bank deposit program and stronger transactional revenues reflecting higher fixed income trading volume, partly offset by lower asset management, distribution and administration fees. The decline in asset management revenues reflects the termination of certain fee-based brokerage programs in the fourth quarter of fiscal 2007 and a change in the classification of sub-advisory fees due to modifications of certain customer agreements, partly offset by growth in other fee-based products.  Total non-interest expenses were $1,447 million, a 5% increase from last year's second quarter. Compensation and benefits expense increased 9%, primarily reflecting higher incentive-based compensation accruals due to higher net revenues, bonuses paid to certain key employees upon completion of the sale of MSWM S.V. and investment in the business.  Non-compensation costs decreased 5%, as higher levels of business activity were more than offset by a change in the classification of sub-advisory fees due to modifications of certain customer agreements.  **Total client assets were $739 billion, an $11 billion**

*increase from last year's second quarter. In addition, client assets in fee-based accounts were $194 billion, an 8% decrease from last year's second quarter and decreased as a percentage of total client assets to 26% from 29%.* The decline in fee-based assets as a percent of total client assets largely reflected the termination on October 1, 2007 of the Company's fee-based (fee-in-lieu of commission) brokerage program pursuant to a court decision vacating an SEC rule that permitted fee-based brokerage. At May 31, 2008, the number of global representatives was 8,350, an increase of 213 from a year ago. [Emphases added.]

184.    The Form 10-Q was signed for the Company by defendant Kelleher, and certified by both Kelleher and Mack. Mack's certification stated:

> I, John J. Mack, certify that:
>
> 1.      I have reviewed this quarterly report on Form 10-Q of Morgan Stanley (the "registrant");
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

185.    On or about June 18, 2008, Defendants issued a presentation entitled "Morgan Financial Overview" for the second quarter of 2008, wherein they again boasted of the Company's excellent liquidity reserves – which had increased to $169 billion at the end of the second quarter of 2008.

186.     Each of the above enumerated press releases, SEC filings, and presentations was false and misleading in that it failed to disclose the following material, non-public information:

(a)     Morgan's earnings from ARS, which lay at the heart of GWMG's, and therefore the entire Company's, profits, were obtained by luring customers into believing that ARS were "safe," "liquid," "cash-equivalent" securities when, in fact, they were not;

(b)     The Company's earnings from ARS further depended on the maintenance of an illegal course of conduct to artificially prop up, and manipulate, the trading market for ARS by Defendants;

(c)     Defendants had determined to completely sell of the Company's inventories of ARS and then abandon the market altogether, an action which would strand thousands of customers with billions of dollars worth of illiquid and unmarketable securities and expose the Company to an obligation to repurchase those securities at par, whether imposed by prosecutors, private lawsuits, or otherwise;

(d)     In having to repurchase ARS sold to customers, the Company would be exposed to trading losses, write-downs associated with repurchasing inventory at par, charges on "monoline" exposure related to ARS and other liabilities;

(e)     The Company's integrity and reputation as an honest, worthy broker to clients was being undermined, which would affect its future business prospects from both individual and institutional clients;

(f)     The Company would be exposed to regulatory investigations and proceedings, civil penalties, damages, and legal fees and costs as a result of Defendants' misconduct;

(g)     The Company's Board of Directors had failed to carry out its most basic duties to ensure that Morgan responded promptly and thoroughly to SEC directives requiring changes in the ways ARS were traded and marketed to customers, and to ensure that it maintained adequate internal controls to ensure that transactions in ARS were legal, honest, and fair to customers;

(h)     The Company's own supposedly independent research department had been co-opted into the cause of selling illiquid ARS to unsuspecting customers, employing various

practices of undue influence that violated federal law, industry standards, and the Company's own policies and procedures; and

(i)      Defendants had paid themselves lavish salaries, bonuses, stock awards, and other compensation at a time when they had caused Morgan to face exposure in the billions of dollars for their wrongdoing.

## THE TRUTH EMERGES CONCERNING
## DEFENDANTS' MANIPULATION OF THE ARS MARKET

187.    The truth concerning the Company's exposure to losses and liabilities from Defendants' misconduct in the ARS market began to emerge in mid-August 2008.

188.    As of August 11, 2008, when the New York Attorney General's Office announced its investigation, Morgan's stock price stood at $45.39.  By the time Defendants had hurriedly settled with the New York Attorney General on August 14, 2008, Morgan's stock price had dropped to $40.64, and by August 21, 2008, it was down to $37.06 – a total drop of 18 percent in just eight trading days.

189.    On September 16, 2008, the other shoe dropped.  On that day, Defendants issued the Company's third quarter earnings for 2008, well below expectations.  The results included

> income from continuing operations for the third quarter ended August 31, 2008 of $1,425 million, or $1.32 per diluted share, compared with $1,474 million, or $1.38 per diluted share, in the third quarter of last year.  Net revenues were $8.0 billion, 1 percent above last year's third quarter.  Non-interest expenses of $6.1 billion increased 7 percent from a year ago.

196.    After the close of trading that day, defendant Kelleher discussed the results with analysts and investors.  During the conference call for analysts and investors, Kelleher revealed the initial impact of the charges related to Defendants' prior sales of ARS – including a $288 million charge – in part, as follows:

> [L]ast month we announced our intention to repurchase at par approximately $5 billion of auction rate securities held by retail

accounts of the firm. ***This has resulted in a provision of $288 million for the estimated difference between the purchase price and the market value of these securities at the date of purchase and other losses.*** This amount was almost entirely recorded in global wealth management. [Emphasis added.]

In other words, the charge taken against earning for auction rate losses, $288 million, was ***nearly six times as big*** as the decrease in earnings from the third quarter of 2007.

197.   The Company's Form 10-Q filed with the SEC confirming these results was issued on October 9, 2008, and signed by defendant Kelleher. In addition to confirming the Company's overall results, the Form 10-Q disclosed that the Company's earnings at GWMG had decreased from the same period in 2007 by $177 million (from $168 million in 3Q07 to negative $9 million in 3Q08). The Form 10-Q explained:

> ***Global Wealth Management Group recorded losses from continuing operations before income taxes of $34 million, as compared with income of $287 million in the third quarter of fiscal 2007, primarily reflecting a charge of $277 million for the announced buy-back program of auction rate securities (see Note 8 to the condensed consolidated financial statements).*** [Emphasis added.]

198.   The market's response to the Company's announcement of third quarter results was quick and dramatic. Morgan's stock price declined from $28.70 on September 16, 2008, to $21.75 on September 17, 2008 (a 24 percent decrease in a single day), on volume of 330 million shares which was nearly three times as high as the previous day's volume of 119 million shares. A chart of Morgan's stock prices (adjusted for splits and dividends) during the Relevant period appears below:



### INSIDER TRADING

199.    Between February 13, 2007 and continuing until such time that investors learned the truth about defendants illegal and improper conduct related to the ARS market, defendants **Mack, Lynch, Tyson, Cruz, Gorman, Kelleher, and Nides** (the Insider Selling Defendants), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market – and while the Company itself was announcing largely positive results and repurchasing millions of dollars worth of its own stock – sold over nearly **$27 million** of their personally held Morgan stock on the basis of their inside information.

200.    Before Defendants caused the Company to "walk away" from the ARS market in February 2008 and the Company's exposure to massive losses and liabilities began to be publicly known, defendants **Mack, Lynch, Tyson, Cruz, Gorman, and Kelleher, and Nides** made the following sales of stock:

| Defendant | Sale Dates | Shares | Average Price | Proceeds |
|-----------|-----------|--------|---------------|----------|
| **Mack** | 3/23/07 | 150,901 | 80.75 | 12,185,000 |
| | 3/26/07 | 56,430 | 80.05-81.28 | 4,552,000 |

| | | | | |
|---|---|---|---|---|
| | | **207,331** | | **16,737,000** |
| **Lynch** | 4/3/07 | 25,000 | 80.00-80.26 | 2,003,000 |
| | 1/22/08 | 21,362 | 46.35 | 990,128 |
| | | **46,362** | | **2,993,128** |
| **Tyson** | 4/6/07 | 15,000 | 72.42-73.54 | 1,095,000 |
| | | **15,000** | | **1,095,000** |
| **Cruz** | 9/10/07 | 30,712 | 62.88 | 1,931,000 |
| | | **30,712** | | **1,931,000** |
| **Gorman** | 2/19/08 | 53,779 | 42.23 | 2,271,087 |
| | | **53,779** | | **2,271,087** |
| **Kelleher** | 3/26/08 | 11,425 | 47.65-47.66 | 544,000 |
| | | **11,425** | | **544,000** |
| **Nides** | 9/4/07 | 9,642 | 63.56 | 612,845 |
| | 9/2/08 | 9,641 | 41.78 | 402,800 |
| | | **19,283** | | **1,025,645** |
| **TOTAL** | | *381,892* | | *$26,596,860* |

201.     At the time of the sale(s), each of the Insider Selling Defendants knew, or were reckless in not knowing of, the adverse, undisclosed facts set forth herein concerning Defendants' misconduct in the ARS market, and the resulting exposure of the Company to massive liabilities from that misconduct which was reasonably foreseeable at that time.  At or before the time of these sales, each of these defendants knew or were reckless or negligent in not knowing of Defendants' illegal and improper misconduct in the ARS market, as follows:

(a)     Mack was the CEO and Chairman of the Board of Directors, to whom all other officers and directors of the Company reported, including with respect to the

Company's practices in the ARS market; indeed, pursuant to the terms of the 2006 SEC settlement, Mack or Lynch was ordered to "certify in writing to the staff of the Commission that Respondent has implemented procedures that are reasonably designed to prevent and detect failures by Respondent to conduct the auction process in accordance with the auction procedures disclosed in the disclosure documents and any supplemental disclosures and that the Respondent is in compliance with Section IV.E of this Order"; he was therefore directly aware of the 2006 SEC administrative proceeding and the Company's failure to maintain operations in compliance with the requirements imposed on it by the SEC in agreeing to settle that proceeding;

(b)     Tyson is a director of the Company and has been a director for approximately 12 years.  She is the Chair of the Nominating and Governance Committee, with direct responsibility for the full Board's oversight of the Company's business practices in all its business lines, including the company's practices in the ARS market;

(c)     Gorman and Cruz were Co-Presidents of the Company, to whom all but one or two of the Company's other officers reported, including with respect to the company's practices in the ARS market;

(d)     Kelleher was Executive Vice-President, Chief Financial Officer and Co-Head of Strategic Planning, with primary responsibility for managing the financial risks of the Company, financial planning and record-keeping, and financial reporting to other officers and directors, including the Company results and practices in the ARS market; and

(e)     Lynch was the General Counsel of Morgan, with direct responsibility for ensuring the Company's compliance with all laws and regulations.  Pursuant to the terms of the 2006 SEC settlement, Lynch or Mack was ordered to "certify in writing to the staff of the

Commission that Respondent has implemented procedures that are reasonably designed to prevent and detect failures by Respondent to conduct the auction process in accordance with the auction procedures disclosed in the disclosure documents and any supplemental disclosures and that the Respondent is in compliance with Section IV.E of this Order"; he was therefore directly aware of the 2006 SEC administrative proceeding and the Company's failure to maintain operations in compliance with the requirements imposed on it by the SEC in agreeing to settle that proceeding.

