**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE MORGAN STANLEY & CO., INC. | ) | Lead Case No. 08 Civ. 7587 (AKH) |
| AUCTION RATE SECURITIES | ) | |
| DERIVATIVE LITIGATION | ) | (Derivative Action) |
| ———————————————————— | ) | |
| | ) | **Oral Argument Requested** |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| ———————————————————— | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

KAHN SWICK & FOTI, LLC
Lewis S. Kahn
Albert M. Myers
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Michael Swick
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
*Attorneys for Plaintiff Louisiana Municipal Police*
*Employees Retirement System*

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 East 42nd Street
New York, NY 10165
Telephone: (212) 685-0969

PASKOWITZ & ASSOCIATES
Laurence D. Paskowitz
60 East 42nd Street
New York, NY 10165
Telephone: (212) 685-0969
Fax: (212) 685-2306

*Attorneys for Plaintiff Terry G. Thomas*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................................... 1

FACTUAL ALLEGATIONS .............................................................................................................. 6

ARGUMENT ..................................................................................................................................... 10

    I.      THE LEGAL STANDARDS FOR DECIDING DEFENDANTS' MOTION ................. 10

           A.     Federal Rule of Civil Procedure 23.1 ................................................................ 10

    II.     THE COMPLAINT ADEQUATELY PLEADS DEMAND FUTILITY. ........................ 14

           A.     The Director Defendants Adopted Specific Duties Involving the ARS
                 Market as Members of Board Committees ............................................................ 14

           B.     The Existence of "Red Flags" Establishes that the Director
                 Defendants Consciously Disregarded Their Duties. ........................................... 17

           C.     The Recent *Citigroup* Decision of the Delaware Chancery Court
                 *Supports* a Finding of Substantial Likelihood of Liability (and Hence
                 Demand Futility) Here. . ..................................................................................... 24

           D.     Director-by-Director Analysis ............................................................................. 30

                  1.       Mack ......................................................................................................... 30

                  2.       Sexton ...................................................................................................... 31

                  3.       Bostock .................................................................................................... 32

                  4.       Bowles ..................................................................................................... 33

                  5.       Davies ...................................................................................................... 34

                  6.       Kidder ...................................................................................................... 35

                  7.       Nicolaisen ................................................................................................ 35

                  8.       Noski ....................................................................................................... 36

                  9.       Olayan .................................................................................................... 36

                  10.     Phillips .................................................................................................... 37

                  11.     Tyson ...................................................................................................... 37

    III.    MORGAN STANLEY'S RESTATED CERTIFICATE OF
          INCORPORATION DOES NOT SHIELD DEFENDANTS FROM
          LIABILITY. ................................................................................................................ 38

    IV.    THE MOTION SHOULD BE DISMISSED TO THE EXTENT THAT IT IS
          PREMISED ON FAILURE TO STATE A CLAIM. ........................................................ 39

           A.     Breach of Fiduciary Duty Claims ....................................................................... 39

           B.     Unjust Enrichment and Corporate Waste Claims ............................................... 41

    V.     PLAINTIFFS SHOULD BE GIVEN LEAVE TO REPLEAD ....................................... 42

CONCLUSION .................................................................................................................................. 43

# TABLE OF AUTHORITIES

## CASES

*In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795 (7th Cir. 2003) ........ 12, 13, 21, 23, 39

*In re American Int'l Group, Inc. Consol. Deriv. Litig.*, C.A. No. 769-VCS, 2009
 Del. Ch. LEXIS 15 (Del. Ch. Feb. 10, 2009) ........................................................ 22, 45

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ...................................................... 2, 5, 10, 11, 14

*Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ................... 43

*In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995) ........................................ 14

*Beam v. Stewart*, 833 A.2d 961 (Del. Ch. 2003) ...................................................................... 11

*In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) ....... 13, 14, 19, 21, 23, 25, 39

*In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117 (D.N.J. 1999) .......................... 22, 23

*In re Citigroup Inc. Shareholder Deriv. Litig.*, Civ. A. No. 3338-CC (Del. Ch. Feb.
 24, 2009) .................................................................................................................... 5, 24-30

*In re Cooper Cos. S'holders Deriv. Litig.*, No. C.A. 12584, 2000 Del. Ch. LEXIS
 158 (Del. Ch. Oct. 31, 2000) ........................................................................................ 31

*Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ............................................ 42

*In re Countrywide Fin'l Corp. Deriv. Litig.*, 554 F. Supp.2d 1044 (C.D. Cal. 2008) ........ 19, 23

*David B. Shaev Profit Sharing Account v. Armstrong*, Nos. Civ. A.10,684, Civ. A.
 10,685, 2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006) ................................... 24, 27

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) .............................................................. 39

*In re Ditech Networks, Inc. Deriv. Litig.*, No. C 06-5157-JF, 2008 WL 820705
 (N.D. Cal. Mar. 26, 2008) ............................................................................................ 39

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) ....................................................... 38, 39

*Ferre v. McGrath*, No. 06 Civ. 1684, 2007 U.S. Dist. LEXIS (S.D.N.Y. Feb. 16,
 2007) .............................................................................................................................. 24

*Friedman v. Beningson*, No. 112232, 1995 Del. Ch. LEXIS 154 (Del. Ch. Dec. 4,
 1995) .............................................................................................................................. 11

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996) ....................................................................... 11

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) ........................................................................... 11

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ............................................... 25, 40

*Guttman v. Jen-Hsun Huang*, 823 A.2d 492 (Del. Ch. 2003) .................................. 40

*Halpert Enters. v. Harrison*, 362 F. Supp. 2d 426 (S.D.N.Y. 2005)................................ 24, 43

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) ..................................................... 11

*In re IAC/InterActive Corp Sec. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007)....................... 24

*Jacobs v. Yang*, No. Civ. A. 206-N, 2004 U.S. Dist. LEXIS 117 (Del. Ch. Aug. 2, 2004).......................................................................................... 34

*Levine v. Smith*, 591 A.2d 194 (Del. 1991) ........................................................ 10

*Loveman v. Lauder*, 484 F. Supp. 2d 259 (S.D.N.Y. 2007) ..................................... 34

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ................................................. 39

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) .......................................... 11, 20, 23, 25

*McSparran v. Larson*, No. 04 C 0041, 2006 WL 250698 (N.D. Ill. Jan. 27, 2006)..... 18, 23, 29

*Mizel v. Connelly*, No. 16638, 1999 Del. Ch. LEXIS 157 (July 22, 1999) ............................ 31

*In re Oxford Health Plans, Inc. Sec. & Deriv. Litig.*, 192 F.R.D. 111 (S.D.N.Y. 2000).......................................................................................... 18, 22, 23

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520 (S.D.N.Y. 2008) ....................................................... 24, 32, 43

*In re Ply Gem Indus. S'holder Litig.*, No. 15779, 2001 Del. Ch. LEXIS 84 (June 26, 2001).......................................................................................... 31, 39

*Pogostin v. Rice*, 480 A.2d 619 (Del. 1984)......................................................... 12

*Rahl v. Bande*, 328 B.R. 398 (S.D.N.Y. 2005)..................................................... 40

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ....................... 2, 5, 10, 11, 12, 13, 14, 23, 31

*Saito v. McCall*, No. 17132, 2004 Del. Ch. LEXIS (Del. Ch. Dec. 20, 2004)....... 10, 18, 22, 23

*Sanders v. Wang*, No. 16640, 1999 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 1999) ................ 39

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) ............................................ 12

*Staehr v. Alm*, 269 Fed. Appx. 888 (11th Cir. 2008)............................................. 34

*Steiner v. Meyerson*, No. 13139, 1995 Del. Ch. LEXIS 95 (Del. Ch. July 18, 1995) ....................... 31

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) .................................................................. 19, 23, 24

*Telxon Corp. v. Bogomolny*, 792 A.2d 964 (Del. Ch. 2001) .................................................... 31

*In re The Limited, Inc. S'holders Litig.*, No. 17148, 2002 Del. Ch. LEXIS 28 (Del.
Ch. Mar. 27, 2002) .................................................................................................. 31

*In re Tyson Foods, Inc. Cons. S'holder Litig.*, 919 A.2d 563 (Del. Ch. 2007) ....................... 42

*In re Veeco Instruments, Inc. Sec. Litig.*,
434 F. Supp. 2d 267 (S.D.N.Y. 2006) .................................................. 20, 21, 23, 27, 31

*In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275 (Del. Ch. 2003) .......... 11, 12, 13, 18, 38, 39

*Wood v. Baum*, 953 A.2d 136 (Del. 2008) ........................................................................ 11, 24

## STATUTES

8 Del. Code § 102(b)(7)............................................................................................................ 38

## RULES

Fed. R. Civ. P. 15(a) ............................................................................................................... 42

Fed. R. Civ. P. 23.1 ............................................................................................................... 10

Plaintiffs Louisiana Municipal Police Employees Retirement System and Terry G. Thomas ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Consolidated Shareholder Derivative Complaint ("Complaint" or "Compl.").

## PRELIMINARY STATEMENT

This action arises out of one of the most extensive securities market manipulation schemes in recent memory.  Defendants, officers and directors of Morgan Stanley ("Morgan Stanley" or the "Company"), participated in an industry-wide scheme (joined by executives of UBS, Goldman Sachs, Citigroup, Bank of America, and Merrill Lynch, among many others) to manipulate the market for auction rate securities ("ARS") on a massive scale, using techniques of concealment that the securities laws have, for decades, proscribed.  Together with their contemporaries at other broker-dealers, Defendants deceived the Company's own customers into believing that the ARS market was a "safe" and "liquid" one, generating enormous bonuses and other compensation for themselves but in the process perpetrating a fraud that eventually will cost the Company multiple billions of dollars and permanently tarnish its reputation among investors. Led by Chairman and Chief Executive Officer John Mack, who in 2005 directed Morgan Stanley to *weaken* the status and independence of the Company's risk management functions (Compl. ¶ 68(h)), the Board was well aware of, and consciously approved, the Company's practices in the ARS market. Put on notice of the impropriety of those practices no later than May 2006, when the Securities and Exchange Commission ("SEC") censured the Company for failing to make liquidity-related disclosures to its customers, ordered it to pay a substantial fine, and required it to cease and desist from further violations, Defendants knowingly allowed the practices to *resume, and even intensify,* in 2007-2008—in spite of further "red flags" concerning the plummeting

1

liquidity in the ARS market and the danger to customers therefrom.