202.    The Company was harmed by the Insider Selling Defendants' misappropriation of inside information in that, at the same time that many of the Insider Selling Defendants were selling their stock, Morgan itself was *buying* the stock.  During the Relevant Period, the Company, pursuant to a share repurchase program, repurchased nearly $4.5 billion of its own stock, broken down as follows:

| Period | Repurchase Amount |
|---|---|
| 12/1/06-2/28/07 | $1,200,000,000 |
| 3/1/07-5/31/07 | $1,400,000,000 |
| 6/1/07-8/31/07 | $600,000,000 |
| 9/1/07-11/30/07 | $550,000,000 |
| 12/1/07-2/29/08 | 0 |
| 3/1/08-5/31/08 | 0 |
| 6/1/08-8/31/08 | 0 |
| 9/1/08-11/30/08 | $700,000,000 |
| **Total** | $4,450,000,000 |

203.    The Company would not have engaged in its repurchases of its own stock if it had known of the material, non-public information possessed by the Insider Selling Defendants.

204.    The information was material, as established by the losses and liabilities, totaling in the multiple billions of dollars, that the Company will incur as a consequence of Defendants' misconduct in the ARS market.  The materiality is confirmed by the Company's stock price behavior after news of the misconduct began to be publicly known in the market, as set forth in paragraphs 187-198 hereof.

205.    The sales by the Insider Selling Defendants of their privately held Morgan stock while in possession of undisclosed material adverse information about the Company constituted a breach of their fiduciary duties to the Company.  In addition, it violated Morgan's corporate policy as contained in the Code of Ethics.

## CORPORATE WASTE AND UNEARNED COMPENSATION

206.    As set forth supra, paragraph 73, defendants Kidder, Bowles, and Nicolaisen, as members of the Compensation Committee, had ultimate authority at Morgan to review and approve corporate goals and objectives relevant to the compensation of Mack and all other Defendants.  All other Director Defendants, by virtue of their positions, had a similar obligation to ensure that the Company's resources were not squandered on inappropriate and unjustifiable compensation at a time of rapidly increasing exposure to losses and liabilities in the ARS market.

207.    Nonetheless, in fiscal 2007, while Defendants were engaging and causing or allowing the Company to engage in the illegal acts, practices and misconduct that would lead to losses and liabilities at Morgan far outstripping its total reported earnings, the Director Defendants caused the Company to pay lavish salaries and other compensation to certain officers who are also named as defendants herein.

208.    Based on each of the officers' purported achievement of the conditions specified by the Compensation Committee of the Board of Directors of the Company and the Committee Charter, and after a purported review by the Committee and the full Board of Directors, the 2008 Proxy Statement reported that Defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides received compensation in fiscal 2007 totaling over *$70 million*, as follows:

| Defendant | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Change in Pension Value and Nonqual-ified Deferred Compensation Earnings ($) | All other compensation ($) | Total |
|---|---|---|---|---|---|---|---|
| Mack | 800,000 | | | 11,461 | 391,844 | 399,153 | $  1,602,458 |
| Kelleher | 339,603 | 6,929,843 | 8,648,512 | 2,780,951 | 170,100 | 2,146,680 | $ 21,015,689 |
| Sidwell | 275,000 | 12,700,000 | 1,467,076 | 46,617 | | 120,000 | $ 14,608,693 |
| Scully | 500,000 | 5,075,000 | 9,425,000 | 1,714 | 209,498 | | $ 15,211,212 |
| Lynch | 300,000 | 6,308,375 | 5,266,625 | 1,046 | 17,818 | 6,100 | $ 11,899,964 |
| Nides | 300,000 | 3,936,250 | 1,938,750 | 434 | 7,033 | 150,681 | $  6,333,148 |
| **TOTAL** | | | | | | | **$70,671,164** |

209.    The 2008 Proxy Statement also disclosed that defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides received *an additional $78 million* in fiscal 2007, in stock options and restricted stock units, as follows:

| Defendant | Grant Dates | Stock Awards (shares or units) | Option Awards (securities underlying options) | Grant Date Fair Value |
|---|---|---|---|---|
| Mack | 12/12/06 | 542,618 | | $ 36,179,923 |
| | 12/12/06 | | 210,252 | $  4,019,934 |
| Kelleher | 12/12/06 | 36,844 | | $  2,456,633 |

| | 12/12/06 | | 144,551 | $ 2,763,757 |
|---|---|---|---|---|
| Sidwell | 12/12/06 | 120,199 | | $ 8,014,461 |
| | 12/12/06 | | 46,574 | $ 890,476 |
| | 11/14/07 | 2,777 | | $ 49,986 |
| | 11/14/07 | 5,277 | | $ 94,986 |
| Scully | 12/12/06 | 173,279 | | $ 11,553,655 |
| | 12/12/06 | | 67,141 | $ 1,283,709 |
| Lynch | 12/12/06 | 107,038 | | $ 7,136,930 |
| | 12/12/06 | | 41,474 | $ 792,966 |
| Nides | 12/12/06 | 46,027 | | $ 3,068,924 |
| | 12/12/06 | | 17,834 | $ 340,979 |
| TOTAL | | | | $78,647,319 |

210.   Thus, while the Company was becoming exposed to multiple billions of dollars in losses and liabilities related to ARS, defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides were being awarded, with the approval of all the Director Defendants, some *$150 million*.

211.   The above compensation was excessive, wasteful, and could not have been approved based on an informed business judgment of the Board.  In violation of their duty to tie compensation to actual, objectively measured, worthy performance, the Director Defendants spurned any objective analysis and simply distributed available cash to whoever happened to occupy executive positions.

212.   For example, in their attempt to justify distributing some $41.8 million to defendant Mack, the Compensation Committee, in its Committee Report in the Company's 2008 Proxy Statement, were constrained to acknowledge:

> **[s]ignificant writedowns of mortgage-related instruments and fourth quarter financial results:**   The significant writedowns of mortgage-related instruments and the Company's fourth financial quarter results were the primary factors considered by the CMDS Committee in determining Mr. Mack's compensation.

213.    But, after paying lip service to the Company's disastrous results, the Committee then struggled to list as many factors as it could to justify awarding defendant Mack his $41.8 million, none of which – separately or together, when viewed in the context of Morgan's mortgage-related write-downs (and its complete lack of overall success) – could have justified such an award:

- **Aggressive actions taken to address significant losses in mortgage securities market and build on momentum in other businesses:**   Mr. Mack held individuals accountable for the Company's fourth quarter results and took aggressive action to address the challenges created by changing market conditions . . . .

    *   *   *

- **Improved financial performance across most of the Company's businesses:**   Despite suffering a significant loss in our fixed income business, the Company continued to deliver improved financial performance across all of its other businesses, including record results in investment banking, equities and asset management and a 127% increase in Global Wealth Management pre-tax income.

- **Continued strengthening of the Institutional Securities franchise:**   The Company continued to deliver strong results across many areas of Institutional Securities (including record performance in equity derivatives, prime brokerage and interest rate and currencies and strong performance in M&A and commodities) and maintained leadership positions in many of our key client businesses.

- **Significantly improved performance in Global Wealth Management:**   Management has dramatically re-invigorated the business, delivering the seventh consecutive quarter of improved performance in the fourth quarter.

- **Dramatic progress executing Asset Management's growth strategy:**   Asset Management delivered its best year ever, with assets under management of $597 billion, up $101 billion from a year ago, and record net inflows of $35 billion for the year compared with net outflows of $9.3 billion a year ago. Pre-tax income increased 72%.

- **Continued build-out of the international franchise:**   The Company achieved record international revenues, up 44% from 2006. The Company also continued expanding its global footprint, particularly in key emerging markets including China, the Middle East and India.

- **Successful execution of transactions involving non-core businesses:**   The Company successfully executed two transactions involving non-core businesses. These were the Company's spin-off of Discover Financial Services on June 30, 2007 (Discover spin-off) and the initial public offering of MSCI Inc.

- **Resolution of legacy legal and regulatory issues:**   The Company has continued to resolve a number of legacy legal and regulatory matters. See Legal Proceedings in Part I, Item 3 of the 2007 Form 10-K.

214. Similarly, in attempting to justify distributing over $100 million to defendants Kelleher, Sidwell, Scully, Lynch, and Nides, the Committee stated:

> In determining the compensation of the other NEOs [named executive officers Kelleher, Sidwell, Scully, Lynch, and Nides] the CMDS Committee weighed the Company's overall financial performance. The CMDS Committee also took note of each NEO's respective contribution to the Company's accomplishments outlined above and reviewed and analyzed his individual performance:
>
> **Mr. Kelleher, Chief Financial Officer:**   The CMDS Committee considered Mr. Kelleher's accomplishments as Head of Global Capital Markets and his ***transition into the CFO role***, including ***helping the Company to address issues*** relating to the disruption in the mortgage securities market during the second half of the year.
>
> **Mr. Sidwell, former Chief Financial Officer:**  The CMDS Committee considered Mr. Sidwell's role as CFO for three quarters of the year, and in ***helping develop the Company's strategic growth plan*** and ***communicating it to the investment community***. The Committee also recognized his ***commitment to ensuring a smooth transition from his CFO role***.
>
> **Mr. Scully, Co-President:**   The Committee considered Mr. Scully's oversight of Asset Management, which delivered its best year ever in fiscal 2007, and his role in the successful completion of the Discover spin-off.
>
> **Mr. Lynch, Chief Legal Officer:**   The Committee considered Mr. Lynch's ***efforts in resolving a number of legacy legal and regulatory matters*** and his success in ***strengthening the Company's relationship with key regulators*** worldwide.
>
> **Mr. Nides, Chief Administrative Officer:**   The Committee considered Mr. Nides' role in ***supporting the Company's strategic initiatives***, as well as his role in managing the Company's Human Resources, *Government Affairs,* Communications, Corporate Services and other administrative functions.