The ARS debacle has had and will have a ruinous effect on Morgan Stanley.  When, in the summer of 2008, the scheme collapsed, the Company was forced by just one state attorney general to pay a *$35 million fine* and undertake onerous remediation measures, including committing to repurchase **billions of dollars** in unmarketable securities.  (Compl. ¶ 137.)  It is now eight months later, and the Company still has not reached a settlement regarding ARS violations with the SEC, which could file a civil or criminal proceeding at any time.  (Compl. ¶¶ 139, 141.)  Meanwhile, the Company has already incurred some $640 million in charges and write-downs (i.e., losses) in connection with its ARS repurchase obligations, as well as $1.7 billion in losses related to transactions with monoline insurers linked to the ARS repurchase program.  (Compl. ¶¶ 145-146.)  These losses are expected to grow to $1.1 billion and $2.9 billion, respectively, as the Company finishes repurchasing ARS.  (Compl. ¶ 147.)  In addition, Defendants have admitted that, in the worst case, Morgan could be required to book additional losses in the amount of $2.6 billion related to ARS repurchases.  (Compl. ¶ 149.)  The total of all these actual and potential losses is *$6.6 billion*.  (Compl. ¶ 150.)  Thus, it can come as no surprise that Defendants have admitted publicly that repercussions from the ARS debacle "***significantly affected the Company's results in fiscal 2008 and fiscal 2007***."  (Compl. ¶ 148.)

Defendants now seek to deny Plaintiffs or other shareholders any opportunity to prove Defendants' orchestration of the scheme, or to obtain redress.  The motion to dismiss is premised primarily on the fact that Plaintiffs did not first make demand on the Morgan Stanley Board of Directors (i.e., the same Defendants being sued herein) to bring these claims.  That gesture, however, would have been entirely futile.  Under the well known tests of *Aronson v. Lewis* and *Rales v. Blasband*, demand is excused on a corporate Board when a majority of the directors

allegedly either are not disinterested and independent *or* their participation in the misconduct leads to a substantial likelihood of liability and thus makes them incapable of objectively considering a demand.

Here, the Board of Morgan Stanley comprises 11 individuals.  Drawing all reasonable inferences in Plaintiffs' favor at this early stage of the litigation—as the Court must—the Complaint alleges that all, or a decisive majority, of these Director Defendants either are conflicted or face a likelihood of liability on the underlying claims that is much more than an abstract "threat" and is, in fact, substantial.[1]  Two Board members, Mack and Sexton, are high-level, highly-compensated executive officers of Morgan Stanley whose interests lie more in justifying their actions than in ferreting out the wrongdoing, explaining why courts routinely excuse demand as to inside, employee directors such as them.  (Compl. ¶ 68(a).)  Four more directors, Noski, Davies, Nicolaisen, and Phillips, sat on the Board's Audit Committee during the misconduct complained of and were directly responsible for the Company's practices in the ARS market as well as its responses to the regulatory scrutiny and discipline those practices were incurring.  (Compl. ¶ 68(b).)  *The analysis could end with those six directors and justify denying Defendants' motion in its entirety.*  However, additional directors also are conflicted from considering demand.  Among other things:  (a) the son-in-law of a seventh director, Bostock, is a Managing Director of Morgan Stanley and received $4.2 million in compensation from the Company in 2007; and (b) another four directors, Bowles, Olayan, Tyson, and Kidder, all serve as senior officers of directors of other companies or charitable institutions which depend in

---

[1] Defendants concede that if only six directors are alleged to be conflicted from objectively considering a demand, demand futility is adequately alleged.  Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Shareholder Derivative Complaint ("Def. Mem.") at 8-9.

substantial part on cash flow from Morgan Stanley, e.g., the Morgan Stanley Children's Hospital of New York (Kidder).  (*See* Compl. ¶ 68(f).)[2]

It is important not to lose sight of the Board's overall responsibility for the ARS debacle at Morgan Stanley.  As detailed in the Complaint, the various Committees of the Board were specifically tasked with monitoring the Company's business practices, reputation, and compliance with securities laws and regulations, and all nine of the non-employee directors sat on at least one committee.  The Board thus had direct responsibility for ensuring various aspects of the integrity of the ARS market at Morgan Stanley.  Yet each of these Defendants disregarded multiple "red flags" that would have led any director discharging his or her duties in good faith to investigate, determine that substantial wrongs were continuing and threatening to harm customers, and institute corrective measures to stop them.[3]  Such "red flags" included:  the 2006 censure of the Company by the SEC related to Defendants' liquidity disclosure practices in the ARS market;[4] 2007 credit tightening leading to collapse in demand for ARS at Morgan Stanley; the 2007 requirement by the Financial Accounting Standards Board that ARS could no longer be treated as "cash equivalents" on investor balance sheets; the 2007 sell-off of ARS by investors; the serial

---

[2] The features noted in this sentence are an illustration.  All Board members have more than one feature disqualifying them from objectively considering a pre-suit demand.  When all of these factors are considered together, it is apparent that for each director, there are several disqualifying features.  A director-by-director analysis is presented *infra*, part II.D.

[3] The Audit Committee, for example, had complete control over the Company system of internal controls, risk management, and compliance with legal and regulatory requirements.  This Committee also was tasked with monitoring the Company's "***receipt, retention and treatment of complaints received [from anyone] by the Company regarding accounting, internal accounting, controls, or auditing matters***" and to "***[d]iscuss with management and the independent auditor any correspondence with regulators or governmental agencies*** . . . ."  (Compl. ¶ 70.)

[4] A copy of the SEC's 2006 cease-and-desist proceeding against Morgan Stanley and other broker-dealers is attached as Exhibit A to the Declaration of Kevin L. Oufnac, signed April 20, 2009, ("Oufnac Decl.") submitted concurrently herewith.

failure of monthly auctions beginning in August 2007; the abandonment of ARS market by Defendants in February 2008; investor lawsuits and/or arbitrations in 2008; and SEC and state regulatory proceedings later that year.  (Compl. ¶¶ 98-110, 112-114, 117-120, 127-131, 133.)

To win their motion, Defendants need this Court to drop all of the above context and consider each of Plaintiffs' demand futility allegations in a vacuum, unrelated to the actual state of affairs at Morgan Stanley as it unfolded from 2006 to 2008.  But the legal standards are clear: the allegations must be read together, with all reasonable inferences drawn in favor of Plaintiffs. In effect, Defendants want to have it both ways.  To the investment community and the general public, they strive to present an image that the Director Defendants are a "hands on" Board, governed by comprehensive, smoothly-running governance mechanisms and actively participating in decision making regarding the Company's marketing of ARS.  On the other hand, when called to account for one of the largest securities violations on record, Defendants embrace their willful ignorance of the Company's securities practices—asking this Court to infer that they were utterly unable to monitor the Company's compliance with straightforward regulatory mandates, and to prevent *repeat occurrences of known misconduct*.[5]

The Court should deny the motion, and Plaintiffs should have their day in Court.

_____

[5] It is the fact that the Director Defendants herein were aware, no later than May 2006, of the *illegality* and *impropriety* of Defendants' practices in the ARS market that establishes the Board's substantial likelihood of liability and therefore excuses pre-suit demand under *Aronson* and *Rales*.  For this reason, a recent Delaware Chancery Court decision dismissing claims for failure to plead demand futility, *In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106 (Del. 2009) ("*Citigroup*")—on which Defendants place heavy emphasis in support of their argument—is not on point and provides no ground for dismissal here. In *Citigroup*, the court found that plaintiffs had alleged the existence of "red flags" only concerning the Citigroup board's failure to monitor *business risk*, and distinguished the situation where, as here, illegality and improper conduct allegedly were brought to the Board's attention and ignored.  *Citigroup*, 964 A.2d at 123-30.  The *Citigroup* decision is discussed more fully *infra*, part II.C.

## FACTUAL ALLEGATIONS

In the spring of 2006, the SEC brought administrative cease and desist proceedings against Morgan Stanley relating to the Company's liquidity disclosure practices in the ARS market. As alleged in the Complaint:

> [I]n an administrative proceeding dated May 31, 2006, the SEC found that Morgan and other broker-dealers had engaged in various illegal practices in order to make it appear that ARS auctions were successful and legitimate when, in fact, they were not. These actions, and the SEC's findings, were the direct and foreseeable consequence of Defendants' having caused or allowed the Company to engage in the illegal conduct and practices complained of herein. The misconduct at issue in 2006 was a direct precursor of Defendants' conduct during the Relevant Period – involving manipulation of the market for ARS and failure to disclose the true facts concerning that market to customers. [Compl. ¶ 97.]

The Complaint details at length the improper and fraudulent practices in which Defendants had engaged. (Compl. ¶¶ 98-103.)[6] The Complaint alleges that, to settle the 2006 SEC proceeding, Morgan Stanley was forced to pay a large fine to the SEC, censured, and ordered to cease and desist from the practices. (Compl. ¶ 104.) Morgan Stanley's misconduct in the ARS market was known to the Director Defendants by the presence of other such "red flags." (*See* Compl. ¶¶ 4-5, 12-13, 16, 68(h), 68(j), 70-81, 96, 97-110, 112-114, 117-120, 122-126, 127-131, 133, 199-201, 226-230, 233-234.)

_____

[6] Such practices included the following misconduct, all of which was designed to manipulate the market for ARS and deceive customers into investing in it despite its inherent illiquidity and risk: taking over customers' bid orders after viewing other bidders' orders, manipulating the auction clearing rate, bidding for the Company's proprietary account without disclosing that fact to customers, pressuring customers to change their bids to influence the clearing rate, setting artificial "market" rates, "netting" of in-house buy and sell orders ahead of actual auctions, "prioritizing" customer bids, "cross-trading," permitting the late submission of bids, permitting bid revision, using customers as "straw man" bidders to support auctions and then secretly compensating those customers, delaying settlement dates, and engaging in inconsistent "price talks." (*Id.*)

Despite the Company's agreement to cease and desist from wrongful conduct and Defendants' direct awareness thereof, in 2007-2008 the Director Defendants caused or allowed Defendants to engage in the same pattern of market manipulation and customer deception that the Company had been disciplined for in 2006—at which point, the SEC, this time joined by numerous state securities regulators and attorneys general, was *again* forced to discipline the Company. Thus, by the summer of 2007, Defendants were struggling to "maintain the illusion of a healthy and liquid market for Morgan's ARS." (Compl. ¶ 115.) At that point, "rather than disclose the weakening demand for ARS, Defendants caused Morgan to *market ARS to customers—even more intensely—as a liquid cash alternative*." (*Id.*) The fraud extended right down to customers' monthly account statements, which showed ARS held in customer accounts as "money-market" or "cash" equivalents. (Compl. ¶ 121.) "As a result, many customers invested in ARS funds that they might need for short-term requirements, such as money to fund business operations or even money intended to be used as a down payment on a house, medical expenses, college tuition, or taxes." (*Id.*) Defendants specifically caused or allowed the Company's Financial Analyst sales force to *accelerate their sales of ARS to unsuspecting customers so that the Company could rid itself of its inventories before they became unmarketable*. (Compl. ¶¶ 116, 125.)