215. Most of the factors set forth above, however, could apply to anyone holding the position at hand (e.g., Sidwell's "commitment to ensuring a smooth transition") and are inappropriate on their face to justify the immense amounts paid to these defendants. Particularly egregious is the encomium given to defendant Lynch for "strengthening" the Company's relationship with regulators: while Lynch was "strengthening" relationships with key regulators, he

simply disregarded the most important key regulator's explicit directive to ensure that the Company was complying with the settlement of the 2006 SEC administrative proceeding.

216.   The Committee's discussion makes clear that 2007 compensation was not tied to actual performance – either that of the Company or that of the individual recipients.  The report sets forth the Company's overall results as follows:

| Performance Priority | Measurement | Fiscal 2006 Level | Fiscal 2007 Level |
| --- | --- | --- | --- |
| Growth | Growth in net revenues | 26.8% | (6.1%) |
| Relative Returns | Return on equity from continuing operations | 23.8% | 7.8% |
| Profitability | Pretax profit margin | 30.5% | 12.3% |
| Relative Stock Price Growth | Core competitors | 3 of 11 | 7 of 11 |
| Price/Earnings Ratio | Core competitors | 10 of 11 | 8 of 11 |
| Price/Book Ratio | Core competitors | 7 of 11 | 4 of 11 |

Thus, with respect to most of the Committee's own, chosen measurements, Morgan's results were not only below target, they were significantly below target, including *negative* revenue growth and a *60 percent drop* in profits.

217.   The initial complaint in this action was filed on August 27, 2008, following which the Director Defendants substantially reduced overall senior executive compensation for fiscal 2008. Although precise figures (comparable to the information contained in the above charts) have not yet been disclosed, the Company disclosed the following in its December 17, 2008, earnings release:

> Given the extraordinary challenges facing the financial industry this year, the Firm's Board of Directors and senior management team have taken a number of steps regarding year-end compensation.
>
> - John Mack, Chairman and CEO, and Co-Presidents Walid Chammah and James Gorman have forgone a bonus for 2008. The 2008 year-end compensation for the 14 members of the Firm's Operating Committee is down an average of 75 percent, while the 2008 year-end compensation for the 35 members of the Management Committee is down an average of 65 percent versus last year.

- Excluding Financial Advisor compensation, the Firm's bonus pool is down approximately 50 percent for 2008, reflecting the difficult market conditions, stock price performance and our full-year earnings in this challenging environment. This bonus pool represents only one part of the Firm's total compensation costs - most of which are non-discretionary costs, including base salaries, 401(k) matching contributions, commissions to global representatives and benefits.

- The Firm's compensation-to-net revenue ratio for 2008 was 49.7 percent. Excluding severance of $791 million, the ratio was 46.5 percent.

- The Firm is implementing a new clawback provision in year-end compensation pertaining to part of the bonus deferral that could be triggered if an individual engages in certain conduct detrimental to the Firm causing, for example, the need for a restatement of results, a significant financial loss or other reputational harm to the Firm or one of its businesses.

218.    Notwithstanding the reductions in compensation in fiscal 2008, the compensation paid to defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides – in view of the Company's burgeoning losses and liabilities from Defendants' misconduct in the ARS market – also was excessive and constituted a waste of corporate assets.

### DEFENDANTS' DUTIES

219.    At all relevant times, Defendants had stringent duties to Morgan and its shareholders.  These duties arose by operation of law and were imposed upon them by the respective companies, by virtue of their positions at the Company.

### Duties at Law

220.    By reason of their positions as officers, directors, and/or fiduciaries of Morgan, and because of their ability to control the business and corporate affairs of those companies, Defendants owed the Company and their shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Morgan in a fair, just, honest and equitable manner.  Defendants were and are required to act in furtherance of the best

interests of Morgan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

221.    Each director and officer of Morgan owes to the company and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to their company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the company's stock would be based on truthful and accurate information. In order to adequately carry out these duties, it is necessary for Defendants to know and understand the material, non-public information should be either disclosed or not disclosed in their company's public statements.

222.    Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by their companies.  Because of their advisory, executive, managerial and directorial positions with their companies, each of Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of their companies.

223.    To discharge their duties, the officers and directors of Morgan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of their companies.  By virtue of such duties, these individuals were required to, among other things:

(i)      refrain from acting in any manner so as to favor the personal interest of the directors or officers of the company at the expense of the best interest of the company and its shareholders;

(ii)     ensure that the company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    conduct the affairs of the company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the company's assets, and to maximize the company's value;

(iv)     properly and accurately guide investors and analysts as to the true financial condition of the company at any given time, including making accurate statements about the company's financial results and prospects, and ensuring that the company maintained an adequate system of financial controls such that the company's financial reporting would be true and accurate at all times;

(v)      ensure that management was conducting legal, fair, and honest transactions with customers, and was not employing artifices or manipulations to maintain so-called "liquid" markets in securities, including ARS, that were not, in fact, liquid;

(vi)     ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets, including ARS;

(vii)    remain informed as to how the company conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices and make such disclosures as necessary to comply with federal and state securities laws;

(viii)   ensure that the company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(ix)   ensure that sufficient checks and balances in the company's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, misevaluation of ARS, manipulation of customer orders for ARS, and deception regarding ARS;

(x)   ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the company; and

(xi)   when in possession of material, non-public information about the Company, either disclosing that information before trading in the Company's stock or abstaining from such trading altogether.

224.   Each of Defendants, by virtue of his or her position as a director and/or officer of Morgan, owed their company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Morgan, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

225.   Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The

conduct of the Officer Defendants was ratified by the Director Defendants during the Relevant Period.

**Corporate Duties**

226.    Defendants emphasized the Company's commitment to the highest standards of ethical business conduct.

227.    Morgan adopted "Corporate Governance Guidelines" to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.   Among other things, these "Guidelines" provided that:

- directors should be "leaders in the companies or institutions with which they are affiliated and be selected based upon contributions they can make to the Board and management and their ability to represent the interests of shareholders";

- "[t]he Company's Bylaws require that the Chairman and Chief Executive Officer be the same person";

- "the Board generally favors the periodic rotation of Committee assignments and Committee chair positions";

- "[t]he Chairman should regularly consult with Committee chairs to obtain their insights and to optimize Committee performance";

- "The Committee chairs, working with the Chairman, should establish Committee agendas for the year[;] [a]ll standing Committees should meet regularly during the year and receive reports from Company personnel on developments affecting the Committee's work";

- "The Company's Chief Financial Officer and Chief Legal Officer regularly attend all scheduled Board meetings [and] the Chairman encourages these persons to respond to questions posed by Board members relating to their areas of expertise";

- "The Board also believes that Presidents of the Company's operating units and other officers can assist the Board with its deliberations and provide critical insights and analysis, particularly when the Board hears presentations on the business plan for the upcoming year[;] [a]ttendance of such officers allows the most knowledgeable and accountable executives to communicate directly with the Board [and] provides the Board direct access to individuals critical to the Company's succession planning";

- "Board members have complete and open access to senior members of management and other employees of the Company";

- "The Board believes that the Company should not enter into paid consulting arrangements with non-employee directors'; and

- "Directors shall not serve on the board of more than six (6) public companies, including Morgan."

228.    Morgan also had a "Code of Conduct" applicable to the entire Company, including

Defendants, providing, among other things, that:

- "Every director, officer and employee must protect our reputation by dealing fairly with clients, the public, competitors, suppliers and one another. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information or misrepresentation of facts";

- "Directors should disclose any actual or potential conflicts of interest to the Chairman of the Board and the Chief Legal Officer, who will determine the appropriate resolution. All directors must recuse themselves from any Board discussion or decision affecting their personal, business or professional interests";

- **"You may never, under any circumstances, trade, encourage others to trade, or recommend securities or other financial instruments while in the possession of inside information";**

- "We have a responsibility under the law to provide accurate and complete disclosure to the investing public, and to the extent that you are involved in the preparation of materials for dissemination to the public, you must ensure that the information is accurate and complete in all material respects. In particular, our senior financial officers, executive officers and directors must endeavor to promote accurate, complete, fair, timely and understandable disclosure in our public communications, including documents that Morgan files with or submits to the United States Securities and Exchange Commission and other regulators"; and

- "We are required to maintain accurate and complete books and records. Every business transaction undertaken by Morgan must be recorded on its books accurately and in a timely manner. You must be candid and accurate when providing information for these documents and never make false or misleading entries. In particular, senior financial officers must endeavor to ensure that financial information included in Morgan's books and records is correct and complete in all material respects."

229.    In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees, highlighted in paragraphs 69-77 above.

230.    Finally, Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required Defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## CLAIMS FOR RELIEF

### COUNT I

**Derivatively Against Defendants for Breach of Fiduciary Duties**

231.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

232.    Defendants owed Morgan fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

233.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Each of Defendants had actual or

constructive knowledge that Defendants had caused the Company to manipulate the market for ARS, deceive its own customers, become exposed to government investigations, lawsuits, and the need to repurchase or otherwise carry billions of dollars of essentially worthless ARS on its books, and mislead shareholders.

234.    Defendants consciously failed to implement an effective system of internal controls over the Company's ARS marketing and trading operations and/or consciously failed to oversee the operations of such control systems.

235.    Defendants failed in good faith to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company's trading and marketing operations of ARS.

236.    Defendants caused excessive and unearned compensation to be paid to defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides, at a time when the Company itself was becoming exposed to multiple billions of dollars in losses and liabilities related to ARS.

237.    As a direct and proximate result of the Morgan Defendants' failure to perform their fiduciary obligations, Morgan sustained significant damages.  As a result of the misconduct alleged herein, each of Defendants is liable to the Company for the payment of money damages.

## COUNT II

**Derivatively Against the Insider Selling Defendants for Breach of Fiduciary Duties**

238.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

239.    At the time of each of the stock sales set forth herein, each of the Insider Selling Defendants knew, but did not disclose publicly, the material information described herein.  Each of the Insider Selling Defendants made each of his or her sales of stock on the basis of and because of his or her knowledge of this material, non-public information.  Such information was a corporate

asset of the Company that could not be used by these defendants to their advantage regardless of whether the Company suffered any harm thereby.