On February 13, 2008, Defendants' house of cards began to collapse. On that date, no longer able to afford maintaining the illusion of a liquid trading market, "Defendants directed Morgan to stop supporting auctions altogether and caused the Company to simply 'walk away' from the ARS market." (Compl. ¶ 119.) As a direct and foreseeable consequence, the ARS market collapsed, and Morgan Stanley was charged with violations of federal and state securities laws so strong that Defendants, to avoid a conviction, were required to settle immediately with

the New York Attorney General.  (Compl. ¶¶ 132-138.)  This they did by agreeing to rigid repurchase and remediation terms and a ***$35 million fine***. (Compl. ¶ 137.)  The settlement was agreed to ***only three days*** after the New York Office of Attorney General announced its intention to bring charges.  (Compl. ¶¶ 134-137.)

In their motion, Defendants rewrite the Complaint—contending, with a straight face, that "Plaintiffs allege <u>no</u> facts regarding the outside directors' purported involvement" in the ARS scam.  Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Shareholder Derivative Complaint ("Def. Mem.") at 18.  That assertion is belied by any fair reading of the Complaint.  The Complaint alleges specific reasons why, when, and how the Director Defendants were aware of, or failed to exercise good-faith oversight sufficient to detect, the misconduct, yet permitted it to recur.  (Compl. ¶¶ 4-5, 12-13, 16, 68(h), 68(j), 70-81, 96, 97-110, 112-114, 117-120, 122-126, 127-131, 133, 199-201, 226-230, 233-234.)  The allegations of the Complaint merely seek to hold Defendants to the standards they admittedly owed to shareholders.

The SEC recently filed a civil complaint against another participant in the ARS scheme, Citigroup Global Markets, Inc. ("Citigroup").  (Compl. ¶ 24 & Exh. B.)  The complaint against Citigroup was filed simultaneously with the SEC's announcement that a settlement with Citigroup was now finalized.  (*See id.*)  Citigroup was able to reach a preliminary settlement with the SEC in the summer of 2008—whereas Defendants ***still*** have been unable to do so.  (Compl. ¶¶ 139, 141.)

The complaint in the SEC civil action against Citigroup is based on misconduct similar or identical to that alleged here of Defendants with respect to Morgan Stanley.  (*See* Compl. Exh. B.)  Specifically, the SEC alleges that Citigroup knowingly concealed from its customers the

growing illiquidity in the ARS market while simultaneously assuring those customers that ARS were safe and liquid investments.  (*See* Compl. Exh. B ¶¶ 20-72.)  Moreover, the SEC complaint alleges that no later than August 2007, as credit markets deteriorated, the true facts concerning the ARS market were made unmistakably clear to senior management.  (*See* Compl. Exh. B ¶¶ 32-34.)  Finally, the SEC alleges that Citigroup nonetheless instructed its brokers to sell as much ARS inventory as possible, which would leave customers holding billions in illiquid securities.  (*See* Compl. Exh. B ¶¶ 40-54.)

The SEC complaint against Citigroup, with its identical allegations of misconduct to those here against the Morgan Stanley Defendants, confirms why the misconduct at issue herein was not in any sense a new violation of the securities laws, of which Defendants did not necessarily have prior awareness, but was in fact a resumption and intensification of the same pattern of misconduct that had led the SEC to fine and censure Morgan Stanley in 2006 and that Defendants were well aware of.  (Compl. ¶ 26 & Exh. B.)  Indeed, the SEC made plain in the Citigroup complaint that, among other things, although Citigroup had duly "posted its ARS practices on its website" pursuant to the 2006 settlement, "***these disclosures were inadequate and did not negate Citi's marketing of ARS as liquid investments that were an alternative to money market instruments***."  (*Id.* (emphasis added).)  The Morgan Stanley Defendants, who had agreed to the same settlement with the SEC in 2006, followed the exact same path afterward, as alleged in the Complaint.  (*See* Compl. ¶¶ 25-28, 96-131.)

In addition, as the Complaint alleges,

> Although Defendants caused the Company to disclose certain features of the auction market, including the fact that insufficient bids *could* lead auctions to fail, ***these disclosures were inconsistent with Defendants' description of ARS as money-market equivalents and inconsistent with the marketing of ARS as liquid, short-term investments.***

> *. . . In addition, Defendants did not disclose the extent to which the liquidity of ARS depended on Morgan itself bidding in the auctions.*  Defendants used the Company's support for auctions, and its corresponding record of no failed auctions, to imply safety and liquidity in promoting ARS to Company customers.  Moreover, even if a customer had been informed that there were liquidity risks associated with ARS, *that customer would not have been able to know that the liquidity risk, to a significant degree, depended on Morgan's own discretion in bidding to support the auctions.*

(Compl. ¶ 122-123.)  These allegations make clear that in 2008—as previously in 2006—Defendants had been engaged in making false statements and disclosures to customers concerning the liquidity of the ARS market and the high degree to which that market depended on Defendants' own participation, which could be withdrawn at any time.

## ARGUMENT

## I.     THE LEGAL STANDARDS FOR DECIDING DEFENDANTS' MOTION.

### A.     Federal Rule of Civil Procedure 23.1

The plaintiff in a shareholders' derivative action must allege either: (a) that he or she has made a demand on the corporation's board of directors to take the requested action; or (b) the reasons for not making demand, i.e., the reasons why demand is futile.  Fed. R. Civ. P. 23.1.  Such futility is apparent where a majority of the Board either lacks independence or is not disinterested.  *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *Saito v. McCall*, No. 17132, 2004 Del. Ch. LEXIS 205, at *33 n.68 (Del. Ch. Dec. 20, 2004).

Pleading demand futility, however, is not nearly as difficult as Defendants insist.  There is no requirement that Plaintiff plead evidence.  *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *overruled in part on other grounds*, *Brehm v.*

*Eisner*, 746 A.2d 244 (Del. 2000).  Instead, the complaint need only raise a "reasonable doubt" as to the disinterestedness or independence of a majority of directors.  *Aronson*, 473 A.2d at 814.[7]

Similarly, Plaintiff are not required to plead facts sufficient to sustain a judicial "finding." *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003); *Grobow v. Perot*, 539 A.2d 180, 186, 195 (Del. 1988).  "[N]or must plaintiff demonstrate a reasonable probability of success on the merits."  *McCall v. Scott*, 239 F.3d 808, 816, *amended on denial of rehearing*, 250 F.3d 997 (6th Cir. 2001).  Instead, Plaintiffs need only make a "threshold showing, through the allegation of particular facts, that their claims have some merit." *Rales*, 634 A.2d at 934 (citing *Aronson*, 473 A.2d at 811-12).

In conducting this analysis, the Court must review the Complaint in its entirety, must assume the truth of the allegations, and must draw all reasonable inferences in favor of Plaintiffs. *Rales*, 634 A.2d at 931; *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (relied upon by Defendants); *Beam v. Stewart*, 833 A.2d 961, 1048 (Del. Ch. 2003) (same).  Rather than dissecting the Complaint into component parts, the Court must **read all of the Retirement System's allegations as a whole**, not relying on any one factor but examining the totality of the circumstances.  *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990); *Friedman v. Beningson*, No. 112232, 1995 Del. Ch. LEXIS 154, at *12 (Del. Ch. Dec. 4, 1995).

## B.    Demand Futility Under *Aronson* and *Rales*

Under Delaware law, the leading case for determining whether demand is futile with respect to an affirmative action of the Board—or a decision not to take *any* action—is *Aronson*.

---

[7] "Reasonable doubt can be said to mean that there is a *reason to doubt*.  This concept is sufficiently flexible and workable to provide the stockholder with the 'keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) (emphasis added), *overruled in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

A plaintiff is excused from making a pre-suit demand on a Board if there is reason to doubt that: (i) a majority of its directors are independent or disinterested; *or* (ii) the challenged acts are a valid exercise of business judgment.  *See Aronson*, 473 A.2d at 812.

Regarding the first prong of *Aronson*, two kinds of allegations allow a court to infer a reasonable doubt regarding director disinterestedness.  First, "[d]irectorial interest exists whenever divided loyalties are present, or a director has received . . . a personal financial benefit from the challenged transaction . . . not equally shared by the stockholders."  *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984).  Second, reasonable doubt is raised where the allegations show a "substantial likelihood" of liability for the misconduct at issue.  *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

To implicate the second prong of *Aronson*, a plaintiff must challenge a board decision where its members exercised business judgment.  *Id.* at 812.  In the alternative, the test may be satisfied by pleading a "conscious decision *to refrain* from acting."  *Aronson*, 473 A.2d at 813 (emphasis added); *Rales*, 634 A.2d at 933; *In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 809 (7th Cir. 2003).

For example, in *Disney*, the court found that the directors were alleged to have adopted an "ostrich-like approach" to whether the company should enter into a lavish employment agreement with Michael Ovitz whereby Mr. Ovitz would receive $38 million in cash upon termination for any reason.  *See Disney*, 825 A.2d at 289.  The court further found that the Board allegedly knew and approved of the agreement but never sought to negotiate the amounts with Mr. Ovitz, thus raising a substantial likelihood of liability for violation of the duty of good faith and excusing demand:

> These facts, if true, do more than portray directors who, in a negligent or grossly negligent manner, merely failed to inform themselves or to

> deliberate adequately about an issue of material importance to the corporation.  Instead, the facts alleged in the new complaint suggest that the defendant directors *consciously and intentionally disregarded their responsibilities*, adopting a "we don't care about risks" attitude concerning a material corporate decision.  *Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct . . . that may not have been taken honestly and in good faith to advance the best interests of the company.*  Put differently, all of the alleged facts, if true, imply that the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss.

*Id.* (second emphasis added).  The *Disney* court went on to identify the following examples of conduct that would establish a failure to act in good faith, thereby excusing demand:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable law, *or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.*

*Id.* at 67.  *See also Abbott Labs.*, 325 F.3d at 809.

When the challenged misconduct does not constitute a business decision by the Board, however, *Rales* applies.  *Rales* addresses demand futility when the wrongdoing arose out of **unconscious** inaction—for example, failure to oversee subordinates or have a system of control procedures.  *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) ("ignorance of liability creating activities").  Under *Rales*, courts evaluate whether the allegations create "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  634 A.2d at 934.

The *Rales* test, like *Aronson*, also focuses on likelihood of liability for the wrongs complained of.  Thus, "[d]irectors who are sued for failure to oversee subordinates have a

disabling interest [for pre-suit demand purposes] when the potential for liability is not a 'mere threat' but instead may rise to a 'substantial likelihood.'" *In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) (quoting *Rales*, 634 A.2d at 936); *Caremark*, 698 A.2d at 969.[8]

## II.     THE COMPLAINT ADEQUATELY PLEADS DEMAND FUTILITY.

As Defendants concede (Def. Mem. at 8-9), Plaintiffs need only raise a reasonable doubt as to the independence or disinterestedness of *six* of these directors.  Such a doubt is in fact raised with respect to *all* of the directors.

### A.     The Director Defendants Adopted Specific Duties Involving the ARS Market as Members of Board Committees.

As members of the Morgan Stanley's Committees of the Board of Directors, nine of the Director Defendants had specific oversight responsibilities for various aspects of Morgan Stanley's operations, and each Committee was tasked with reporting back to the full Board. (Compl. ¶¶ 69-77.)