240.    At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's stock would dramatically decrease.  These defendants' sales of the Company's common stock based on their knowledge of the material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

241.    As a result of this misconduct, the Insider Selling Defendants are liable to the Company for repayment of improperly received insider profits.  The Company  is entitled to have a constructive trust imposed on any proceeds obtained by these defendants obtained thereby.

### COUNT III

**Derivatively Against the Defendants Mack, Kelleher, Sidwell, Scully,
Lynch, and Nides for Unjust Enrichment and Restitution of Unearned Compensation**

242.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

243.    Defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides were eligible for incentive compensation premised upon their achievement of Morgan's business and financial goals in a legitimate and lawful manner.  Each of these Defendants received substantial incentive compensation payments.

244.    By reason of their positions as officers of Morgan, these Defendants owed fiduciary duties to the Company and its shareholders in connection with the operation, management, and direction of the Company.

245.    Defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides failed to achieve Morgan's business and financial goals except in an illegitimate and unlawful manner.  Accordingly,

the compensation payments to these defendants were not properly awarded for the work performed and results achieved.  Since these defendants did not obtain the business results expected, they have been unjustly enriched and must return to the Company the incentive compensation that was awarded to them.

246.     Plaintiffs have no adequate remedy at law.

## COUNT IV

### Derivatively Against Defendants for Contribution

247.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

248.     The conduct of Defendants has exposed Morgan to significant liability under various federal and state laws.

249.     By reason of the foregoing, Defendants have caused the Company to suffer substantial harm.

250.     If the Company is held liable under federal or state laws for damages, civil penalties, restitution, or other relief, Defendants are liable to the Company for contribution.

## COUNT V

### Derivatively Against Defendants for Corporate Waste

251.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

252.     As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Defendants caused the Company to waste valuable corporate assets by awarding excessive compensation to senior executives.

253.     As a direct and proximate result of Defendants' waste of corporate assets, Defendants are liable to the Company or its Parent.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.     Against all Defendants and in favor of Morgan for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants, and the proceeds to the Insider Selling Defendants from their sales of the Company's common stock based on material, non-public information, so as to assure that Plaintiffs have an effective remedy;

C.     Declaring that Defendants' improper payments to themselves through the Company of unearned bonuses, compensation, stock awards, fees, and other illicit transfers – as well as any assets or property acquired with such payments – be held in constructive trust for the benefit of the Company;

D.     Awarding to Morgan restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

E.     Directing Morgan to take all necessary actions to reform and improve their corporate governance and internal procedures regarding the pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between the Company's research departments and their sales and trading departments, so as to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for

amendments to the Company's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

(i)     strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)    controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments, including instituting a performance-based "clawback" policy whereby bonuses and other incentive-based compensation paid to Company officers must be returned by those officers to the Company if later found to be based on incorrect financial statements;

(iii)   permitting shareholders to nominate at least three additional candidates for election to the Board;

(iv)    appropriately testing and then strengthening the internal audit and control functions demanded herein;

(v)     establishing enhanced minimum qualifications for members of the committees of the Board which have oversight of ARS, regulatory affairs, and the relationship of the research department to the sales and trading department;

(vi)    establishing a committee of the Board charged with monitoring and minimizing the risk to the Company from activities in various types of derivative securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or customers, or damage its reputation;

(vii)    erecting an unbridgeable ethical wall between the Research Department and the Sales & Trading and other departments at the Company which generate revenue from the sale of securities analyzed by the Research Department, precluding employees of the Sales & Trading and other departments from influencing the content of the Research Department's reports;

(viii)    reforming the Company compensation policies so as to preclude the payment of any compensation to Research Analysts which would encourage the analysts to provide other than objective reports which reflect the honest assessments of the analysts to the best of their knowledge, information, and belief;

(ix)    preventing the Company from underwriting or selling any new derivative securities without adequate safeguards that such securities will trade in a liquid market without the need for supportive or manipulative activities by the Company that violate Company policies, ethical norms, industry standards, or federal or state securities laws; and

(x)    separating the office of Chairman of the Board from Chief Executive Officer and ensuring that the Company always has an Chairman who is independent of management.

F.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  February 2, 2009

KAHN GAUTHIER SWICK, LLC

By:_____

Lewis S. Kahn (admitted pro hac vice)
*lewis.kahn@kgscounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@kgscounsel.com*
Kevin Oufnac (admitted pro hac vice)
*kevin.oufnac@kgscounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax:  (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Fax: (504) 455-1498

*Attorneys for Plaintiff Louisiana Municipal Police*
*Employees Retirement System*

-and-

ROY JACOBS & ASSOCIATES
Roy L. Jacobs (a member of the bar of this Court)
*rjacobs@jacobsclasslaw.com*
60 East 42nd Street
New York, NY  10165
Telephone:  (212) 685-0969

PASKOWITZ & ASSOCIATES
Laurence D. Paskowitz (a member of the bar of this
        Court)
*classattorney@aol.com*
60 East 42nd Street
New York, NY  10165
Telephone:  (212) 685-0969
Fax: (212) 685-2306

*Attorneys for Plaintiff Terry G. Thomas*

## **VERIFICATION**

I, Albert M. Myers, Esq., aver under penalty of perjury of the United States that, as counsel for plaintiff Louisiana Municipal Police Employees Retirement System, I have reviewed the foregoing Consolidated Shareholder Derivative Complaint, and that the allegations are true and correct to the best of my knowledge and belief.

_____

Albert M. Myers

**Exhibit A**

**Partial List of Litigation and Governmental
Proceedings Against Morgan Stanley Related to ARS**

| Matter Name | Jurisdiction | Summary of Claims | Damages Sought |
|---|---|---|---|
| *Miller v. Morgan Stanley & Co. Inc., et. al.,* No. 08-3012 | S.D.N.Y. | On behalf of individuals who allegedly had their ARS "frozen" by Morgan Stanley, this complaint alleges that Morgan Stanley failed to disclose material facts with respect to ARS and thereby violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. | compensation for **billions** of dollars in ARS transactions |
| *Jamail v. Morgan Stanley & Co., et. al.,* No. 08-3178 | S.D.N.Y. | On behalf of individuals who allegedly had their ARS "frozen" by Morgan Stanley, this complaint alleges that Morgan Stanley failed to disclose material facts with respect to ARS and thereby violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. | compensation for **billions** of dollars in ARS transactions |
| *Bartholomew v. Morgan Stanley & Co., Inc.,  et al.,* No. 08-4910 | S.D.N.Y. | On behalf of individuals who allegedly had their ARS "frozen" by Morgan Stanley, this complaint alleges that Morgan Stanley made misrepresentations and omissions with respect to ARS and breached a fiduciary duty to the putative class by failing to participate in auctions and asserts claims under the Investment Advisers Act of 1940 and state law | compensation for **billions** of dollars in ARS transactions |

| | | | |
|---|---|---|---|
| *Louisiana Sheriffs Pension and Relief Fund, et al. v. Conway, et al.*, No. 08-650364 | N.Y. Supreme | Securities class action on behalf of purchasers of bonds and preferred stock pursuant to a shelf registration which "failed to disclose that the Company . . . was responsible for significant liability arising out of its participation in the market for auction rate securities" | on behalf of purchasers of **$32 billion** of ARS |
| *In re Morgan Stanley & Co., Inc.* | SEC Enforcement Division | Ongoing investigation | |
| *In re Morgan Stanley & Co., Inc.* | Joint investigation of New York Attorney General, Office of the Illinois Secretary of State, Securities Department, Texas State Securities Board and other state entities | Repurchase and remediation | Settlement requiring Morgan Stanley to repurchase approximately **$4.5 billion** in ARS (later increased to **$6.4 billion**) and pay **$35 million** penalty |
| *In re Morgan Stanley & Co., Inc.* | Massachusetts Secretary of the Commonwealth, Securities Division | Repurchase and remediation | Settlement requiring Morgan Stanley to repurchase auction rate securities from small to medium sized businesses with accounts of $10 million or less |
| *In re Morgan Stanley & Co.,Inc.* | Office of the Massachusetts Attorney General | Repurchase and remediation | Settlement requiring Morgan Stanley to repurchase auction rate securities from Massachusetts municipalities |

**U8 CIV 10753**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, :

Plaintiff, :                    $\mathcal{ECF\ CASE}$

v. :                             Civil Action No.

CITIGROUP GLOBAL MARKETS, INC. :

Defendant. :

---

RECEIVED
DEC 11 2008
U.S.D.C. S.D. N.Y.
CASHIERS

### **COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges the

following against Defendant Citigroup Global Markets Inc. ("Citi" or "Defendant"):

### **NATURE OF THE ACTION**

1.      This is a case in which the Defendant misled tens of thousands of its customers

regarding the fundamental nature and increasing risks associated with auction rate

securities ("ARS") that Citi underwrote, marketed and sold. Through its financial

advisers ("FAs"), sales personnel, and marketing materials, Citi misrepresented to

customers that ARS were safe, highly liquid investments comparable to money market

instruments. As a result, numerous customers invested in ARS funds they needed to have

available on a short-term basis.

2.      Citi historically had committed it own capital to support ARS auctions for which

it served as the lead manager so that those auctions did not fail. During the fall of 2007,

the credit crisis and deteriorating market conditions caused Citi to have to support its

auctions to a greater extent. Citi knew the ARS market was deteriorating and Citi's

1

inventory of ARS was significantly increasing. Accordingly, Citi knew the risk of failed auctions had materially increased. Citi knew these material facts but did not disclose to its customers timely, complete, and accurate information about them.

3.      In mid-February 2008, Citi decided to stop supporting the auctions. On February 11, 2008, Citi stopped supporting its student loan ARS auctions, and those auctions failed. On February 12, 2008, Citi stopped supporting its auctions for other ARS with low maximum rate resets, and those auctions failed. As a result of failed auctions, tens of thousand of Citi customers held approximately $45 billion of illiquid ARS, instead of the liquid short-term investments Citi had represented ARS to be.

4.      By engaging in the conduct described in the Complaint, the Defendant violated Section 15(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(c)]. Accordingly, the Commission seeks: (a) entry of a permanent injunction prohibiting the Defendant from further violations of the relevant provision of the Exchange Act; (b) the imposition of a civil penalty against the Defendant; and (c) any other relief this Court deems necessary and appropriate under the circumstances.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to Sections 21(d)(1), 21(e), 21(f), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u(f), and 78aa].