As members of the Audit Committee, Defendants Noski, Davies, Nicolaisen, and Phillips had the ultimate responsibility at the Company for the following duties, among others:

- *"[d]iscuss, as appropriate, the adequacy of the Company's internal controls with the internal and independent auditors and management"*;

- *"[r]eview and discuss, as appropriate, any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies"*;

- *"[e]stablish procedures for:   (i) the receipt, retention, and treatment of complaints received [from anyone] by the Company regarding accounting, internal accounting, controls, or auditing*

_____

[8] While Defendants refer to both the *Aronson* and *Rales* tests, they incorrectly assert that the *Rales* standard is the only applicable one.  *See* Def. Mem. at 7-8.  As discussed *infra*, part II.B, the Director Defendants' misconduct can be classified *either* as a conscious decision, in the form of a failure to act in the face of a known duty, or as a complete failure of oversight.

*matters*; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters";

- "*review with the Company's Chief Legal Officer, or appropriate delegates, legal, disclosure or other matters that may have a material impact on the Company's consolidated financial statements or on the Company's compliance policies*";

- "*[o]btain, review and evaluate reports from management with respect to the Company's policies and procedures regarding compliance with applicable legal and regulatory requirements, and the Company's Code of Ethics and Business Conduct*"; and

- "*[d]iscuss with management and the independent auditor any correspondence with regulators or governmental agencies* and any external or employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies."

(Compl. ¶ 70.) The Audit Committee met 10 times during 2007, and it specifically reported in the Company's 2008 Proxy Statement that it had "[r]eviewed and discussed reports from management on the Company's policies regarding applicable legal and regulatory requirements." (*Id.*)[9]

Similarly, as members of the Compensation Committee, Defendants Kidder, Bowles, and Nicolaisen had the ultimate responsibility at the Company for evaluating the compensation of the Company's directors, executives, and employees, as well as to:

- "*[r]eview and approve corporate goals and objectives relevant to the compensation of the* Chairman and CEO, evaluate his or her performance in light of those goals and objectives, and determine his or her compensation level based on that evaluation";

- "*[a]pprove the compensation of executive officers and such*

_____

[9] Such a statement, in the context of Defendants' resumption and continuation, in 2007-2008, of conduct for which the Company had been censured in 2006, establishes either that the Audit Committee did not review and discuss the 2006 SEC censure, or did not ensure compliance with it. There is no middle ground. *See infra*, part II.B.

> ***other officers as the Committee determines appropriate***"; and

- "***[o]versee the evaluation of management***".

(Compl. ¶ 73.)  This Committee would have had access to materials and information on the performance of Morgan Stanley relative to its various business sectors, including the ARS market and other fixed income activities, so that they could evaluate the performance of the CEO and other executive officers in relation to their compensation.  (*See id.*)  The Compensation Committee met seven times during 2007.  (Compl. ¶ 74.)  Each member of the Committee has a substantial likelihood of liability for paying compensation to Defendants and other officers involved in the improper marketing of ARS based in part on the issuance and sale of such securities, despite knowing of Defendants' recidivist misconduct—including ***$150 million in 2007 compensation*** to Defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides alone. (Compl. ¶ 75.)

Likewise, as the members of the Company's Nominating and Governance Committee, Defendants Tyson, Bostock, and Olayan, had the ultimate responsibility at the Company for overseeing the Board as a whole and ensuring proper corporate governance policies, as well as to

- "[o]versee the annual evaluation of the Board and its committees";

- "review and assess the adequacy of the Company's Corporate Governance Policies and, if appropriate, recommend changes to the Corporate Governance Policies to the Board"; and

- "[r]eview and approve related person transactions in accordance with the Company's Related Person Transactions policy and associated disclosure.  Report approved related person transactions to the Board."

(Compl ¶ 76.) This Committee met five times during 2007.  (Compl. ¶ 77.)  Each member of the Committee has a substantial likelihood of liability for failing to prevent the Insider Selling Defendants from selling ***$26.6 million*** in Morgan Stanley stock based on material, non-public

information concerning the Company's exposure to ARS-related losses and liabilities, as well as for approving **over $45.2 million in 2007 compensation** to various Board members in the same circumstances.  (Compl. ¶ 77.)

## B. The Existence of "Red Flags" Establishes that the Director Defendants Consciously Disregarded Their Duties.

The Complaint alleges a series of wrongful acts, many of which are interrelated, that evidence an abandonment or abdication of the Board's fiduciary duties, including a lack of loyalty, good faith, and oversight.  Indeed, the Board (and its Committees) was fully aware of the Company's misconduct in the ARS market because the misconduct was right on the surface, visible to any Director Defendants attending to their fiduciary duties in good faith.

As detailed in the Complaint, the collapse of the ARS market in early 2008—followed by regulatory investigations of Morgan Stanley, $35 million settlements, and onerous settlement terms—was by no means the first time that the Director Defendants were obliged to confront Defendants' deception of customers as to the safety and liquidity of the ARS market.  No later than May 2006, when Defendants agreed to settle the SEC's cease and desist proceeding, the Director Defendants were well aware of—or were consciously or in bad faith indifferent to—the Company's misconduct.  (Compl. ¶¶ 4-5, 12-13, 16, 68(h), 68(j), 70-81, 96, 97-110, 112-114, 117-120, 122-126, 127-131, 133, 199-201, 226-230, 233-234.)   The Complaint alleges that numerous "red flags" concerning the safety and liquidity of the ARS market were clearly apparent to the Director Defendants, based on many separate sources.  (*See id*.)  Given their responsibilities and undertakings as set forth above, the fact that the Board and its Committees met frequently throughout 2007 and 2008, the prominence of the 2006 SEC cease and desist proceeding, and the existence of many other "red flags," it is a reasonable inference at this early stage in the litigation that the Director Defendants were aware of yet refrained from stopping

Defendants' resumed misconduct.[10]

In that regard, the facts alleged in the case at bar are similar to, and require the same outcome as, the *Disney* decision discussed *supra*, part II.A.  Although the Board and its Committees undoubtedly were aware of the 2006 disciplining of the Company by its primary securities market regulator regarding liquidity disclosures in the ARS market, the Director Defendants evidently took no steps to inform themselves of the Company's compliance with that disciplining going forward, despite accumulating "red flags" that the ARS market was growing even more illiquid and, thus, the potential harm to customers even more harsh.[11]  As in *Disney*, they failed to ask questions, failed to review or even request documents, and simply left to others the task over which they had primary responsibility.  *See Disney*, 825 A.2d at 280-82.

As discussed *supra*, part II.A, courts excuse demand where a plaintiff demonstrates a lack of good faith by pleading **either** conscious inaction by the Board to known problems, **or** a sustained or systematic failure to exercise oversight.  In the latter case, demand futility is ordinarily found when such a failure involves a scheme of significant magnitude and duration which went undiscovered by the directors as a group.  *See In re In re Oxford Health Plans, Inc. Sec. & Deriv. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (applying Delaware law); *McSparran*

---

[10] This applies to all Board members no less than to members of the Audit Committee, as directors of a Delaware corporation are expected to speak with one another when serious problems arise in their company.  *See Saito*, 2004 Del. Ch. LEXIS 205, at *33 n.68, *33 n.71 (observing that a "committee of the board, acting in good faith, would have openly communicated with each other concerning the accounting problems . . . and would have shared the information with the entire     . . . board").

[11] These "red flags" included:  the 2007 credit tightening leading to collapse in demand for ARS securities at Morgan Stanley; the 2007 requirement by the Financial Accounting Standards Board that ARS securities could no longer be treated as "cash equivalents" on investor balance sheets; the 2007 selloff of ARS securities by investors; the serial failure of monthly auctions beginning in August 2007; the abandonment of ARS market by Morgan Stanley in February 2008; investor class actions in 2008; and SEC and state regulatory proceedings later that year.  (*See* Compl. ¶¶ 98-110, 112-114, 117-120, 127-131, 133.)

*v. Larson*, No. 04 C 0041, 2006 U.S. Dist. LEXIS 3787, at *15-*16 (N.D. Ill. Jan. 27, 2006) (applying Delaware law).  The Delaware Supreme Court has made clear that such a failure of oversight can arise either from a failure to implement any reporting or control system, or, having implemented such a system, from a conscious failure to monitor or oversee its operations, thus disabling directors from being informed of risks or problems requiring their attention.  *Stone v. Ritter*, 911 A.2d 362, 367, 370 (Del. 2006).  As illustrated by the cases discussed and relied on herein, under any of the above standards, Defendants are alleged to face a substantial likelihood of liability and demand therefore is excused.

     *In re Countrywide Fin'l Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1080-82 (C.D. Cal. 2008), is directly on point.  There, the court denied a motion to dismiss, for failure to plead demand futility, a complaint alleging that directors of a prominent mortgage loan originator had knowingly allowed the company's underwriting standards to decline.  The court specifically analyzed the duties of the Board's various committees, including audit, finance, credit, and public policy, and found that those duties, to have been fulfilled, would necessarily have involved the committee members' awareness of the declining underwriting standards, given the existence of specific "red flags" (such as the a dramatic "rise in negative amortization resulting from pay-option ARMs held for investment" and "increasing delinquencies in Countrywide's riskiest loans") that the directors "must necessarily have examined . . . in the course of their Committee oversight duties."  *Id.* at 1060.  The court held:

> [The committee members] could not ignore the impact of departures from underwriting standards, especially given the public report issued by a collation of banking regulators condemning low-documentation loans and the demise of competing lenders later in the Relevant Period.
>     . . . [T]he Court finds that the Complaint pleads evidence of a "sustained or systematic failure of the board to exercise oversight," *Caremark*, 698 A.2d at 931, so as to create a substantial likelihood of

> liability for at least the members of those Committees. It defies reason, given the entirety of the allegations, that these Committee members could be blind to widespread deviations from the underwriting policies and standards . . . . At the same time, it does not appear that the Committees took corrective action. Though the Complaint leaves many details unpled, it provides enough of a factual basis for this Court to determine that a majority of the directors are "interested" for demand purposes at this juncture . . . .

*Id.* at 1082 (footnotes and citations to pleadings omitted).