6.      Citi, directly or indirectly, used the mails and means and instrumentalities of interstate commerce in connection with the acts, practices, and courses of business alleged herein.

7.      Venue is appropriate in this District pursuant to Section 27 of the Exchange Act because Citi is found, has its headquarters and principal executive offices, and transacts business in this District.

## DEFENDANT

8.      Citigroup Global Markets Inc., a wholly-owned brokerage and securities subsidiary of Citigroup Inc., is incorporated and has its headquarters, principal executive offices, and short-term trading desk in New York, New York. Citigroup Global Markets is registered with the Commission as a broker-dealer. Among other services, Citi provided underwriting services for issuers of ARS and marketed ARS to retail and other customers located throughout the United States.

## FACTUAL ALLEGATIONS

### Description Of ARS

9.      ARS are bonds issued by municipalities, student loan entities, and corporations, or preferred stock issued by closed-end mutual funds, with interest rates or dividend yields that are periodically reset through frequent auctions, typically every seven, fourteen, twenty-eight or thirty-five days. ARS are usually issued with maturities of thirty years, but the maturities can range from five years to perpetuity.

10.     The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process. If the issuer selects more than one broker-dealer, then the issuer designates one of the broker-dealers as the lead broker-dealer, which is primarily responsible for managing the auction process. Customers can only submit orders for that ARS through the selected broker-dealers.

3

11.     Each participating broker-dealer accepts orders from its customers, as well as from non-participating broker-dealers, and then submits the orders to the auction agent, which runs the auction. Customers bid the lowest interest rate or dividend they are willing to accept. The auction clears at the lowest rate bid that is sufficient to cover all of the securities for sale, and that rate applies to all of the securities in the auction until the next auction. If there are not enough bids to cover the securities for sale, then the auction fails. If an auction fails, then the issuer pays a maximum rate, which either is a pre-determined flat rate or a rate set by a pre-determined formula described in the disclosure documents. The maximum rate may be higher or lower than the prior auction rates or the rates available on similar securities of similar credit quality and duration in the market place.

### Citi's Role In The ARS Market

12.     Citi marketed ARS to public and private issuers as an attractive way to obtain financing. ARS are long-term obligations that re-price frequently using short-term interest rates, which typically are lower than long-term rates.

13.     Citi marketed ARS to customers as an investment that offered "[c]ompetitive short-term interest rates compared with other money market instruments."

14.     For certain ARS, Citi was the sole or lead broker-dealer. Citi's practice, as was the practice of other broker-dealers participating in the ARS market, was to submit cover or support bids in all auctions for which it was the lead broker-dealer so that the auctions would not fail.

15.     If Citi's cover bid was "hit," then Citi would purchase for its inventory the amount of ARS necessary to prevent a failed auction. Citi tried to sell the inventory in

4

the secondary market between auctions and submitted sell orders for any ARS it still held at the next auction.

16.     Citi received a fee from ARS issuers for underwriting the ARS offering. Citi also received an annual fee from ARS issuers for remarketing the ARS. For ARS that it placed with customers or held in inventory, Citi received higher fees than for other short-term instruments.

### Citi Marketed ARS As Money Market Alternatives

17.     Through its FAs and sales personnel, Citi marketed ARS to its customers as money market alternatives and liquid investments that could be liquidated at the customer's demand on the next auction date. As a result, some customers invested in ARS funds that they might need for short-term requirements, such as for a down payment on a house, medical expenses, college tuition, or taxes. In many cases, Citi did not adequately advise these and other customers that, under certain circumstances, any funds invested in ARS could become illiquid, possibly for long periods.

18.     Monthly account statements sent to Citi customers listed certain types of ARS under the heading "money market and auction instruments." These characterizations could have caused customers who received such statements to reasonably believe that the safety and liquidity features of their ARS investments were similar to those of other money market instruments.

19.     Citi's association of ARS with money market alternatives was misleading because of the illiquidity risks associated with ARS.

### Citi's Disclosures Did Not Negate Citi's Misleading Marketing of ARS

20.    Citi posted its ARS practices and procedures on its website, but these disclosures

were inadequate and did not negate Citi's marketing of ARS as liquid investments that

were an alternative to money market instruments.

21.    According to Citi's practices and procedures, "From an investor's

perspective,...ARS are generally viewed as an alternative to money market funds."

22.    Citi had disclosures relating to, among other things, an "Existing Holder's Ability

to Resell Auction Rate Securities May be Limited" that stated in part:

> Existing holders will be able to sell the ARS in an auction only if there are bidders
> willing to purchase all the ARS offered for sale in the auction. If sufficient
> clearing bids have not been made, existing holders that have submitted sell orders
> will not be able to sell in the auction all, and may not be able to sell any, of the
> ARS subject to such submitted sell orders. ... Citigroup may submit a bid in an
> auction to keep it from failing, but it is not obligated to do so. There may not
> always be enough bidders to prevent an auction from failing in the absence of
> Citigroup bidding in the auction for its own account. Therefore, failed auctions
> are possible, especially if the issuer's credit were to deteriorate, if a market
> disruption were to occur or if, for any reason, Citigroup were unable or unwilling
> to bid.

Citi's disclosures regarding auction failures, however, were inconsistent with its

description of ARS as "an alternative to money market funds" and inconsistent with its

marketing of ARS as liquid, short-term investments.

23.    In addition, Citi did not disclose the extent to which the liquidity of ARS

depended upon Citi bidding in the auctions. Citi used its support of auctions, and

corresponding record of no failed auctions, to imply safety and liquidity in promoting its

ARS to certain customers. Consequently, even if a customer had been informed that

there were liquidity risks associated with ARS, the customer would not know that that the

liquidity risk, to a significant degree, depended upon Citi's discretion to bid to support

auctions.

24.     Moreover, Citi did not take adequate steps to adequately ensure that its FAs and

sales personnel were aware of Citi's practices and procedures and/or aware that auctions

could fail and render the ARS illiquid.  At least some FAs and sales personnel did not

know this information, and, consequently, did not provide this information to customers.

As a result, many Citi customers indicated that they understood from their FAs that ARS

were short-term, liquid instruments to manage their cash.

### Citi Knew Or Was Reckless In Not Knowing That Its FAs And Sales Personnel Marketed ARS To Customers As Money Market Alternatives And Did Not Adequately Disclose The Risks Associated With These Securities

25.     Citi was aware that its FAs and sales personnel marketed ARS to customers as

liquid investments and money market alternatives.

26.     In August 2007, when concerns about ARS were heightened at Citi, internal

documents provided to senior management discussed the implications if Citi were to stop

supporting auctions.  The documents stated, "Investors and issuers might believe that

there is implied liquidity provided by Citi because we have marketed the fact that we

have never had a failed auction as lead manager in twenty years," and also identified the

risk of lawsuits.  Short-Term Trading management also discussed the implications in a

separate document: "Implied liquidity: bankers, salespeople and trades have implied the

concept of liquidity provided by Citi for investors and issuers for over 20 years."  The

document also identified "a risk of lawsuits initiated by thousands of retail investors, high

net worth clients and institutional clients because Auction Rate Securities (ARS) have

7

been marketed as 'money market alternatives' and 'liquid investments' for 20 years. The hundreds of ARS issuers may also seek litigation against Citi."

27.    Senior managers received an internal presentation, dated November 1, 2007, that stated, "Investors purchase ARS as a high-yielding money market alternative to CP [commercial paper] and CD's."

28.    Moreover, Citi was aware that at least some customers in ARS were unsophisticated investors.

29.    Citi also was aware that many of its customers did not understand the liquidity risks associated with ARS, including that ARS are long term securities without assured liquidity other than through the auction process.

### Citi Failed To Disclose That, By Late 2007, Citi's Ability To Support Auctions Was Impaired

30.    Prior to February 2008, Citi had supported its ARS auctions, and, consequently, had never had a failed auction since it began marketing ARS in the 1980s.

31.    Historically, Citi's inventory from supporting auctions ranged from approximately $1 to $2 billion, and this amount of ARS inventory was within the balance sheet limit that Citi had set as the amount of capital resources that Short-Term Trading could use to purchase the ARS necessary to prevent failed auctions. Accordingly, Citi historically was willing and able to support its ARS auctions. That situation began to be stressed in August 2007.

32.    By August of 2007, the credit crisis had created significant balance sheet stress for Citi, as well as for other financial services firms. This balance sheet stress affected Citi's ability to purchase additional assets, including ARS, because Citi would have had to use its capital resources for the purchase. At the same time, the ARS market was

8

deteriorating. In mid-August, an internal email stated that "there are definitely cracks forming in the market. Inventories are starting to creep higher in the market and failed auction frequency is at an all time high."

33.     Beginning in August 2007, as Citi increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of Citi's ARS inventory reached the internal balance sheet limit that Citi had set for its ARS inventory.

34.     Short-Term Trading management, and the heads of banking units that underwrite ARS, realized that without an increase to the inventory limit set for ARS, Citi could not purchase the ARS necessary to continue to support the auctions and auctions would fail. Consequently, on August 16, 2007, Short-Term Trading management emailed senior management, "We need to discuss the current state of the auction rate market, our commitment to the auctions, its impact on our balance sheet and the effect of our actions on our clients…our actions will have broad-reaching implications to all of our constituents, the market, and our franchise."

35.     On August 19, 2007, Short-Term Trading management outlined the ramifications if Citi allowed widespread failed auctions, including the "implied liquidity" and risk of lawsuits by customers who had been marketed ARS as "money market alternatives" and "liquid investments" for 20 years," discussed previously. These general points were included in a document provided to more senior managers the next day.

36.     The balance sheet limit for ARS ultimately was increased, and Citi continued to support auctions. The balance sheet limit had to be increased additional times throughout the fall of 2007 and beginning of 2008 to accommodate Citi's ARS inventory as it

9

increased from approximately $4 billion to more than $10 billion in February 2008 when Citi stopped supporting auctions.

37.     As early as August 2007, Citi recognized that the amount of available ARS exceeded the demand, but Citi continued to increase the amount of ARS that Citi underwrote and marketed, thereby contributing to the inventory and balance sheet problems that threatened its ability to continue supporting auctions. For instance, Citi still explored opportunities to take over ARS from other broker-dealers as those broker-dealers struggled in the deteriorating market. Citi investment bankers also wanted to continue bringing new ARS to market, to earn fees and to maintain their position vis-à-vis bankers at other broker-dealers, despite the need to control the supply and inventory of ARS. Not until early November 2007 did Citi finally curtail new ARS issuances for the year.