Similarly applicable is *McCall v. Scott*, in which the Sixth Circuit held that the directors' sustained failure to act against a corporation's systematic health care fraud occurring over two years (less than the three years at issue here) alleged sufficient facts to present a "substantial likelihood of liability." 239 F.3d at 814, 819. Reversing the district court's dismissal of the claims, the appeals court held that particularized facts were alleged to present a substantial likelihood of director liability for intentional or reckless breach of duties through awareness of the fraud, including: (i) "the prior experience of a number of the defendants as director or managers" (a "significant factor" in the Court's assessment); (ii) the existence of a federal investigation; (iii) ongoing practices at the company; (iv) allegations brought against the corporation in civil proceedings; and (v) newspaper reportage. *See id.* at 819-20, 822-23.[12]

Recently, the Honorable Colleen McMahon of the Southern District of New York denied the defendants' motion to dismiss on demand futility grounds. *See In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006). Again like the instant Complaint, the *Veeco* plaintiffs alleged that the company's board had oversight over legal and regulatory matters yet did

---

[12] The facts alleged by Plaintiffs are analogous to those found sufficient to excuse demand in *Countrywide* and *McCall v. Scott*. As in those cases, the Complaint alleges the existence of numerous "red flags" that made the Director Defendants well aware of all Defendants' misconduct in the ARS market. (*See* Compl. ¶¶ 98-110, 112-114, 117-120, 127-131, 133.) And as in *McCall v. Scott*, the Director Defendants here have vast prior experience as directors and managers of corporations that enabled them to easily process these "red flags" had they only wanted to. (*See* Compl. ¶¶ 35-45.)

not discover significant financial fraud:

> The significance of the TurboDisc division—both in terms of the money expended to acquire it and the value it purportedly added [sic] the Company—coupled with the Audit Committee's role in reviewing matters that significantly impact on the Company's financial disclosures, suggest that the Committee was duty-bound to ensure that Veeco implemented an adequate system of internal controls when integrating the TurboDisc division.

*Id.* at 277.  Similarly, the plaintiffs alleged that Veeco's audit committee had abdicated their responsibility when, barely seven months after an internal audit had discovered a $15 million violation of federal export control laws, a second set of violations occurred.  *See id.* at 278.  In light of these allegations, the court concluded:  "This is not a case where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability,'" and demand therefore was excused as futile.  *Id.* (citing *Caremark*, 698 A.2d at 969).  So, too, should be the result here.

Other cases compel the same conclusion.  For example, in *Abbott Laboratories*, the Seventh Circuit noted that several of the directors were members of the Board's audit committee, which, similarly to the instant action, was charged with "assessing any risks involved in regulatory compliance."  *Abbott Labs.*, 325 F.3d at 808.  The Court further noted that the directors "had a fiduciary duty under the SEC to comply with 'comprehensive government regulations' . . . ."  *Id.*  The Seventh Circuit, stating that continuing violations of federal regulations—including the receipt of warning letters from the Food and Drug Administration ("FDA") and the eventual withdrawal of products and the payment of a $100 million fine to the FDA—"could not be minimized," and used these facts to form the basis for finding "***inferred awareness of the problems***" on the part of the entire Board of Directors.  *Id.* at 808-09 (emphasis

added).[13]

Furthermore, in *Saito*, the court denied a motion to dismiss because, drawing all reasonable inferences in his favor, the plaintiff had alleged sufficient facts to establish that Board was aware or should have been aware of accounting irregularities at company—including knowledge that the 1997 audit was "high risk," audit committee discussion of risks, knowledge that certain accounting practices at company were "***a problem***," and advice that "there could be a ***potential*** SEC issue." 2004 Del. Ch. LEXIS at *33 (emphases added).  The Delaware Chancery Court's finding of demand futility in *Saito*—which involved only vaguely-defined "problems" and "potential" issues—should lead, a fortiori, to a finding of demand futility here, where the known misconduct is extremely well defined and the issues—including the strict SEC discipline imposed in 2006—were actualized ones.

In sum, based on the above case authority, the Complaint meets either standard—conscious inaction ***or*** a sustained or systematic failure to exercise oversight—necessary to excuse demand for Board inaction.  At the bare minimum, the Complaint meets at least ***one*** of the standards:  Either the Director Defendants were unaware of Defendants' resumed liquidity disclosure failures in the ARS market following the heightened notice provided by the 2006 SEC censure, or they were aware of it yet did nothing.  In either case, the alleged continuation of the

---

[13] *See also In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 125 (D.N.J. 1999) (demand excused as futile on audit committee members where plaintiff alleged that directors "knew or recklessly disregarded the existence of the accounting irregularities," including numerous "red flags" regarding merger partner's prior accounting machinations); *Oxford Health Plans*, 192 F.R.D. at 115-16 (demand excused as futile where Board was alleged to have continued to support and retain former CEO and Chairman as a consultant despite knowing he was responsible for billing and insurance problems that had drawn regulatory actions by the Governor of New York and the Superintendent of Insurance of New York); *In re American Int'l Group, Inc. Consol. Deriv. Litig.*, C.A. No. 769-VCS, 2009 Del. Ch. LEXIS 15 (Del. Ch. Feb. 10, 2009) (demand excused as futile where facts were pleaded allowing inference that Board had been aware of fraudulent or criminal misconduct).

misconduct leads to a substantial likelihood of liability for breach of the duties of oversight and good faith on the part of the Morgan Stanley Board, and excuses demand.[14]

By misreading the Complaint, Defendants are led to cite inapposite case law in their argument against a finding of demand futility on the facts alleged. *See, e.g.*, Def. Mem. at 19-24 (discussing *Caremark* and other cases). *Caremark*, for example, did not concern a motion to dismiss for demand futility but, rather, whether to approve a settlement, and the court issued its decision *after reviewing the discovery record*, finding "essentially no evidence that the director defendants were guilty of a sustained failure to exercise their oversight function." Moreover, at issue was a bare allegation that the directors "ought to have known" of anti-trust violations, leading the court to conclude that "there were no grounds for suspicion . . . ." *Caremark*, 698 A.2d at 969. Those facts contrast sharply with the situation here, where numerous "red flags" are alleged to have come to the attention of, and been consciously disregarded by, various Board members. *See Oxford Health Plans*; *McSparran*; *Countrywide*; *McCall v. Scott*; *Veeco Instruments*; *Abbott Labs.*; *Saito*; *Cendant.*

Indeed, each of Defendants' cases can be distinguished based on one or the other of two reasons. Either:  (1) the case did not involve earlier "red flags" calling the Board's attention to problems and thereby establishing their knowledge thereof and their corresponding conscious failure to act; or (2) if the plaintiff did attempt to allege that there were "red flags," the court found that the flags were not actually "red" at all—for example, they concerned different conduct than that which formed the basis for the complaint, or they pointed merely to a situation of

---

[14] For example, if the Audit Committee members were unaware of the misconduct, then it could only have been because, in spite of that Committee's Charter requiring it to monitor significant regulatory matters, no one on the Committee asked for a list of regulatory inquiries made to the Company. Thus, as in the above cases, there was a conscious failure to monitor or oversee the operations of the Company's own control system, thereby excusing demand under the *Rales/Caremark/Stone* test.

*business* risk that had been disregarded and that did not involve illegality or impropriety.[15]

### C. The Recent *Citigroup* Decision of the Delaware Chancery Court *Supports* a Finding of Substantial Likelihood of Liability (and Hence Demand Futility) Here.

That leaves Defendants' principal case, *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del. Ch. 2009). *See* Def. Mem. at iii, 3, 21-22. Contrary to Defendants' argument, however, *Citigroup* does not negate a finding of demand futility here but, rather, ***supports*** such a finding.

*Citigroup* was a shareholder derivative action against the directors and officers of Citigroup Inc. to recover massive losses that company had experienced from investment in subprime mortgage-related securities. *See Citigroup*, 964 A.2d at 111, 112-14. The plaintiffs therein alleged that the defendants had failed to monitor risks, disregarding multiple "red flags" showing the company's huge downside exposure. *See id.* at 111-12, 114-15. The defendants

---

[15] See, for example, the following cases relied upon by Defendants: *Wood*, 953 A.2d at 141-43 (there had been no "red flags," such as an SEC investigation and cease and desist proceeding); *Stone*, 911 A.2d at 364 (plaintiffs ***conceded*** in their complaint that directors neither "'knew [n]or should have known that violations of law were occurring,' i.e., that there were no 'red flags' before the directors"); *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 534 (S.D.N.Y. 2008) (complaint failed to allege, except in a conclusory manner, any information that would have come to the attention of the audit committee concerning impact of merger on company's financial results); *Ferre v. McGrath*, No. 06 Civ. 1684, 2007 U.S. Dist. LEXIS 29490, at *23-*24 (S.D.N.Y. Feb. 16, 2007) (complaint alleged merely that audit committee had failed to detect and prevent illegal activities, and did not contain "a single particularized fact" showing awareness of "red flags"); *Halpert Enters. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005) (no allegations of "red flags" that would have put Board on notice); *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 Del. Ch. LEXIS 103, at *46 (the single "red flag" alleged to have come to Board's attention was a "possibly onerous elevation in a single ***financial*** statistic"); and *In re IAC/InterActive Corp Sec. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007) (plaintiff failed to plead "what obvious danger signs were ignored"); *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) (plaintiff ***conceded*** that the complaint "does not plead a single fact suggesting specific red—or even yellow—flags waved at the outside directors"). One case relied upon by Defendants specifically suggests that Defendants' motion to dismiss should be ***denied***. *See David B. Shaev Profit Sharing Account v. Armstrong*, Nos. Civ. A.10,684, Civ. A. 10,685, 2006 Del. Ch. LEXIS 33, at *5 (Del. Ch. Feb. 13, 2006) ("A claim that an audit committee or board ***had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss***, even if the committee or board was well constituted and otherwise functioning.") (emphasis added).

moved to dismiss, and the Delaware Chancery Court applied the *Caremark* test in holding that the plaintiff must show "bad faith" misconduct in order both to demonstrate a "substantial likelihood" of liability sufficient to excuse demand and to avoid the preclusive effect of a corporate charter provision exculpating directors from all but intentional or bad-faith misconduct. *See id.* At 120-23, 125.  In analyzing what constituted "bad faith" sufficient to make these showings, the court defined bad faith as the "conscious disregard of responsibilities such as by failing to act in the face of a known duty to act."  *Id.* at 123 (citing *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003)).

In applying these principles, the Chancery Court began by noting that the facts of the case were completely unlike the "typical *Caremark* situation."  *Citigroup*, 964 A.2d at 123.  Whereas *Caremark* addressed the failure to properly monitor or oversee employee **misconduct** or **violations of law**, the plaintiffs "in contrast, base their claims simply on defendants' failure to properly monitor Citigroup's **business risk**, specifically, its exposure to the subprime mortgage market."  *Id.*  To underscore this distinction, the court repeated it several more times—in the process distinguishing cases relied upon by Plaintiffs herein.  *See id.* at 126, 127, 128, 129 (distinguishing *McCall v. Scott* as having involved alleged "red flags" making Board aware of earlier misconduct of the same type as that at issue in the case), 130 (distinguishing *American Int'l Group* as having involved alleged failure to exercise oversight over known fraudulent or criminal misconduct), 131 ("There are significant differences between failing to oversee employee fraud or criminal conduct and failing to recognize the extent of a company's business risk.").