38.     As the fall of 2007 passed and the likelihood of failed auctions significantly increased, Citi did not provide current, complete, and accurate information to its customers to make them aware of this increased risk.

39.     Citi knew that its ARS were marketed to institutional and retail customers, and that retail customer participation was essential to the success of the ARS market. Citi also knew or was reckless in not knowing that its retail customers expected liquidity on demand and that Citi-managed auctions historically had provided that liquidity. As Citi's ARS inventory grew in late 2007, diminishing Citi's ability to continue providing liquidity, Citi failed to ensure that new or existing customers were advised of these risks associated with buying or holding ARS.

**Citi Increased Its Efforts To Sell Its Growing Inventory
As It Continued To Try To Support ARS Auctions**

40.    As Citi's ARS inventory grew, Citi increased its efforts to sell the inventory.

41.    For example, on August 30, 2007, an email to ARS traders stated, "Make sure you don't leave any stones unturned today. We are currently at our extended limit. Hit all bids....Times like these, we need to do whatever is necessary. Just make sure all hands are on deck and paper is sold."

42.    Although commissions for selling ARS were among the highest for short-term products, in early November 2007, Citi raised its commission to FAs for seven-day municipal ARS from twenty to twenty-five basis points. Although this increase impacted approximately 25% of the ARS auctioned through Citi, these ARS were primarily purchased by retail customers. The email to FAs alerting them of the increase stated, "The risks for all ARS remain the same." In contrast, an internal memorandum explained that the increased commissions were to "help to move increasing inventory while capital is sparse," "assist in managing another large year of new issuance distribution," "make[] the product more attractive relative to other options," and "answer[] the call of banking and management to find additional methods to augment distribution."

43.    Citi also took steps to sell its inventory of ARS to customers by offering discounts and other promotions. For example, in mid-December, Citi offered certain ARS to customers with as much as six days of interest free. The offer meant that customers did not have to pay for the inventory until six days after the auction but received the interest on the ARS as if the customers had held the ARS for the entire period. Citi lost money on ARS after two days of free interest.

11

44.     In early January, Citi raised some of the fees for other broker-dealers that sell

Citi's ARS: subordinate ARS increased from ten to twenty basis points, and all other

auction products, excluding seven-day municipal debt, increased from ten to fifteen bps.

45.     Even during the days leading up to when Citi allowed auctions to fail, Citi still

was trying to sell inventory.  An email instructed ARS traders and others to "sell anything

you can" and "if there is an opportunity to reduce our book, then we have to hit it

ASAP."

### Citi Failed To Disclose To Customers That Certain ARS Had Low Maximum Rate Resets And That It Was Supporting ARS That Were Not "Viable" Structures In The Deteriorating Market

46.     When Citi discussed the possibility of failed auctions, Citi often stated that ARS

have high, above market, maximum rate resets if an auction failed to compensate the

holder for the lack of liquidity and to create incentives for the issuer to restructure the

ARS, thereby providing liquidity to the holder.  Citi failed to disclose that, at least under

market conditions at that time, certain ARS had low, below market, maximum rate resets.

47.     Certain types of ARS, such as certain classes of municipal ARS, did have fixed

maximum rate resets as high as fifteen or twenty percent, and, thus, well above market

rates for instruments of similar credit quality and duration.  In contrast, however, other

ARS, such as Student loan ARS (which Citi generally did not sell to retail customers) and

preferred ARS issued by closed-end funds (which Citi sold to institutional and retail

customers), had formulaic maximum rate resets that were determined by reference to

certain market indices.  At least since August 2007, these market indices were generally

low, so the formulas for certain ARS resulted in reset rates lower than the rates set in

auctions, and, thus, a rate below market rates for instruments of similar credit quality and duration.

48.     For example, in a presentation in the fall of 2007 specifically on student loan ARS, most of which had low formulaic maximum rate resets, Citi stated that "the failed auction rate is intended to be a punitive level for the issuer and to compensate the customer for the lack of liquidity in the auction."

49.     As early as August 2007, Citi knew that student loan ARS, which had low maximum rate resets, comprised a significant amount of its inventory.

50.     During the fall of 2007, Citi increasingly became aware that ARS with low maximum rate resets were not "viable" instruments in the market conditions at that time because if an auction failed, a holder of these ARS would receive a below-market rate, rather than an above-market rate to compensate the holder for the illiquidity.  These ARS contributed to Citi's increasing inventory and balance sheet stress.

51.     By early December 2007, Citi was aware that certain customers were beginning to distinguish between whether the ARS had a low or high maximum rate reset.  Citi began to track its inventory based upon the type of rate reset.

52.     In late December 2007, senior Citi management was provided with a draft plan in the event of failed auctions that stated:

> [I]f we are forced to fail on a specific asset type of auction rate securities, we
> would try to differentiate between the program structures that failed because max
> rates were set too low and all other program structures which can support high
> max rates.  It would be critical to articulate the differences between viable
> structures and structures that have failed.

13

Thus, "[a]ssuming sufficient balance sheet, Citi will support above market, fixed

maximum rates...remainder of market with formulaic maximum rates will not be

supported and will fail."

53.     On February 1, 2008, a research analyst at Citi issued a research report about

"Bond Insurers Impact on the Muni Market." The research report stated:

> Those [preferred ARS] with a medium or high penalty rate, those with strong
> underlying ratings, and those insured or reinsured by a strong insurer should be
> easily remarketable. Indeed, the 'bad news' of fail in these cases is offset by a
> very attractive interest rate until a successful auction is held. There are a smaller
> number of issues with a low reset rate. Even here, many of the issues are either
> backed by a strong issuer, guaranteed by a strong issuer, or in the process of being
> wrapped by a strong guarantor.
>
> While there are likely to be some more failed auctions, in our view, ultimately the
> outcome for investors should be favorable. Issuers and investment bankers have a
> strong incentive to make whole, and this can be done in the limited number of
> problem situation by a restructuring or a 'wrap' by a strong insurer.

54.     In contrast to Citi's marketing materials, this research report recognized that

certain ARS had a low maximum rate reset, but the report underestimated the number of

ARS issues that had low rate resets, the likelihood of widespread and prolonged failures,

and the impact to the holders if these ARS failed.

### Citi Knew That Auction Failures In One Segment
### Of The ARS Market Might Trigger A Chain Reaction
### Across All Segments Of The ARS Market

55.     As early as August 2007, Citi knew that fails at other broker-dealers were

impacting the ARS market, including ARS at other broker-dealers and different types of

ARS.

56.     Similarly, in December 2007, an internal document provided to senior

management stated that "if one segment of the ARS market experiences fails, there is a

high probability that investors will lose confidence in all sectors and asset types funded in

the ARS market." The documents also listed "[c]ompeting broker-dealers failing on auctions" as one of a number of events that could force Citi to fail auctions.

### Citi Knew The Risk Of Failed Auctions Had Materially Increased During The Fall Of 2007

57. A November 1, 2007 internal email from Short-Term Trading management expressed concerns about "monolines and growing illiquidity in the ARS market." Short-Term Trading management had reviewed "Citi's liquidity commitment to the short-term tax-exempt market," and stated, "A change in the outlook or a downgrade on any monoline from one of the rating agencies would hurt liquidity in the ARS market...Even apart from the potential of a monoline downgrade, the ARS market is subject to a potential liquidity crisis." They stated, "Since the credit crisis hit this summer, the ARS market has been under pressure caused by investor risk aversion and other dealers' failed auctions...As a result, liquidity has been thin. Given the difficulty of monolines... we are very concerned that a further investor pullback could increase the risk of widespread failed auctions."

58. By the beginning of December 2007, Short-Term Trading management communications discussed various scenarios under which auctions might fail. In addition, Risk Management was conducting scenario analyses to evaluate the impact of failed auctions.

59. A December 7, 2007 email stated that senior Citi officials "don't have much of a problem of letting them [ARS] go if times get much tougher."

60. On December 15, 2007, internal emails discussed subordinate student loans, which were a significant portion of Citi's inventory, and Citi potentially allowing those auctions to fail when certain maximum loss or balance sheet limits were reached. One

15

email stated, "Of course if they [the subs] go, everything will probably go as well. There may be an outside chance of the subs failing and talking the market into it being a specific credit issue like what has already happened with the CDO paper." Citi was aware that if certain auctions failed, other auctions also likely would fail unless investors could be convinced that the fails related to credit risks with certain ARS, which is what happened when certain ARS backed by CDO's failed in August 2007.

61.    In mid-December, senior management had further discussions about the ramifications if Citi stopped supporting auctions. The handout for one such discussion stated, "If it survives at all, the ARS market will be much smaller in the future and will be primarily tax-exempt issuers." By December 24, 2007, an internal Citi document provided to senior management about the ARS market discussed Citi's current goals and objectives and its plan in the event of failed auctions.

62.    Citi's plan in the event of failed auctions stated:

> A specific asset class in the ARS market may become so stressed that Citi may decide to no longer support that asset class, causing failed auctions. Should this occur, Citi will continue to attempt to support the programs that are viable. However, if a specific ARS asset class experience fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market.

63.    According to the plan, "[o]n the day that auctions begin to fail, we would immediately alert the market through Citi's public relations." The public statement would state that "[u]ntil conditions improve, these 'failed auctions' will most likely continue to occur."

64.    In the cover email to the December 24, 2007 document, a senior official stated that a failed auction at Citi "seems like an unavoidable eventuality."

16

**If Customers Knew About the Increased Liquidity Risk,**
**Many Likely Would Sell Their ARS**

65.     Citi was aware from recent events that liquidity issues in the ARS market tended to increase customers' sales of ARS.

66.     In 2004, customer interest in ARS diminished during the Commission's investigation into broker-dealers' practice in connection with ARS securities. Similarly, in 2005, many public companies sold their ARS after accounting guidance was issued relating to the classification of ARS in the books and records of a public company as a "cash equivalent." The guidance indicated that this classification likely was not appropriate in many circumstances because the securities did not have guaranteed liquidity, and that companies may need to reclassify such securities as long-term investments because these instruments typically had long-term maturities. In both market events, Citi had to increase its support of ARS until the dislocation subsided.

67.     As early as August 2007, Citi documents discussed its support of ARS, including its support of ARS during these other crises.