In contrast, the Chancery Court held, the supposed "red flags" relied upon by the *Citigroup* plaintiffs were not "red flags" at all, but simply involved phenomena like decreased

loan originations, losses by other subprime investors, downgrades of subprime-based securities, increasing subprime defaults, and the like.  In these circumstances, the court held, the plaintiffs were suing the directors, in essence, simply for exercising their business judgment in making the subprime investments at issue.  *See Citigroup*, 964 A.2d at 124.  Thus, the claim was a nothing more than a traditional duty of care claim subject to numerous defenses, including in the demand futility analysis.  *See id.* at 124-25.

The facts in the case at bar are categorically different from those that were present in *Citigroup* and dictate the opposite outcome.  Here, unlike in *Citigroup* (and as in the cases distinguished by it), there ***are specific allegations of known, prior misconduct and illegality— i.e., traditional "red flags" establishing Board awareness and conscious participation in the overall misconduct.***  Indeed, the allegations as whole clearly satisfy the "failing to act in the face of a known duty to act" standard enunciation by the Chancery Court in *Citigroup*:

<u>Duty to act</u>—the Director Defendants are alleged to have had a duty to monitor Morgan Stanley's practices in the ARS market, particularly as it related to disclosures to customers, and to ensure that there was ***no repeat of the disclosure problems that had led to the 2006 censure and cease-and-desist proceeding by the SEC***.

<u>Knowledge of duty</u>—Each member of the Morgan Stanley Board is alleged to have been aware of his or her duties to monitor the Company's exposure to regulatory and legal inquiries.

<u>Failure to act</u>—The Complaint alleges a failure to act on the part of the responsible Director Defendants, inasmuch as, despite agreeing with the SEC in 2006 to pursue honest practices in the ARS market (particularly as to liquidity issues in the Company's disclosures to customers), the Company, in fact, began to make even ***worse*** disclosures about ARS— representing to customers that they were "safe," "liquid," "cash equivalent" securities.  This

constitutes a failure of the Board to act for the simple reason that *if the Board had acted, it could and would have prevented this repeat misconduct.*  Thus, although the precise contours of the Board's failure to act are not known at this time—the *fact of the failure to act is known, and is alleged.*

Regarding the Director Defendants' failure to act, that failure could have occurred at various points in the oversight process without affecting the viability of the Complaint's demand futility allegations.  Perhaps the Board simply approved the 2006 SEC settlement without having read it closely enough to understand what the problems were and what was required to avoid future violations.  Perhaps the Board simply never bothered to follow up after the 2006 SEC settlement to inquire whether, and how, the SEC's mandate was being implemented.  The precise details simply are not necessary at this stage in the litigation.  *See*, *e.g.*, *Veeco Instruments*, 434 F. Supp. 2d at 278 (Audit Committee faced "substantial likelihood" of liability sufficient to excuse demand; despite responsibility for legal compliance and "whistleblower" claims, Audit Committee had allowed second set of export violations to occur even after internal audit had uncovered original set of violations; court credited plaintiff's allegation that "in light of the second report, the Audit Committee permitted additional violations to occur, either by completely disregarding the first report, or by establishing procedures that were wholly inadequate and ineffective and that failed to protect the Company from potentially enormous liability"); *David B. Shaev*, 2006 Del. Ch. LEXIS 33, at *5 ("A claim that an audit committee or board *had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss*, even if the committee or board was well constituted and otherwise functioning.") (emphasis added); *Abbot Labs.*, 325 F.3d at 806 ("where there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and the board

27

knew of the problems and decided no action was required").

Defendants deny any significance to the 2006 SEC cease-and-desist proceedings, laboring to characterize it as a one-time infraction that was acted upon, disposed of, and involved conduct bearing no relationship to that which occurred in 2007-2008. *See* Def. Mem. at 22-23 (discussing Morgan Stanley's posting of its ARS procedures, including bidding for proprietary accounts, on its website in compliance with 2006 settlement and asserting that Plaintiffs "fail to adequately plead particularized facts supporting the allegation that Defendants caused or allowed Morgan Stanley to continue to engage in any wrongful practices alleged to have been engaged in [in 2007-2008] that are similar to those identified by the SEC [in the 2007 SEC Settlement]").

Defendants, however, are not free to rewrite the Complaint and must accept as true the facts as alleged therein.  The Complaint alleges, in a detailed, factually-particularized manner, the fundamental identity between the 2006 misconduct and the resumed and intensified misconduct of 2007-2008.  *See* Compl. ¶¶ 25, 26,  28 n.3, 72, 109, 122, and 123.  As alleged therein, the message to all Defendants from the 2006 SEC Settlement was that Morgan Stanley needed to provide adequate disclosure to its ARS customers of the extensive role that the Company itself played in the ARS market, so as to obviate misperceptions by those customers as to the actual *liquidity* of that market.  Thus, the Director Defendants, in approving of the 2006 SEC Settlement and agreeing to ensure that Morgan Stanley provided expanded disclosure of its role as both seller of ARS to customers and a key dealer for its own account in that market, were put on notice that they must monitor what Morgan Stanley communicated to its customers about ARS *liquidity*. For Defendants, after 2006, to have marketed ARS to Morgan Stanley customers as "safe," "liquid," "cash equivalents," cannot reasonably be interpreted to involve anything but conduct substantively identical (and, indeed, even more flagrantly wrong) to that from which the

Company agreed to cease and desist in 2006.

The distinction urged by Defendants, moreover, is one that the SEC itself pointedly has rejected.   Indeed, in both its public statements and its recent *Citigroup* complaint, the Commission has emphasized the similarity and continuity between the 2006 conduct and the 2007-2008 conduct.  In the *Citigroup* complaint, for example, the Commission explicitly linked the misconduct by Citigroup in the two time periods, alleging that the disclosures made in response to Citigroup's 2006 SEC settlement "were inconsistent" with the marketing of ARS as "liquid," "money market alternatives."  (*See* Compl. Exh. B ¶ 22.)[16]

Defendants protest that "[a]llegations regarding the existence of a governmental or regulatory agency's investigation, or a company's payment of fines to such an agency, fail to demonstrate that the directors knowingly ignored purported wrongdoing such that they face a substantial likelihood of liability . . . ."  Def. Mem. at 23 (citing *McSparran v. Larson*, No. 04C0041, 2007 U.S. Dist. LEXIS 14778, at *5 (N.D. Ill. Feb. 28, 2007)).  This argument is overbroad and incorrect.  As an initial matter,  *McSparran* says nothing about the payment of fines to a governmental agency either constituting or not constituting a "red flag."  Moreover, *McSparran* is not on point factually.  In that case, the plaintiff had alleged simply that the SEC was investigating a "salacious" employee complaint that the nominal defendant education company had inflated enrollment numbers.  *McSparran*, 2006 U.S. Dist. LEXIS 3787, at *15. The court rejected this as a sufficient "red flag" to impute knowledge of misconduct to the Board,

---

[16] Moreover, Linda Thomsen, Director of the SEC's Division of Enforcement, in testimony on September 18, 2008 before the House Committee on Financial Services concerning the SEC's 2008 ARS enforcement proceedings, stated:  "This is not the first time the SEC has brought enforcement actions involved ARS issues. . . .  In its May 2006 Order, the Commission noted that as a result of certain of these undisclosed practices, investors may not have been aware of certain *liquidity* risks."  Oufnac Decl. Exh. B, at 6 (emphasis added).

in that it included no supporting detail and a mere investigation by a government agency of an unconfirmed employee complaint is relatively commonplace and thus insufficient to put the Board on notice of misconduct.  *See id.* at *15-*16.  Here, of course, the SEC is alleged not only to have investigated, but also **censured and fined** Morgan Stanley and **ordered it to cease and desist from future misconduct.**

### D.    Director-by-Director Analysis

Below are summarized the key allegations establishing the futility of demand with respect to each member of Morgan Stanley's 11-member Board.

### 1.    Mack

The Complaint contains specific allegations regarding Defendant Mack's lack of independence and disinterestedness.  Specifically, it alleges that Mack is the current CEO and Chairman, and is a "high-level, highly compensated executive officer" of the Company, all of which support the reasonable inference that Mack derives his principal livelihood from his employment relationship.  (Compl. ¶ 35.)  Moreover, Mack in 2005 directed the Board to weaken the status and independence of the Company's risk management functions by having the Company's Chief Risk Officer report to Co-President Cruz, who led Fixed Income Sales and Trading, rather than to the CEO; these and other moves allowed Mack to plunge the Company headlong into reckless risk-taking and leverage, including investments in ARS and the decision to sell off the Company's inventories of ARS to customers by falsely touting the ARS market as a "safe" and "liquid" one.  (Compl. ¶ 68(h).)  In addition, Mack sold nearly $17 million worth of Morgan Stanley stock based on material, non-public information, before revelations of the SEC and New York Attorney General proceedings in August 2008.  (Compl. ¶¶ 35, 200.)  Further, Mack received over $41 million in unearned compensation based on inflated revenues from

improper ARS practices (Compl. ¶¶ 208, 213), and he directly participated in issuing false and misleading statements to the market concerning Defendants' actual practices related to ARS. (*See*, *e.g.*, Compl. ¶¶ 157, 159, 163, 165, 167, 169, 172, 174, 177, 179, 184.)

Particularized allegations that directors are employees of the company who derive their principal livelihood from that relationship are sufficient to raise a reasonable doubt regarding such directors' independence from other Board members.  *See*, *e.g.*, *Rales*, 634 A.2d at 937 (finding reasonable doubt regarding independence when officer's annual compensation was $300,000; "there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices").[17] That is certainly true where, as here, Mack **realized personal profits of over $58 million at the expense of the Company.**  Moreover, the Company has acknowledged that Mack is not an independent director (Compl. ¶ 68(a)), and Defendants do not seriously argue that he is independent.[18]

### 2.    Sexton

Sexton, like Mack, is a "high-level, highly compensated executive officer" of the Company, whom Defendants have effectively conceded is not independent director.  (Compl.

---

[17] *See also In re The Limited, Inc. S'holders Litig.*, No. 17148, 2002 Del. Ch. LEXIS 28, at *20-*22 (Del. Ch. Mar. 27, 2002) (receipt of $1.8 million in compensation was sufficient to call director's independence into question).  *See also Veeco*, 434 F. Supp. 2d at 275; *In re Cooper Cos. S'holders Deriv. Litig.*, No. C.A. 12584, 2000 Del. Ch. LEXIS 158, at *19-*20 (Del. Ch. Oct. 31, 2000); *Mizel v. Connelly*, No. 16638, 1999 Del. Ch. LEXIS 157, at *8 (July 22, 1999); *Steiner v. Meyerson*, No. 13139, 1995 Del. Ch. LEXIS 95, at *29 (Del. Ch. July 18, 1995); *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001), *rehearing denied*, 2001 Del. Ch. LEXIS 148 (Dec. 16, 2001); *In re Ply Gem Indus. S'holder Litig.*, No. 15779, 2001 Del. Ch. LEXIS 84, at *28-*29 (June 26, 2001).