68.     Thus, in late 2007 and early 2008, Citi was aware that if it disclosed to FAs and customers, or if customers learned of, the increased liquidity risk, many of these customers likely would have sold their ARS. Accordingly, on an ongoing basis, Citi noted the awareness FAs and retail customers had about ARS and the market.

**Final Events Leading Up To Citi's Decision To Allow Auctions To Fail**

69.     On February 7, 2008, another broker-dealer was the first broker-dealer to allow multiple ARS auctions to fail. A Citi ARS trader provided the following market color, "Panic is now clearly evident with both retail and institutional customers. Pricing is very erratic as dealers attempt to find a new buying base for ARS."

17

70.     That weekend, Citi assessed whether it would continue supporting the ARS

market. On February 9, 2008, a senior Citi official emailed other senior officials:

> I believe that we should allow market dynamics to determine the pricing and
> success/failure of these auctions [student loans]. If we do so, I'd expect them to
> fail. There's another factor we need to consider/ We're beginning to hear from
> investors that they're taking dealers like GS, Leh, and JPM off of their "approved"
> list (due to their allowing auctions to fail) and will begin to migrate money into
> our auctions. We do not want to indirectly encourage this inflow. This is a
> market problem and we don't want to imply that we're somehow immune from
> this situation. Allowing fails (if indeed they will) in Monday's student loan
> auctions will help highlight this.

Another senior official replied:

> I agree. It's time to let the market itself try to correct the supply/demand
> imbalances we are experiencing. Given that we don't want to encourage investors
> to migrate to our auctions on the presumption that ours are not at risk of failure,
> we may want to think about releasing our statement Monday morning.

71.     On February 11, 2008, Citi stopped supporting its student loan ARS, and all of

those auctions failed. On February 12, 2008, Citi stopped supporting ARS with low,

formulaic maximum rates, and all of those auctions failed. Thereafter, Citi allowed other

Citi-managed auctions to fail.

72.     Citi's failed auctions, and the resulting market freeze, left customers holding

billions of dollars of illiquid ARS, and many of those customers still hold those illiquid

securities.

## CLAIM FOR RELIEF

### [Violation of Section 15(c) of the Exchange Act].

73.     Paragraphs 1 - 72 are realleged and incorporated by reference as if set forth fully

herein.

74.     The Defendant made use of the mails or means or instrumentalities of interstate

commerce to effect transactions in, or to induce or attempt to induce the purchase or sale

18

of, securities: (a) by means of a manipulative, deceptive, or other fraudulent device or contrivance, and (b) in connection with which Defendant engaged in a fraudulent, deceptive, or manipulative act or practice.

75.     By engaging in the foregoing conduct, the Defendant violated Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently enjoin the Defendant and its respective agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in violations of Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)];

B.     Order the Defendant to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

C.     Grant such other and further relief as this Court deems necessary and appropriate under the circumstances.

Respectfully submitted,

_Robert B Blackburn_ (signature)

_Jordan A. Thomas_ (signature)

Robert B. Blackburn (RB 1545)

Jordan A. Thomas

Securities and Exchange Commission
3 World Financial Center, Room 4300
New York, New York 10281-1022
(212) 336-1050 [Blackburn]
(212) 336-3317 [FAC]
BlackburnR@sec.gov

Fredric Firestone
Kenneth Lench
Andrew Sporkin
Melissa Lamb
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4475 [Thomas]
(202) 772-9245 [Thomas FAX]
ThomasJA@sec.gov

Attorneys for Plaintiff

Dated: December **11**, 2008

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8684 / May 31, 2006

SECURITIES EXCHANGE ACT OF 1934
Release No. 53888 / May 31, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12310

| | |
|---|---|
| In the Matter of<br><br>**BEAR, STEARNS & CO. INC.; CITIGROUP GLOBAL MARKETS, INC.; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES, INC.; LEHMAN BROTHERS INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MORGAN STANLEY & CO. INCORPORATED AND MORGAN STANLEY DW INC.; RBC DAIN RAUSCHER INC.; BANC OF AMERICA SECURITIES LLC; A.G. EDWARDS & SONS, INC.; MORGAN KEEGAN & COMPANY, INC.; PIPER JAFFRAY & CO.; SUNTRUST CAPITAL MARKETS INC.; AND WACHOVIA CAPITAL MARKETS, LLC,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Bear, Stearns & Co. Inc.; Citigroup Global Markets, Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities, Inc.; Lehman Brothers Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.; RBC Dain Rauscher Inc.; Banc of America Securities LLC; A.G. Edwards & Sons, Inc.; Morgan Keegan & Company, Inc.; Piper Jaffray & Co.; SunTrust Capital Markets Inc.; and Wachovia Capital Markets, LLC ("Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement ("Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds that:[1]

### A.    RESPONDENTS

Respondent **Bear, Stearns & Co. Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Citigroup Global Markets, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Goldman, Sachs & Co.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **J.P. Morgan Securities, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Lehman Brothers Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Merrill Lynch, Pierce, Fenner & Smith Incorporated**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Respondents **Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc. ("Morgan Stanley")**, headquartered in New York, New York, are both broker-dealers registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **RBC Dain Rauscher Inc.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Banc of America Securities LLC**, headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **A.G. Edwards & Sons Inc.**, headquartered in St. Louis, Missouri, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Morgan Keegan & Company, Inc.**, headquartered in Memphis, Tennessee, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Piper Jaffray & Co.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **SunTrust Capital Markets Inc.**, headquartered in Atlanta, Georgia, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Wachovia Capital Markets LLC,** headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

**B.      SUMMARY**

As part of their broker-dealer businesses, Respondents underwrite, and manage auctions for, auction rate securities.[2]  From at least January 1, 2003 through June 30, 2004, in connection with certain auctions, each Respondent engaged in one or more of the practices described in Section III.C.2 below, each of which violates Section 17(a)(2) of the Securities Act.  Accordingly, each Respondent violated that provision.

**C.      FACTS**

1.      <u>The Auction Rate Securities Market</u>

Auction rate securities are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 14, 28, or 35 days.  Auction rate bonds are usually issued with maturities of 30 years, but the maturities can range from 5 years to perpetuity.  Respondents often market auction rate securities

---

[2] One entity of Morgan Stanley, Morgan Stanley DW Inc., has not underwritten auction rate securities since January 1, 2003.

to issuers as an alternative variable rate financing vehicle, and to investors as an alternative to money market funds.  Auction rate securities were first developed in 1984, and the auction rate securities market has grown to well over $200 billion.  Mostly institutional investors participate in the auction rate securities markets, although recently smaller investors also have begun participating in the market.  Typically, the minimum investment is $25,000.

        a.     <u>Auction Mechanics.</u>  Auction rate securities are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through the auctions.[3]  According to the disclosure documents (the prospectus or official statement) for each security, the interest rate or dividend yield is set through an auction (commonly referred to as a "Dutch" auction) in which bids with successively higher rates are accepted until all of the securities in the auction are sold.  Investors can only submit the following types of orders: 1) a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears; 2) a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate; 3) a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or 4) a "buy" bid, where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate.  Disclosure documents often state that an investor's order is an irrevocable offer.

       The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction.  Bids with the lowest bids and then successively higher rates are accepted until all of the sell orders are filled.  The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction.[4]  If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with minor exceptions.  If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate is the all-hold rate, a below-market rate set by a formula described in the disclosure documents.

        b.     <u>Broker-Dealers' Role in Auctions</u>.  The issuer of each security selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  Investors can only submit orders through the selected broker-dealers.  The issuer pays an annualized fee to each broker-dealer engaged to manage an auction (typically 25 basis points for

---

[3] Between auctions, investors might be able to buy or sell auction rate securities in the secondary market at prices greater than, equal to, or less than par.

[4] For example, suppose $100,000 of securities were for sale and the auction received four buy bids.  Bid A was for $50,000 at 1.10%, Bid B was for $50,000 at 1.15%, Bid C was for $50,000 at 1.15%, and Bid D was for $25,000 at 1.20%.  Under these circumstances, the "clearing rate" would be 1.15%, meaning all of the securities in the auction would pay interest at a rate of 1.15% until the next auction.  Bid A would be allocated $50,000, Bids B and C would receive pro-rata allocations ($25,000 each), and Bid D would receive no allocation.

4

the par value of the securities that it manages).  The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.

Investors must submit orders for an auction to the broker-dealer by a specified time.  Many broker-dealers have an internal deadline by which investors must submit their orders to the broker-dealer.  This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up until the submission deadline, i.e., the deadline for broker-dealers to submit orders to the auction agent.  The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

        c.     <u>Auction Agents' Role in Auctions</u>.  After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  In practice, however, if there is only one broker-dealer, the broker-dealer can discern the clearing rate before submitting the orders to the auction agent.

The auction agent allocates the securities to the broker-dealers based on the orders they submitted.  The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.  When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

        d.     <u>Disclosures Regarding Broker-Dealer Bidding</u>.  During the relevant period, the disclosure documents for different securities varied as to what, if anything, they disclosed about broker-dealers bidding in auctions that they were managing.  Some disclosure documents did not disclose anything about bidding by broker-dealers.  Other disclosure documents disclosed that broker-dealers may bid in auctions with language similar to the following: "[a] broker-dealer may submit orders in Auctions for its own accounts."  Still other disclosure documents disclosed that broker-dealers may bid in auctions and may have an information advantage with language similar to the following:  "[a] Broker-Dealer may submit orders in Auctions for its own accounts.  Any Broker-Dealer submitting an order for its own account in any Auction might have an advantage over other bidders in that it would have knowledge of other orders placed through it for that Auction (but it would not have knowledge of orders submitted by other Broker-Dealers, if any)."