[18] *See* Def. Mem. at 30-31. The Company excluded Mack and Sexton from the list of directors deemed "independent" under the New York Stock Exchange ("NYSE") listing standards or the Company's own Director Independence Standards.  (Compl. ¶ 42(a).)  This exclusion constitutes an acknowledgment that these directors are **not** independent under those standards and establishes that these directors lack independence for purposes of analyzing demand futility.

¶¶ 44, 68(a).)  Sexton received over $325,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director.  (Compl. ¶ 44.)[19]

### 3.  Bostock

Bostock is a member of the Nominating and Corporate Governance Committee of the Board and, thus, faces a substantial likelihood of liability for failing to prevent the Insider Selling Defendants from selling $26.6 million in Morgan Stanley stock based on material, non-public information concerning the Company's exposure to ARS-related losses and liabilities, as well as for approving over $45.2 million in 2007 compensation to various Board members in the same circumstances.  (Compl. ¶ 77.)  Bostock is further conflicted in that his son-in-law, Daniel Waters, is a Managing Director of the Company who received some $4.2 million in 2007 compensation.  With his daughter and her husband dependent on the Company to that extent, Bostock will not knowingly sue wrongdoers among his fellow Board members for fear of retaliation against his son-in-law.  (Compl. ¶ 68(d).)  Bostock also derives prestige from the Company's donation to his charities in the amount of $50,000 in 2007.  (Compl. ¶ 68(f).) Bostock received over $335,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director.  (Compl. ¶ 36.)

------------------------

[19] Defendants argue that the receipt of "ordinary director compensation" does not establish lack of independence. Def. Mem. at 12. However, as Defendants' own cases establish, Delaware courts' "view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Pirelli*, 579 F. Supp. 2d at 536 n.11 (quoting *Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2006)). Here, the fees in question totaled nearly $350,000 to each Director Defendants—almost 40 percent higher than the $250,000 maximum customary fee commonly noted in the literature on directors' fees. *See, e.g.*, Theodore F. DiStefano, "Setting Directors' Fees After Sarbanes-Oxley," *TechNewsWorld* (June 23, 2006), available at http://www.technewsworld. com/story/51226.html?wlc=1235685035 (last visited Apr. 20, 2009).

### 4.      Bowles

Bowles is a member of the Compensation, Management Development and Succession Committee of the Board and, thus, faces a substantial likelihood of liability for having (a) approved over *$150 million* in compensation, in fiscal 2007 alone, to defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides, at a time when the Company itself was becoming exposed to multiple billions of dollars in losses and liabilities related to ARS; (b) failed to review and approve appropriate goals and objectives relevant to the compensation of these defendants; and (c) failed to evaluate the performance of these defendants in light of appropriate goals and objectives and set their compensation accordingly. (Compl. ¶¶ 37, 75.) In addition, Defendants have conceded that the Company has significant existing commercial relationships with entities that Bowles or one or more of his family members serve as executive officers or employees (Compl. ¶ 68(e))—as well as the fact that the Company made significant charitable contributions to organizations led by Bowles. (Compl. ¶ 68(f).)[20]  Finally, Bowles is the President of the University of North Carolina and sits on the boards of three major companies, significantly diluting his time and making him unable to devote the time and resources necessary to objectively consider a demand in the present suit. (Compl. ¶¶ 37, 68(*l*).) Bowles received over $335,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director. (Compl. ¶ 37.)

Defendants argue that Plaintiffs' allegations regarding such commercial relationships are not adequately particularized. *See* Def. Mem. at 14-15. Yet Defendants' cases in support of this

---

[20] *Bader v. Blankfein*, No. 07 CV 11305 (SLT) (JMA), 2008 U.S. Dist. LEXIS 102968 (E.D.N.Y. Dec. 19, 2008), a decision cited by Defendants on the issue of charitable contributions, is not to the contrary. In that case—unlike here—there was no specific allegation that Morgan Stanley itself, as opposed to a charitable foundation, had made the contributions in question. *See id.* at *28.

proposition are readily distinguishable.  In *Jacobs v. Yang*, No. Civ. A. 206-N, 2004 U.S. Dist. LEXIS 117 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del. 2005), derivative allegations were asserted against only two defendants, one defendant who was an officer of Yahoo! and one defendant who was an officer and a director, and the remaining directors, who were outside directors and not named as defendants, were not alleged to be dominated by the insiders merely because they sat on the boards of companies that did business with Yahoo!, as there was no indication that these two inside directors had the power to terminate Yahoo!'s relationships with those companies.  *Id.* at *11-*24.  The case is inapplicable here, where the named defendants comprise the entire Board of Directors of Morgan Stanley as well as its top officers of Morgan Stanley (including its Chief Executive Officer, Chief Financial Officer, Chief Administrative Officer, and General Counsel), all of whom unquestionably have the power to terminate the Company's relationship with the companies in which Bowles and other particular Director Defendants have assumed leadership positions.[21]

### 5.     Davies

Davies is a member of the Audit Committee and, thus, faces a substantial likelihood of liability for the Company's improper disclosure practices in the ARS market after 2006.  (Compl. ¶¶ 68(b), 70-72.)  In addition, Defendants have conceded that the Company has significant existing commercial relationships with entities that Davies or one or more of his family members serve as executive officers or employees (Compl. ¶ 68(e))—as well as the fact that the Company made significant charitable contributions to organizations led by Davies, including London's

---

[21] Two other cases cited by Defendants, *Staehr v. Alm*, 269 Fed. Appx. 888, 892 (11th Cir. 2008), and *Loveman v. Lauder*, 484 F. Supp. 2d 259, 268 (S.D.N.Y. 2007) similarly are distinguishable as having involved the absence of any particularized facts concerning the likely actual bias arising from the affected directors' positions of leadership at other companies.  (*Cf.* Compl. ¶ 68(e).)

prestigious Tate Gallery.  (Compl. ¶ 68(f).)  Further, Davies sat on the Audit Committee in 2005,
acquiescing in Mack's directive to weaken risk management by having the Company's Chief
Risk Officer report to Co-President Cruz, who led Fixed Income Sales and Trading, rather than to
the CEO.  (Compl. ¶ 68(h).)  Davies received over $340,000 in fees, stock awards, and other
compensation in fiscal 2007 just for being a director.  (Compl. ¶ 38.)

### 6.      Kidder

Kidder is a member of the Compensation Committee and, thus, faces a substantial
likelihood of liability for the wasteful and improper payments to Mack, Kelleher, Sidwell, Scully,
Lynch, and Nides described above.  (Compl. ¶¶ 73-75.)  In addition, Defendants have conceded
that the Company made significant charitable contributions to organizations led by Kidder,
including being a major donor, and/or giving its name, both to the Morgan Stanley Children's
Hospital of New York and the Wexner Center Foundation of Ohio State University.  (Compl.
¶ 68(f).)[22]  Further, Kidder sat on the Audit Committee in 2005, acquiescing in Mack's directive
to weaken risk management by having the Company's Chief Risk Officer report to Co-President
Cruz, who led Fixed Income Sales and Trading, rather than to the CEO.  (Compl. ¶ 68(h).)
Kidder received over $376,000 in fees, stock awards, and other compensation in fiscal 2007 just
for being a director.  (Compl. ¶ 39.)

### 7.      Nicolaisen

Nicolaisen is a member of the Compensation Committee and, thus, faces a substantial
likelihood of liability for the wasteful and improper payments to Mack, Kelleher, Sidwell, Scully,

---

[22] Defendants argue that charitable contributions cannot undermine a director's independence  where there
is no allegation of the "significance" of the contributions to the charitable organizations.  Def. Mem. at 16.
Surely, however, donations sufficient to earn "major donor" status to Morgan Stanley—let alone the
naming rights to a hospital—are adequately alleged to be "significant" to the charity involved.

Lynch, and Nides described above.  (Compl. ¶¶ 73-75.)  Nicolaisen *also* faces a substantial likelihood of liability as a member of the ***Audit Committee*** for the Company's improper practices in the ARS market after 2006.  (Compl. ¶¶ 70-72.)  Nicolaisen sits on the boards of three other companies, significantly diluting his time and making him unable to devote the time and resources necessary to objectively consider a demand in the present suit.  (Compl. ¶ 40.) Nicolaisen received over $350,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director.  (Compl. ¶ 40.)

### 8.  Noski

Noski is a member of the Audit Committee and, thus, faces a substantial likelihood of liability for the Company's improper practices in the ARS market after 2006.  (Compl. ¶¶ 41, 68(b), 70-72.)  Noski sits on the boards of three other companies, significantly diluting his time and making him unable to devote the time and resources necessary to objectively consider a demand in the present suit.  (Compl. ¶ 41.)  In addition, Defendants have conceded that the Company made significant charitable contributions to organizations led by Noski.  (Compl. ¶ 68(f).)  Noski received over $355,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director.  (Compl. ¶ 41.)

### 9.  Olayan

Olayan is a member of the Nominating and Corporate Governance Committee and, thus, faces a substantial likelihood of liability for failing to prevent the Insider Selling Defendants from selling $26.6 million in Morgan Stanley stock based on material, non-public information concerning the Company's exposure to ARS-related losses and liabilities, as well as for approving over $45.2 million in 2007 compensation to various Board members in the same circumstances.  (Compl. ¶¶ 42, 76-77.)  In addition, Defendants have conceded that the Company

has significant existing commercial relationships with entities that Olayan or one or more of his family members serve as executive officers or employees, including The Olayan Group, a Saudi Arabian conglomerate which derives substantial revenue from Morgan Stanley (Compl. ¶ 68(e))—as well as the fact that the Company made significant charitable contributions to organizations led by Olayan, including over $250,000 to the Memorial Sloan-Kettering Cancer Center. (Compl. ¶ 68(f).) Olayan further sits on the boards of nearly one dozen other companies and organizations, significantly diluting his time and making him unable to devote the time and resources necessary to objectively consider a demand in the present suit. (Compl. ¶ 42.) Olayan received over $335,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director. (Compl. ¶ 42.)

### 10.   Phillips

Phillips is a member of the Audit Committee and, thus, faces a substantial likelihood of liability for the Company's improper practices in the ARS market after 2006. (Compl. ¶¶ 43, 68(b), 70-72.) Defendants have conceded that the Company has significant existing commercial relationships with entities Phillips or one or more of his family members serve as executive officers or employees, including Oracle Corporation, which has a longstanding investment banking relationship with Morgan Stanley and which the Company is a customer of and provides ratings on Oracle's securities (having recently upgraded Oracle's rating to "Overweight"). Phillips is thus conflicted from analyzing demand by his ties to Oracle and his wish to see it benefit. Phillips received over $340,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director. (Compl. ¶ 43.)