      2.     <u>Respondents' Conduct</u>

Each Respondent engaged in one or more of the following violative practices in connection with certain auctions:

        a.     <u>Completion of Open or Market Bids.</u>  Some investors placed open bids and/or market bids in auctions.  When an investor placed an open bid, it allowed the

Respondent to designate some or all of the bid's parameters, such as the specific security, rate, or quantity.  When an investor placed a market bid, it indicated that it would buy at whatever rate was set during an auction.  After viewing other orders in the auction, certain Respondents supplied the bid parameters missing from open bids and/or the rate for market bids.  In certain instances, these practices advantaged the investors submitting open bids or market bids by displacing other investors' bids and/or affected the clearing rate.[5]

        b.     <u>Intervention in Auctions.</u>  Certain Respondents intervened in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures.[6]  In certain instances, the interventions affected the clearing rate.  Certain Respondents intervened in one or more of the following three ways:

        *b.1*     *<u>Bids To Prevent Failed Auctions.</u>*  Without adequate disclosure, certain Respondents bid to prevent auctions from failing.  Failed auctions occur when there are more securities for sale than there are bids for securities and result in an above-market rate described in the disclosure documents.  These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate;

        *b.2*     *<u>Bids To Set a "Market" Rate.</u>*  Without adequate disclosure, certain Respondents submitted bids or asked investors to change their bids so that auctions cleared at rates that these Respondents considered to be appropriate "market" rates.  In certain instances, this practice affected the clearing rate and/or the Respondents' or investors' bids displaced other investors' bids; and

        *b.3*     *<u>Bids To Prevent All-Hold Auctions.</u>*  Without adequate disclosure, certain Respondents submitted bids or asked investors to submit bids to prevent the all-hold rate, which is the below-market rate set when all current holders want to hold their positions so that there are no securities for sale in the auction.  Sometimes certain Respondents did not have any or sufficient inventory to be eligible to submit the hold-at-rate bids they submitted, or changed an investor's bid without obtaining permission.  In certain instances, this practice affected the clearing rate;

---

[5] The clearing rate determines the interest rate or yield the issuer must pay to investors until the next auction.  In those instances when these practices or any of the practices described in this Order lowered the clearing rate, investors received a lower rate of return on their investments.  Conversely, in those instances when the practices raised the clearing rate, issuers had to pay a higher interest rate or yield.  To the extent that certain practices affected the clearing rate, investors may not have been aware of the liquidity and credit risks associated with certain securities.

[6] This Order does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed.

      c.     <u>Prioritization of Bids.</u>  Before submitting bids to the auction agent, certain Respondents changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization and a similar practice known as "cross-trading," certain bids were moved up in the disclosed hierarchy by which different types of bids would be filled.[7]  In certain instances, these practices resulted in certain investors' bids displacing other investors' bids when the auction was oversubscribed, affected the clearing rate, and did not conform to disclosed procedures;

      d.     <u>Submission or Revision of Bids After Deadlines.</u>  Most auctions had an internal deadline that broker-dealers set for investors to submit bids to the broker-dealers and a formal submission deadline set by the offering documents for broker-dealers to submit bids to the auction agent.  Certain Respondents at times allowed certain investors to submit or revise bids after these deadlines.  In addition, certain Respondents themselves submitted or revised bids after these deadlines.  In certain instances, these practices, except when solely done to correct clerical errors, advantaged investors or Respondents who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to disclosed procedures;

      e.     <u>Allocation of Securities.</u>  Certain Respondents exercised discretion in allocating securities to investors who bid at the clearing rate instead of allocating the securities pro rata as stated in the disclosure documents.  In certain instances, this practice displaced other investors' bids and did not conform to disclosed procedures;

      f.     <u>Partial Orders.</u>  When an auction is oversubscribed, investors may receive a partial, pro rata allocation of securities rather than receiving the full amount of the securities for which they bid.  When this occurred, certain Respondents did not require certain investors to follow through with the purchase of the securities even though the bids were supposed to be irrevocable.  Knowing that they would not have to follow through in purchasing partial orders, some investors bid to try to obtain the securities at rates higher than they would have bid if they had known that they risked having to buy partial orders.  In certain instances, this practice affected the clearing rate and did not conform to disclosed procedures;

      g.     <u>Express or Tacit Understandings To Provide Higher Returns.</u>  Based upon an express or tacit understanding reached prior to or during an auction, certain Respondents provided higher returns than the auction clearing rate to certain investors.  For example, pursuant to an express or tacit understanding reached prior to or during an auction: (1) certain Respondents

---

[7] One example of prioritization occurred when certain Respondents received a sell order from one customer and a buy order from another customer in the same auction.  Rather than submitting each order to the auction agent as required by the disclosure documents, certain Respondents instead netted those orders before submitting them to the auction agent.  Cross-trading occurred when certain Respondents actually transferred securities from a customer that wanted to sell to a customer that wanted to buy, rather than submitting the bids in the auction.  Pursuant to both practices, these customers that wanted to buy securities were considered to be existing holders so that their orders had a higher priority in the auction than other new customers' bids for securities.

provided a higher return by having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) certain Respondents simply displaced an investor's bid and then compensated the investor by selling securities to the investor at below par value in the secondary market; and (3) certain Respondents provided a higher return by delaying the settlement date for certain investors. In certain instances, these practices affected the clearing rate and did not conform to disclosed procedures; and

> h.    Price Talk.  Certain Respondents provided different "price talk"[8] to certain investors.  In certain instances, some investors received information that gave them an advantage in determining what rate to bid, thereby displacing other investors' bids and/or affecting the clearing rate.

### D.    LEGAL SECTION

Section 17(a)(2) of the Securities Act prohibits material misstatements and omissions in any offer or sale of securities.  Negligent conduct can violate Section 17(a)(2).  See, e.g., SEC v. Hughes Capital Corp., 124 F.3d 449, 453 (3d Cir. 1997).  Each Respondent violated Section 17(a)(2) by engaging in one or more of the practices described in Section III.C.2 above.  As a result, Respondents willfully[9] violated Section 17(a)(2) of the Securities Act.

### E.    STRUCTURE OF THE SETTLEMENT

In determining the structure of the settlement and the size of the penalties in this matter, the Commission considered the amount of investor harm and the Respondents' conduct in the investigation to be factors that mitigated the serious and widespread nature of the violative conduct.  In particular, the Respondents voluntarily disclosed the practices they engaged in to the Commission staff, upon the staff's request for information, which allowed the Commission to conserve resources.  The Commission aims to promote similar voluntary disclosures in industry-wide investigations in the future and to encourage firms to provide comprehensive information to the staff in such investigations.  The Commission believes that, after taking into account the factors described above, as well as the importance of deterring future violations of the securities laws, this settlement is appropriate.

---

[8] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.  Often this range is 5-10 basis points.  Some broker-dealers update the price talk as auctions progress.

[9] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation, see Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).  There is no requirement that the actor also be aware that he is violating one of the Rules or Acts.

For purposes of this settlement, Respondents are divided into two tiers for civil money penalty purposes based on their respective market share and conduct during the relevant period. Tier One consists of the following firms, each of which had a relatively large share of the auction rate securities market and engaged in more types of violative practices than the firms in Tier Two: Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Dain Rauscher, and Banc of America Securities. While all Respondents cooperated with the Commission, Banc of America Securities will be assessed a lesser civil monetary penalty because of the quality of its self-monitoring capabilities in the auction rate securities area that it demonstrated to the Commission staff.  Tier Two consists of the following firms, each of which had a relatively small share of the auction rate securities market and engaged in fewer types of violative practices than the firms in Tier One: A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets.

## F.  RESPONDENTS' REMEDIAL ACTS AND COOPERATION

In determining to accept the Offers, the Commission considered the remedial acts promptly undertaken by the Respondents and the cooperation afforded the Commission staff.

## IV.

In view of the foregoing, the Commission deems it appropriate, and in the public interest, to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act and Section 15(b) of the Exchange Act, it is hereby ORDERED that**:**

A.      Respondents Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, and RBC Dain Rauscher each:

1.      Be, and hereby is, censured;

2.      Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

3.      Shall, within 10 days of the entry of this Order, pay a civil money penalty of $1,500,000 to the United States Treasury;

B.      Respondent Banc of America Securities:

1.      Be, and hereby is, censured;

2.      Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

     3.      Shall, within 10 days of the entry of this Order, pay a civil money penalty of $750,000 to the United States Treasury;

C.     Respondents A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets each:

     1.      Be, and hereby is, censured;

     2.      Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

     3.      Shall, within 10 days of the entry of this Order, pay a civil money penalty of $125,000 to the United States Treasury;

D.     Payments of such civil money penalties shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies the Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth R. Lench, Division of Enforcement, Securities and Exchange Commission, 100 F Street N.E., Washington, D.C. 20549-8549.

E.     Not later than 6 months after the entry of this Order, each Respondent shall provide all of its customers who hold auction rate securities ("Holders") and the issuers of such securities ("Issuers") with a written description of the Respondent's material auction practices and procedures. In addition, commencing not later than 6 months after the entry of this Order, each Respondent shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers, and all broker-dealers who are purchasers, of auction rate securities from the Respondent ("Purchasers") with a written description of the Respondent's material auction practices and procedures. A Respondent may fulfill the foregoing requirements to provide such written description to Holders and Purchasers by sending a written notification (e.g., via e-mail, subject to applicable legal requirements) or, with respect to Purchasers, by including a written notification with the trade confirmation, that a written description of the Respondent's material auction practices and procedures is available on a specified web page of the Respondent's website accessible to such Holders and Purchasers. Such written notification must be set forth prominently in such a manner as to call it to the attention of the reader and also state that a written description of the Respondent's material auction practices and procedures will be sent to the Holder or Purchaser upon request. In addition, not later than 6 months after the entry of this Order, each Respondent shall send a written description of the Respondent's material auction practices and procedures accompanied by a list of all auction rate

10

securities for which the Respondent serves as broker-dealer (including related CUSIP numbers) to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR") and appropriate State Information Depository ("SID"), if any.  Respondents may use the facilities of DisclosureUSA for such purpose with respect to auction rate securities that are municipal securities.

Furthermore, commencing not later than 3 months after the entry of this Order, each Respondent shall at all times make a description of its then-current material auction practices and procedures available to (1) all customers and broker-dealers who are participating through such Respondent in an auction of auction rate securities on the portion of its website that is accessible to such customers and broker-dealers and is related to such auction and (2) the general public on another portion of its website accessible to the general public.

As used in this Section, "auction rate securities" means, with respect to a Respondent, auction rate securities sold in auctions managed by such Respondent.

F.     Not later than 6 months after the date of this Order, unless otherwise extended by the staff of the Commission for good cause shown, each Respondent's chief executive officer or general counsel shall certify in writing to the staff of the Commission that Respondent has implemented procedures that are reasonably designed to prevent and detect failures by Respondent to conduct the auction process in accordance with the auction procedures disclosed in the disclosure documents and any supplemental disclosures and that the Respondent is in compliance with Section IV.E. of this Order.

By the Commission.


                           Nancy M. Morris
                           Secretary


11