### 11.   Tyson

Tyson is a member of the Nominating and Corporate Governance Committee and, thus,

faces a substantial likelihood of liability for failing to prevent the Insider Selling Defendants from selling $26.6 million in Morgan Stanley stock based on material, non-public information concerning the Company's exposure to ARS-related losses and liabilities, as well as for approving over $45.2 million in 2007 compensation to various Board members in the same circumstances.  (Compl. ¶¶ 45, 76-77.) In addition, Tyson sold over $1 million worth of Morgan Stanley stock based on material, non-public information, before revelations of the SEC and New York Attorney General proceedings in August 2008.  (Compl. ¶¶ 45, 200.)[23]  Also, Defendants have conceded that the Company has significant existing commercial relationships with entities that Tyson or one or more of his family members serve as executive officers or employees. (Compl. ¶ 68(e).)  Further, Tyson received over $346,000 in fees, stock awards, and other compensation in fiscal 2007 just for being a director.  (Compl. ¶ 45.)

## III.    MORGAN STANLEY'S RESTATED CERTIFICATE OF INCORPORATION DOES NOT SHIELD DEFENDANTS FROM LIABILITY.

Defendants mistakenly claim that they are shielded from liability by Morgan Stanley's Restated Certification of Incorporation ("RCI"), adopted pursuant to 8 Del. Code § 102(b)(7), which they claim not only negates the "substantial likelihood" of liability necessary to excuse demand, Def. Mem. at 19, but also justifies dismissal for failure to state a claim.  *Id.* at 33-35. However, Section 102(b)(7) does *not* allow for exculpation for acts or omissions not in good faith, which constitute a breach of the duty of loyalty, or which involve intentional misconduct or knowing violation of law.  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *Disney*, 825

---

[23] Defendants do not seriously contest that such stock sales are sufficient to render a director nonindependent for demand futility purposes.  *See* Def. Mem. at 30-31 (citing a case which merely held that, without more, allegation that a ***minority*** of directors are alleged to have traded on inside information, was insufficient).  Here, there is plenty "more" to establish demand futility on behalf of a majority of the Morgan Stanley Board.

A.2d at 286.  It compels dismissal only if a complaint states a "residual" breach of the duty of care—*and nothing else.*  *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001); *Emerald Partners*, 787 A.2d at 91.  The misconduct at issue here—conscious failure of oversight with respect to the Company's misdisclosures concerning the ARS market, dissemination of misleading and inaccurate information, and insider trading—indisputably implicates the duties of loyalty and good faith—i.e., nonexculpated claims.  *See McCall*, 239 F.3d at 1001; *Disney*, 825 A.2d at 290.  Moreover, Section 102(b)(7) is in the nature of an affirmative defense, not properly before this Court on a motion to dismiss.  *See Emerald Partners*, 726 A.2d at 1223; *Abbott Labs.*, 325 F.3d at 810 (applying Illinois counterpart to § 102(b)(7)); *Sanders v. Wang*, No. 16640, 1999 Del. Ch. LEXIS 203, at *34-*35 (Del. Ch. Nov. 8, 1999); *In re Ply Gem Indus. S'holders Litig.*, No. 15779, 2001 Del. Ch. LEXIS 84, at *40 (Del. Ch. June 26, 2001).

## IV.    THE MOTION SHOULD BE DISMISSED TO THE EXTENT THAT IT IS PREMISED ON FAILURE TO STATE A CLAIM.

### A.    Breach of Fiduciary Duty Claims.

Defendants argue that the fiduciary duty claims should be dismissed for failure to state a claim, purportedly based on *Caremark* and Rule 9(b).  *See* Def. Mem. at 35-38.  For reasons set forth above, the Complaint asserts much more than a simple *Caremark* claim.  Moreover, the only case cited by Defendants for the proposition that Plaintiffs' fiduciary duty causes of action fail to state a claim is *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007), a case that is vastly dissimilar to the case at bar.  In that case, the court decided on grounds of public policy that a claim for relief is not stated where the only allegation is that "the company disclosed material information affecting its stock price in proximity to an automatic, regularly-scheduled option grant."  *Id.* at 950.    Defendants' argument to dismiss the fiduciary duty claims based on Rule 9(b) similarly fails.  Def. Mem. at 35-36 (citing *In re Ditech Networks, Inc. Deriv. Litig.*, No. C

06-5157-JF, 2008 WL 820705, at *6 (N.D. Cal. Mar. 26, 2008)).   The Complaint contains sufficient allegations of the statements concerning the ARS market that were made to Morgan Stanley customers, why they were false, and when and where they were made.   (E.g., Compl. ¶¶ 12-14, 18, 115-118, 121-137, 153-185, 186.)  In all events, where, as here, facts concerning the details of the false statements are peculiarly within Defendants' knowledge and discovery has not begun, Rule 9(b) is relaxed.   *See*, *e.g.*, *Rahl v. Bande*, 328 B.R. 398, 415-16 (S.D.N.Y. 2005).

Similarly unavailing is Defendants' argument that the insider selling claim fails to state a claim.  Def. Mem. at 36-38.  Under Delaware law, "directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits."  *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (citing *Brophy v. Cities Serv., Inc.*, 70 A.2d 5, 8 (Del. Ch. 1949)).   A breach of fiduciary duty claim premised on insider trading, also known as a *Brophy* claim, arises where "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."  *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).

Here, the complaint contains ample allegations of actionable insider trading.  In particular, it is alleged that:

> Between February 13, 2007 and continuing until such time that investors learned the truth about defendants illegal and improper conduct related to the ARS market, defendants **Mack, Lynch, Tyson, Cruz, Gorman, Kelleher, and Nides** (the Insider Selling Defendants), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market – and while the Company itself was announcing largely positive results and repurchasing millions of dollars worth of its own stock – sold over nearly **$27 million** of their personally held Morgan stock on the basis of their inside information.  [Compl. ¶ 199]

40

The Complaint contains a detailed chart setting forth the names, dates, number of shares, and proceeds of the Insider Selling Defendants' stock trades (Compl. ¶ 200), as well as these Defendants' positions, access to knowledge, and what they knew about the Morgan Stanley's exposure to ARS losses and liabilities.  (Compl. ¶ 201.)

Moreover, at the same time that these Defendants were selling their stock, Morgan Stanley itself was *buying* the stock.  (Compl. ¶ 202.)  The timing of these Defendants' sales thus raises an actionable suspicion of knowingly trading based on inside information.  Indeed, the vast majority of the Insider Selling Defendants' sales occurred as the ARS market was deteriorating and Defendants were unloading inventories of ARS onto unsuspecting customers, and *before* Defendants caused Morgan Stanley to simply "walk away" from the ARS market in mid-February 2008.  In similar circumstances, courts reject attempts to dismiss at the pleading stage. *See*, *e.g.*, *American Int'l Group, Inc. Cons. Deriv. Litig.*, C.A. No. 769-VCS, 2009 Del. Ch. LEXIS 15, at *81-*85 (Feb. 10, 2009).

Similarly invalid is Defendants' claim that "Plaintiffs fail to demonstrate that the decline in Morgan Stanley's stock price is due to ARS-related issues as opposed to market events and mortgage-market related losses," etc.   Def. Mem. at 38.   Of course, Plaintiffs need not "demonstrate" any such thing at this early stage in the litigation, merely make cogent allegations. Such allegations regarding loss causation are set forth in abundant detail.  (Compl. ¶¶ 189-98.)

### B.       Unjust Enrichment and Corporate Waste Claims.

The claim for excessive compensation is directed at Defendants Mack, Kelleher, Sidwell, Scully, Lynch, and Nides—who collectively took *over $150 million* out of Morgan Stanley in purported "salaries" and other compensation in the single year 2007, aside from their improper insider stock sales.  (Compl. ¶¶ 206-218.)  The staggering size of these payments—coupled with

these Defendants' alleged bad-faith conduct of the Company's activities in the ARS market exposing it to billions of dollars in losses and liabilities—more than adequately states a claim. *See In re Tyson Foods, Inc. Cons. S'holder Litig.*, 919 A.2d 563, 589-90 (Del. Ch. 2007) (denying motion to dismiss).  Defendants' statement that "Plaintiffs do not plead any support for their allegation that these Defendants engaged in any illegitimate or unlawful conduct" (Def. Mem. at 38) is a non sequitur, given detailed allegations in the Complaint about each recipient's role in the ARS scheme.  (Compl. ¶¶ 35, 50, 54, 55, 57, 58, 68(a), 68(j), 81, 159, 160, 165, 169, 172, 176, 177, 178, 181, 182, 186, 196, 197, 199, 200, 201(d), 201(e).)  Moreover, the statement that compensation committees are entitled to "deference" in compensation decisions (Def. Mem. at 38-30) certainly has no application here, where Plaintiffs have set ample reasons to show that Morgan Stanley's Compensation Committee—for the transparent unseriousness of its compensation analyses—is entitled to no deference whatsoever.  (Compl. ¶¶ 212-216.)  Tellingly, *after* the initial complaint was filed in this action, the Director Defendants saw fit to substantially reduce overall compensation at the Company, in tacit recognition of the excesses of the past. (Compl. ¶ 217.)

## V.    PLAINTIFFS SHOULD BE GIVEN LEAVE TO REPLEAD.

Plaintiffs are confident that the Complaint is more than sufficient under the applicable pleading standards to excuse demand and state a claim.  However, should the Court grant any part of Defendants' motion to dismiss or require more specific pleadings, Plaintiffs respectfully request that this Court permit amendment, consistent with Fed. R. Civ. P. 15(a) (leave to amend should be "freely given when justice so requires").  *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (noting the "usual practice upon granting a motion to dismiss to allow leave to replead").  *See also Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144, at *55-57

(Del. Ch. Sept. 15, 2000) (allowing leave to replead breach of duty cares premised on failure to

detect and cure accounting irregularities).  Defendants' own cases are in accord.  *See Pirelli*, 579

F. Supp. 2d at 538; *Halpert*, 362 F. Supp. at 433 (granting *second* leave to replead).

Leave is particularly warranted here, where Morgan Stanley and the SEC have not

reached a settlement, and only if and when that happens will the SEC file a complaint—as it did

against Citigroup—setting forth additional allegations, based on documents produced by Morgan

Stanley (and theretofore uniquely in the custody of the SEC).  (*See* Compl. Exh.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

KAHN GAUTHIER SWICK, LLC

By:_____ *Albert M. Myers*_____
Lewis S. Kahn (admitted pro hac vice)
*lewis.kahn@kgscounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@kgscounsel.com*
Kevin Oufnac (admitted pro hac vice)
*kevin.oufnac@kgscounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax:  (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

*Attorneys for Plaintiff Louisiana Municipal Police Employees Retirement System*

-and-

ROY JACOBS & ASSOCIATES
Roy L. Jacobs (a member of the bar of this Court)
*rjacobs@jacobsclasslaw.com*
60 East 42nd Street
New York, NY  10165
Telephone:  (212) 685-0969
Facsimile:  (212) 685-2306

PASKOWITZ & ASSOCIATES
Laurence D. Paskowitz (a member of the bar of this
Court)
*classattorney@aol.com*
60 East 42nd Street
New York, NY  10165
Telephone:  (212) 685-0969
Facsimile:  (212) 685-2306

*Attorneys for Plaintiff Terry G. Thomas*