**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:  MORGAN STANLEY & CO., INC. AUCTION RATE SECURITIES DERIVATIVE LITIGATION,<br><br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 08 Civ. 7587 (AKH)<br><br>ECF CASE |

**DECLARATION OF ALBERT M. MYERS**

ALBERT M. MYERS hereby deposes and says:

      1.       I am a member of the bar of this Court and a partner of Kahn Swick & Foti, LLC ("Kahn Swick"), counsel to plaintiff Louisiana Municipal Police Employees Retirement System ("LMPERS" or the "Retirement System") and the Court-appointed Lead Counsel for all plaintiffs in this consolidated derivative action (the "Action") against certain officers and directors of Morgan Stanley & Co. Inc. ("Morgan Stanley").   Capitalized terms in this declaration shall have the meanings ascribed to them in the Stipulation of Settlement, executed January 17, 2012 and filed with the Court on that date (the "Stipulation"). [Docket #60, Attachment #1].

      2.       I respectfully submit this Declaration in support of Plaintiffs' unopposed[1] motion for Court approval (the "Motion for Final Approval") of:  (i) the proposed Settlement on the terms set forth in the Stipulation; (ii) an award of attorneys' fees and expenses to Plaintiffs'

---

[1]       Although Defendants do not oppose the Plaintiffs' motion for final approval, this Declaration is submitted solely by Plaintiffs and does not in all instances represent the views of Defendants.

Counsel in the total amount of $775,000; and (iii) approval of Lead Counsels' request for the payment of a plaintiff's incentive award of $3,000 to LMPERS (any such award to be paid from attorneys' fees awarded, disbursed by Plaintiffs' counsel, and not assessed against Morgan Stanley).  I make this declaration based upon personal knowledge of the facts set forth herein, except where the context makes clear that I am expressing my or Lead Counsel's professional opinion, in which case I affirm that such opinions are honestly held and based on my professional experience and judgment as a shareholder litigation attorney or law clerk since 1994.  I was directly involved in, and responsible for, every key aspect of prosecuting this case, along with related litigation in the Court of Chancery of the State of Delaware, *Louisiana Municipal Police Employees Retirement System v. Morgan Stanley & Co. Inc.*, No. 5682 (Del. Ch. Ct. filed July 30, 2010) (the "Delaware Action" or the "Section 220 Action").[2]

3.      There were a total of three law firms which participated in this Action or the Delaware Action:  (1) Kahn Swick & Foti, LLC, who represented LMPERS in both this Action and the Delaware Action and is the Court-appointed Lead Counsel in the Action; (2) Roy Jacobs & Associates (the "Jacobs Firm"), who represented derivative plaintiff Terry G. Thomas in this Action; and (3) Biggs & Battaglia, an experienced Delaware practitioner, who represented LMPERS in the Delaware Action (the "Biggs Firm").  Fee and expense declarations from the latter two firms are attached hereto as Exhibits 12 and 13, respectively.  (Besides supporting the Motion for Final Approval, this declaration contains the fee and expense declaration of Kahn Swick.)

---

[2]      As described below, the Delaware action was commenced by LMPERS in 2010 to obtain corporate books and records of Morgan Stanley pursuant to 8 Del. C. § 220 ("Section 200") after the Morgan Stanley Board of Directors' rejected Plaintiffs' demand to assert derivative claims.

## I.     INTRODUCTION AND OVERVIEW

4.     After more than three years of litigation—including a vigorously contested motion to dismiss which was ultimately granted on demand futility grounds, a protracted shareholder demand process, and a request for inspection of corporate books and records under Delaware Section 220 (the "Books and Records Demand") that was vigorously litigated in the Delaware Action—Plaintiffs have achieved a result that is beneficial to Morgan Stanley and its shareholders.  We believe that this Action is an example of the significant benefits that can result to a company and its shareholders from a derivative action initiated by a committed institutional shareholder and prosecuted by experienced and dedicated counsel.

5.     The core theory of this case was that the Board of Directors of Morgan Stanley breached its fiduciary duties by allowing systemic misconduct in the marketing and sale of auction rate securities ("ARS") that in time required Morgan Stanley to pay a $35 million fine to the State of New York and other regulatory authorities,[3] repurchase approximately $4.5 billion in illiquid ARS from customers, and book at least $2 billion in losses related to the repurchases. The alleged misconduct chiefly concerned alleged misrepresentations to ARS purchasers that such securities were "safe," "liquid," and "equivalent to cash"—whereas, in reality, the market for such securities was not liquid and was dependent on the support of Morgan Stanley and other broker-dealers.  *See, e.g.*, Compl. ¶¶ 3, 121-131.[4]  Although some courts have held, in the context of private civil actions, that such alleged misrepresentations did not constitute actionable fraud or were barred by the repurchase provisions provided in the settlement with the State of

---

[3]     Various states and territories participated in the regulatory settlement.  That settlement involved the payment of $4,867,949.38 to the State of New York, and the remainder of the $35 million to the other participating states and territories.  *See* Dalton Decl. Attachment 3 (Assurance of Discontinuance) ¶ 36.

[4]     The Consolidated Shareholder Derivative ("Complaint" or "Compl.") was filed on Feb. 5, 2009. Docket #9.

New York and other regulatory authorities, the holdings are not uniform, and we do not believe the holdings dismissing claims changed the financial impact upon Morgan Stanley from the $35 million fine.   Nor do we believe that they changed the financial impact from the related repurchases of securities that had become unmarketable or worthless, which evidently totaled in the billions of dollars in booked losses to Morgan Stanley.   We further believe that the direct, non-derivative claims asserted in those actions could not have obtained redress for Morgan Stanley for those financial impacts.

6.     Plaintiffs' central aim in this derivative litigation, therefore, was to hold Morgan Stanley's directors and senior managers accountable for the Company's alleged prior misconduct and to assume responsibility for preventing future misrepresentations to customers concerning complex financial products such as ARS.   Plaintiffs and their counsel were determined to confront Morgan Stanley's directors and executives with the record leading to Morgan Stanley's settlement with New York and to ensure that all Morgan Stanley directors, senior managers, and sales and marketing personnel assumed heightened ownership over disclosure practices going forward.

7.     We respectfully submit that the prosecution of this litigation and the related Delaware Action in aid of this litigation, together with the arm's-length and informed negotiation and finalization of the Settlement—including significant corporate governance and client-relationship enhancements—accomplished those goals.   The Stipulation of Settlement setting forth the complete corporate changes is Docket #60, Attachment #1, ¶¶ 2.1(a)-(c).   As Morgan Stanley has acknowledged, these enhancements were undertaken as a result of this Action.   *Id.* ¶ 2.1.

8.      In analyzing the corporate governance improvements, we called upon corporate governance expert and University of Indiana Professor Dan R. Dalton, Ph.D. to ensure that we had obtained meaningful protections for Morgan Stanley and its shareholders.[5]  Substantively, the changes memorialized in the Settlement achieve numerous benefits for Morgan Stanley, including the implementation of new protocols (and confirmation of the effective functioning of certain existing policies and procedures) concerning the marketing and sale of its securities products, including complex or derivative securities such as ARS.  In particular, Morgan Stanley enhanced its suitability standards to help control risk and ensure that clients are not offered products that are inconsistent with their risk tolerances or financial profile; developed additional mandatory product training for Financial Advisors; and conducted a review and confirmed the effectiveness of its protocols concerning risk management, compliance, surveillance, oversight, and sales practices in connection with its retail products.  In addition, Morgan Stanley instituted new mandatory and optional training modules for Financial Advisors covering, *inter alia*, "what Morgan Stanley learned from instability in the securities markets and the product risks that may exist in markets that may not be readily apparent."

9.      Significantly, we believe the corporate changes memorialized in the Settlement go substantially beyond providing additional disclosures to retail clients concerning ARS included in their account statements and trade confirmations.[6]  The changes cover client suitability in general and securities in general, not just ARS.  We respectfully refer the Court to the declaration of Professor Dalton filed herewith for an analysis of these significant governance

---

[5]      Dr. Dalton is the Founding and Managing Director of the Institute for Corporate Governance at the University of Indiana.  He is the Dean Emeritus, and Poling Chair of Strategic Management Emeritus, of the Kelley School of Business at the University of Indiana.  *See* Declaration of Dan R. Dalton, dated April 2, 2012, ("Dalton Decl.") submitted concurrently herewith.

[6]      Such disclosures had been mandated by the SEC in its 2006 cease-and-desist order covering Morgan Stanley and other broker-dealers.  *See* Compl. Exh. C, at 10-11.

and compliance improvements. *See* Declaration of Dan R. Dalton, Ph.D., dated April 2, 2012 ("Dalton Decl.") ¶¶ 4-22.

10. On behalf of Plaintiffs, we and other law firms who supported our efforts, vigorously prosecuted this Action since its commencement. From the moment we first filed a complaint on behalf of LMPERS in late August 2008 until the day Morgan Stanley agreed to the terms of the Settlement, Plaintiffs' team of lawyers—working entirely on a contingency basis—devoted themselves to achieving the best possible result in this matter. In the process, in Lead Counsel's professional judgment, Plaintiffs and their counsel helped clarify Delaware law relevant to corporate books and records requests.

11. We appreciated from the outset that, under Delaware law, we were prosecuting a case that is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark International Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996). Meeting this high burden of liability and obtaining results for Morgan Stanley was further complicated because—upon this Court's dismissal of the complaint for failure to make pre-suit demand, and upon LMPERS's subsequent making of such a demand in August 2009 (the "Litigation Demand") and the Board of Directors' rejection of that demand in April 2010—Plaintiffs faced the additional hurdle of alleging and proving that the Board's refusal of the demand was made in bad faith. To this end, Plaintiffs and their counsel were required to seek to examine books and records of Morgan Stanley; however, Morgan Stanley resisted all efforts to do so. In the end, LMPERS filed the Delaware Action in order to vindicate its inspection rights. Like this Action, Morgan Stanley vigorously opposed the Delaware Action.

12. Indeed, every aspect of this Action was hotly contested and involved substantial attorney efforts. The motion to dismiss in this Action was finally decided in July 2009, only

after briefing on the motion (including sur-reply briefs) and a motion for reconsideration.  In connection with the Litigation Demand, counsel for Plaintiffs made a comprehensive written demand and in support of it made a presentation to counsel assisting with the Board of Directors' review of the Litigation Demand.  When the Litigation Demand was rejected, Plaintiffs made the Books and Records Demand, received another rejection, attempted to negotiate a resolution of the claims, and was again rebuffed.  Thereafter, LMPERS filed the Section 220 Action in Delaware, which led to very zealous litigation by both parties of a motion to dismiss by Morgan Stanley, oral argument before the Delaware Chancery Court, and a round of supplemental briefing at the request of that court.  Even after the Chancery Court denied in substantial part the motion to dismiss (reserving for a later point a renewed demand to inspect certain records as to which the motion had been granted), Morgan Stanley continued to resist producing books and records, ultimately agreeing to make certain records available only in the context of a global resolution of the litigation.

13.     While confident of obtaining complete books and records relevant to the Board's rejection of demand, and of presenting a viable case for wrongful refusal of demand, Plaintiffs also were cognizant of the risks of proceeding.  With respect to the merits of the claims, this Court had determined that similar allegations of knowing or bad-faith misconduct in the original complaint did not set forth allegations of oversight failure sufficient to excuse demand under the particularized pleading requirements of Rule 23.1.  Thus, even assuming that the claims in the new complaint could survive a motion to dismiss for failure to state a claim under the lower pleading standard of Rule 12(b)(6), Plaintiffs then would face the risk of being unable to prove oversight failure at trial or in summary judgment proceedings.  With respect to the Board's refusal of demand, Plaintiffs face the risk of being unable to allege incontestable facts tending to

show that the Board, in rejecting the Litigation Demand, acted in bad faith. Such a showing would depend in part on establishing that the Board's consideration of the facts and the merits of the potential claims were undertaken in bad faith. Confirmatory discovery by Lead Counsel for Plaintiffs has been sufficient to conclude that Plaintiffs' ability to make such a showing was uncertain at best. In light of these determinations, Plaintiffs concluded that even if they could plead cognizable claims, discovery would be long, victory at trial uncertain, and appeal assured.

14.    Compounding these matters, we faced the practical reality that, even if Plaintiffs were successful in obtaining a money judgment, Morgan Stanley likely would not have been able to collect that judgment for some time, if ever. While the individual defendants are professionally accomplished and many are wealthy by relative measures, they could not personally fund a judgment in the hundreds of millions of dollars—let alone the billions of dollars in alleged losses from the ARS misconduct. In light of the bad faith/disloyalty standard needed to overcome the exculpatory provision in Morgan Stanley's certificate of incorporation, any post-trial judgment could potentially trigger exclusions in defendants' insurance policies, which in all events would lose significant recoverable value by the time a judgment were granted, appealed, and confirmed. In addition, and perhaps most importantly, it is unclear whether any jury (or an equitable bench ruling after trial) could produce the corporate governance requirements that resulted from this litigation and fulfilled its goals.

15.    The Settlement itself was the product of protracted negotiations occurring over the summer and fall of 2011. These negotiations concerned the nature of the corporate changes at Morgan Stanley which could serve as consideration for the release of claims, as supported by a review of internal Morgan Stanley documents provided by defendants, as well as the scope of the release, the notice to be given to shareholders, and various implementing provisions.

16.     The Court preliminarily approved the Settlement on February 9, 2012. Defendants had responsibility for providing notice.  Consistent with the Court's Order, the Summary Notice of Pendency and Settlement of Shareholder Derivative Action and of Settlement Hearing was to be published once in *Investor's Business Daily*, *PR Newswire*, and *USA Today* on February 22, 2012.  The full Notice of Pendency and Settlement of Shareholder Derivative Action and of Settlement Hearing was to be published both on the investors' relations page of Morgan Stanley's website and on a dedicated website, *www.MorganStanley ARSDerivativeLitigationSettlement.com*.  In addition, the full Notice was to be sent by U.S. Mail to all persons who requested it.  The notices advised all recipients of, among other things, the background of the action and the Settlement, as well as their right to object to any aspect of the Settlement, including Lead Counsel's request for attorneys' fees and reimbursement of expenses.

17.     The Court-ordered deadline for filing objections to the Settlement is April 9, 2012.  To date, Lead Counsel has not received any objections to the Settlement.  Should there be any objections, they will be addressed by Lead Counsel in a reply brief on April 16, 2012.

## II.     HISTORY OF THE LITIGATION

18.     This Action commenced on August 27, 2008, when LMPERS filed a shareholder derivative complaint on behalf of Morgan Stanley in this Court.  Subsequently, the consolidated Complaint was filed, naming Terry G. Thomas as an additional party plaintiff.  [Docket #9]  No additional derivative actions were filed in the consolidated cases.  The Complaint sought relief against several current and former officers and directors of Morgan Stanley[7] arising from their

---

[7]     John J. Mack, Chairman of the Board and CEO; directors Roy J. Bostock, Erskine Bowles, Sir Howard Davies, C. Robert Kidder, Donald Nicolaisen, Charles Noski, Hutham Olayan, Charles Phillips, Jr., O. Griffith Sexton, and Laura Tyson; Co-President Walid Chammah; Co-President James Gorman; Chief Risk Officer Kenneth deRegt; Global Head of Interest Rates Roberto Hoornweg; CFO Colm Kelleher; Global Head of Institutional Sales and Trading Michael Petrick; President and COO of Global

alleged misconduct in allegedly causing the Company to make misrepresentations to customers and investors with respect to the market for ARS.  The allegations asserted in principal part that:

- Defendants engaged in, or allowed Morgan Stanley to engage in, an industry-wide scheme to manipulate the ARS market;

- Defendants engaged in conduct intended to misrepresent ARS to investors as cash equivalents;

- Defendants deceived investors, or allowed Morgan Stanley to deceive investors, into believing that the ARS market was safe and liquid;

- Defendants failed to supervise or maintain internal controls over Morgan Stanley's marketing and selling of ARS;

- Defendants made false or misleading statements to shareholders or the general public about Morgan Stanley's ARS;

- Certain Defendants sold Morgan Stanley common stock while in possession of material, non-public information about Morgan Stanley's ARS, and the other Defendants improperly failed to prevent such insider trading; and

- Deficiencies in Morgan Stanley's risk management policies and internal controls allowed Defendants to engage in the alleged misconduct.

*See* Compl. ¶¶ 7-20, 121-131, 153-186, 199-205.

19.     The alleged misconduct allegedly exposed the Company to multiple state and federal regulatory proceedings and led it to agree to pay monetary penalties totaling over $35 million and undertake remediation efforts, including the repurchase $4.5 billion par value of unmarketable ARS.  In connection with the implementation of that settlement, Morgan Stanley allegedly incurred at least $640 million in charges and write-downs, as well as $1.7 billion in losses related to transactions with monoline insurers linked to the ARS repurchase efforts.  Based on these figures, which had been disclosed by Morgan Stanley with respect to only a partial fulfillment of the Company's ARS repurchase obligation, Plaintiffs projected that Morgan

---

Wealth Management Ellyn McColgan; Head of National Sales Andy Saperstein; former CFO David Sidwell; Co-President Robert Scully; former Co-President Zoë Cruz; Chief Legal Officer Gary Lynch; and Chief Administrative Officer Thomas Nides.

Stanley would incur approximately $6 billion in losses from the repurchases. *See* Compl. ¶¶ 132-150.

20.     On March 23, 2009, all Defendants in this Action, including Morgan Stanley as nominal defendant, moved to dismiss the federal complaint under Federal Rule of Civil Procedure 23.1 for failure to adequately allege reasons why pre-suit demand on the Morgan Stanley Board of Directors was futile.  Defendants also moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

21.     Briefing on the motion to dismiss involved a moving brief, an opposition brief, and a reply brief.  [Docket ##13, 15, 19]  In addition, by stipulation of the parties approved by the Court, Plaintiffs filed a sur-reply brief addressing the impact, if any, of an intervening decision, *Louisiana Mun. Police Employees Ret. Sys. v. Blankfein*, No. 08-cv-7605 (LBS), 2009 WL 1422868 (S.D.N.Y. May 19, 2009), on the case.  [Docket #21]

22.     Oral argument on defendants' motion was held on June 23, 2009.  [Docket #24] The Court indicated that it would grant Defendants' Rule 23.1 motion, on the grounds that demand was not excused where at least one member of the Board of Directors remained independent, in which case that director could appoint a special litigation committee to investigate plaintiffs' allegations and recommend whether or not a lawsuit should be brought. *See* Docket #28, at 1; Docket #24 (Transcript) at 7:25-8:10; 9:11-21.

23.     In a written opinion issued on June 24, 2009, the Court held, for reasons stated in the record of the oral argument, that demand was not excused as futile.  However, the Court held that Plaintiffs were entitled to make a pre-suit demand on the Morgan Stanley Board of Directors.  As reflected in the written order issued on June 24, 2009 [Docket #23]:

> Plaintiffs will have until July 24, 2009 to make demand of Morgan Stanley.  If the
> Board of Directors of Morgan Stanley chooses to investigate the allegations made

in the demand, it will have until January 25, [2010] (and any enlarged period granted by the court) to conduct the investigation and issue a report. Within thirty days (and any enlarged period granted by the court) from when Morgan Stanley issues its report of investigation, plaintiffs may move for appropriate relief, including leave to file an amended complaint. I shall retain jurisdiction over these proceedings.

24.     In addition, during oral argument, the Court stated that "I think also it would benefit the company's investigation to give Mr. Myers [undersigned counsel for LMPERS] an opportunity to present his points of view to whoever it is that's conducting the investigation." Docket # 24 at 32:22-25.

25.     Plaintiffs filed a motion for reconsideration of the Court's June 24, 2009, Order. [Docket #27]  In the motion, Lead Counsel argued that, under Delaware law, it was not the case that demand was excused if only one director was independent but, rather, only if a majority were independent.   *Id.* at 4-8.   In addition, Plaintiffs renewed their argument that any independent directors constituted only a minority of the Board of Directors and that a majority were not independent or otherwise not capable of objectively considering a shareholder demand. *Id.* at 8-11.  Plaintiffs argued that:

> Because the Court seemed prepared [at oral argument] to accept that at least six members of Morgan Stanley's 11-member Board were not independent (two directors for being inside, employee directors, and four members for having served on Morgan Stanley's Audit Committee and having disregarded "red flags" putting them on notice of the misconduct), this holding may have been outcome determinative and therefore require reversal.

*Id.* at 1.

26.     Subsequently, the Court granted reconsideration of its June 24, 2009, Order. [Docket #28]  The Court held that, "as plaintiffs' motion for rehearing points out, a demand is excused under Delaware law whenever a majority of the defendant's corporate board has lost its independence."  *Id.* at 1.  The Court then proceeded to conduct a director-by-director analysis of

the demand allegations and held that, notwithstanding the point of law, a majority of the Board were not conflicted and were independent at the time suit was filed." *Id.* at 2. The Court reaffirmed the grant of Morgan Stanley's motion to dismiss on July 22, 2009 and held that, although three (and possibly four) members of Morgan Stanley's eleven-member Board were conflicted from considering pre-suit demand,[8] a majority of the Board members were not conflicted and were independent at the time suit was filed. "However," the Court stated, "there is no reason why a demand cannot now be made and, if made, investigated by the board, or a special committee of the board. I adhere to my previous rulings in this respect . . . ." *Id.* at 3. The Court then repeated its ruling regarding the timetable for making of shareholder demand, verbatim except for new deadlines of August 26, 2009 for Plaintiffs to make demand and February 26, 2010 for the Board to respond.

27.     Pursuant to the Court's guidance, on August 24, 2009, LMPERS made formal demand on the Morgan Stanley Board of Directors to investigate and file suit with respect to the ARS claims (the Litigation Demand). [Docket #30] The Morgan Stanley Board, acting through a corporate Secretary, acknowledged Plaintiffs' demand, by letter dated September 9, 2009.

28.     In response to the Litigation Demand, the Morgan Stanley Board requested that the Audit Committee review the matters raised in the Litigation Demand and recommend to the Board an appropriate response.[9] The Audit Committee retained the law firm Simpson Thacher & Bartlett LLP ("STB") to assist the Audit Committee with its review of the matters raised in the

---

[8]     The Court held that three directors were allegedly conflicted: Mack and Sexton, because defendants had conceded their conflict as officers of Morgan Stanley, and Bostock, because "Mack, the company's Chairman, had given Bostock's son-in-law the position of Managing Director, a coveted and lucrative position." *Id.* at 2. A fourth director, Tyson, was also arguably conflicted through insider sales of stock. *Id.*

[9]     Audit Committee member Sexton recused himself from the Audit Committee's review of the matters raised in the Litigation Demand and recommendation as to an appropriate response.

Litigation Demand and its recommendation to the Board.  As part of the Audit Committee's investigation and evaluation of the matters raised in the Litigation Demand, STB met with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), which had conducted an investigation of Morgan Stanley's marketing and selling of ARS during 2007 and 2008 in connection with several regulatory investigations of Morgan Stanley and which reported the results of its investigation to the Audit Committee on November 18, 2008.  Skadden's prior investigation of Morgan Stanley's marketing and selling of ARS during 2007 and 2008 included the review of approximately 2.8 million pages of electronic and hard copy documents, and interviews of twelve Morgan Stanley employees.

29.     Meanwhile, Lead Counsel sought a promised meeting with representatives of the Morgan Stanley Board to provide further information and further present the demand to the Board.  Subsequently, a meeting was arranged and held in New York City, on October 26, 2009, and Lead Counsel made a presentation to STB and Skadden.

30.     Following this meeting, STB, as part of the Audit Committee's investigation and evaluation of the matters raised in the Litigation Demand, conducted a review and analysis of the relevant material from Skadden's investigation, and also investigated certain matters that were not a focus of Skadden's prior investigation by requesting and reviewing additional documents and speaking with relevant Morgan Stanley employees.

31.     After completing its work, STB provided the Audit Committee with a written report (the "STB Report"), dated April 13, 2010, detailing the steps STB took to review the Litigation Demand's allegations and its findings and recommendation regarding the matters raised in the Litigation Demand.  The Audit Committee concluded that none of the Defendants violated any fiduciary duty to Morgan Stanley or committed any other wrongdoing and that any

lawsuit based on the claims and allegations made in the Litigation Demand was not supported by the facts or existing law.  The Audit Committee unanimously resolved to recommend to the Board that the demand in the Litigation Demand be refused in its entirety.[10]

32.     STB, at the Audit Committee's request, provided the Board members who did not recuse themselves with a copy of the STB Report in advance of the Board's April 20, 2010, meeting.  At that meeting, the Audit Committee made a presentation to the Board members who did not recuse themselves concerning STB's report, findings and recommendation, and the Audit Committee's recommendation that the Litigation Demand be refused in its entirety.

33.     At the Board's April 20, 2010, meeting, the participating Board members unanimously agreed with the Audit Committee's recommendation and resolved to refuse the demand in the Litigation Demand in its entirety.  On April 26, 2010, the Board, through counsel, responded to Lead Counsel in writing to communicate the Board's refusal of the Litigation Demand (the "Litigation Demand Refusal Letter").  [Docket #33]

34.     After receiving the Litigation Demand Refusal Letter, Lead Counsel formed the professional opinion that, although describing the procedural mechanism which the Board had used in addressing the Litigation Demand, the Litigation Demand Refusal Letter did not set forth the Board's substantive consideration of the Litigation Demand or the reasoning behind the Board's decision to reject it.  As such, Lead Counsel believed that the refusal of the Litigation Demand constituted a peremptory refusal under the holding of *Grimes v. DSC Communications, Inc.*, 724 A.2d 561, 566 (Del. Ch. 1998) (granting Section 220 request to inspect books and

---

[10]     Board members Mack, Gorman (newly added), Griffith, Sexton, and Tyson recused themselves from the Board's consideration of the Audit Committee's recommendation concerning, as well as the Board's review of, the matters raised in the Litigation Demand and response to the Litigation Demand.

records relevant to Board's decision to reject shareholder demand transmitted after complaint premised on demand futility had been dismissed).[11]

35.     Accordingly, shortly after receiving the Board's Litigation Demand Refusal Letter, on May 12, 2010 Lead Counsel for Plaintiffs sent the Board a letter asserting, pursuant to Section 220 of the Delaware General Corporation Law, the right to inspect corporate books and records of Morgan Stanley concerning the Board's refusal of the Litigation Demand and whether such refusal was wrongful (the "Books and Records Demand").  [Docket #34]

36.     The Books and Records Demand sought several categories of documents, including the actual report and recommendation relied upon by the Board to reject the Litigation Demand; the minutes of any Board or Board committee meeting at which the Litigation Demand (or the Company's investigation thereof) was discussed; any documents or witness interviews relied upon by the Board, any Board committee, or any of their counsel, to evaluate the Litigation Demand or recommend the refusal of it; and documents concerning the recusal of Board and Board committee members from the consideration of the Litigation Demand.  [Docket #34]

37.     The Books and Records Demand was premised upon Lead Counsel's interpretation of Delaware law that under Section 220, shareholders are entitled to demand inspection of corporate books and records in these circumstances, to determine whether the Board's refusal to act on the demand was a valid exercise of its business judgment.[12]

38.     Lead Counsel transmitted a copy of the Books and Records Demand to this Court. [Docket #34]  On the same day, Lead Counsel wrote to the Court advising of the Books and

---

[11]     *Grimes v. DSC Communications* (hereinafter "*Grimes II*") was a decision following remand of *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996) ("*Grimes I*"), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[12]     As discussed herein, this interpretation was determined by the Chancery Court to be correct.

Records Demand, briefly describing its purposes and justification under Delaware law, and requesting a case management conference "at which the parties may be heard on the issue of appropriate deadlines and procedures for the Board's response to the Section 220 demand." *Id.*

39.     On May 19, 2010, counsel for Morgan Stanley wrote to Lead Counsel for Plaintiffs, rejecting the Books and Records Demand in its entirety.  [Docket #35]  The Board refused to provide any books and records in response to LMPERS's request, including the STB report that it had reviewed and relied upon for its "findings and recommendation regarding the matters raised in the Litigation Demand."

40.     Morgan Stanley's rejection of the Books and Records Demand was premised upon several legal grounds.   First, the Company contended that under Delaware law, shareholders making Section 220 demands are required to do so prior to commencing any derivative litigation whatsoever.   Docket #35, Attachment #1, at 2-4 (citing *Freund v. Lucent Techs., Inc.*, No. Civ. A. 18893, 2003 WL 139766, at *4 (Del. Ch. Jan. 9, 2003)).   Second, the Company contended that LMPERS's Books and Records Demand constituted an impermissible end-run around the discovery provisions of the Federal Rules of Civil Procedure, which did not countenance discovery in aid of a derivative complaint premised upon wrongful refusal of pre-suit demand.  *Id.* at 4-6 (citing *Boston Scientific Corp. S'holders Litig.*, No. 02 Civ. 247 (AKH), 2007 WL 1696995, at *4 (S.D.N.Y. June 13, 2007) (Hellerstein, J.)).[13]   Third, the Company opposed any case management conference in this Court to determine procedures for responding to LMPERS's Books and Records Demand, based on the exclusive jurisdiction of Chancery Courts to adjudicate such demands.  *Id.* at 6 (citing Section 220).   Fourth, the Company argued

---

[13]     LMPERS had not cited nor relied upon the discovery rules of the FRCP as a basis to obtain books and records concerning the Board's refusal of the Litigation Demand, but only on Section 220 itself.  *See* Docket #34.

that, by making the Litigation Demand, Plaintiffs had "conceded the independence and disinterestedness of the Board," thereby rendering the Books and Records Demand improper. *Id.* at 4 n.1.

41.     On July 1, 2010, this Court issued its order denying Plaintiffs' request for a case management conference concerning the Books and Records Demand issues. [Docket #36] The Court held that Section 220 vested exclusive jurisdiction in Chancery Courts to adjudicate Section 220 demand proceedings and that the Federal Rules did not otherwise allow the Court to do so. *Id.* The Court ordered Plaintiffs to show cause why the action should not be dismissed.

42.     That same day, Lead Counsel wrote to the Company's counsel suggesting a voluntary resolution of the Section 220 dispute. Docket #39, Exhibit 7. Lead Counsel stated that notwithstanding this Court's determination that it lacked jurisdiction to adjudicate Section 220 issues, the avenue of Delaware proceedings remained open to Plaintiffs to pursue the Section 220 demands. *Id.* Moreover, Lead Counsel stated Plaintiffs' continued belief that Delaware law permitted shareholders whose derivative complaint had been dismissed on demand futility grounds—and who subsequently made a demand to bring claims which was rejected—to obtain books and records concerning the Board's rejection of demand. *Id.* (citing *Grimes II*). However, in a spirit of compromise, Lead Counsel invited defendants' counsel, for the time being, to produce only the Audit Committee's report to the Board recommending refusal of the pre-suit demand, on an attorneys'-eyes-only basis.

43.     Morgan Stanley, through counsel, rejected Plaintiffs' invitation. *See* Docket #39, Exhibit 8. Counsel stated that

> We see nothing in the *Grimes* decisions *(Grimes* v. *Donald,* 673 A.2d 1207 (Del. 1996), *overruled on other grounds by Brehm* v. *Eisner,* 746 A.2d 244 (Del. 2000) and *Grimes* v. *DSC Communications Corp.,* 724 A.2d 561 (Del. Ch. 1998) that supports discovery under § 220 here, given your client's prior filing of the

18

> derivative lawsuit assigned to Judge Hellerstein. To the contrary, both *Grimes* decisions support Morgan Stanley's refusal of Plaintiffs' Section 220 demand because they make clear that a Section 220 demand for the inspection of corporate records must be made *prior* to the commencement of derivative litigation.

*Id*. at 1.  Moreover, Morgan Stanley's counsel argued that in the *Grimes* litigation, the Board had denied the shareholder's demand only "peremptorily," whereas the Morgan Stanley Board had "explained in detail the process that the Board and Audit Committee took in reviewing and rejecting Plaintiffs' demand." *Id*.

44.     Having confirmed that negotiation of the Books and Records Demand would lead nowhere, on July 30, 2010, Plaintiff LMPERS filed the Section 220 Action in the Delaware Chancery Court seeking, under Section 220, to obtain by court order the books and records that the Company had refused to allow inspection of.  Docket #39, Exhibit 9.

45.     In addition, on July 31, 2010, LMPERS filed a response to the order to show cause pending in this Court.  Docket #39.  LMPERS informed the Court of its filing of the Delaware Action, and asked the Court to place this Action in abeyance pending the outcome of that action.  *Id*. at 10-14.

46.     In LMPERS's response to the order to show cause, Lead Counsel addressed the putative contradiction between the principle of *Grimes* (*viz*., that shareholders could inspect books and records relevant to a board's decision to reject a shareholder's litigation demand which was transmitted after the shareholder's complaint premised on demand futility had been dismissed) and the principle of *Freund* (*viz.*, that shareholders seeking books and records must make a request therefore before filing a derivative claim).  Lead Counsel argued:

> [T]he Board's counsel has cited no case—and Plaintiffs are aware of no case—in which a Chancery Court has overturned or otherwise called into question the *Grimes* court's making Section 220 requests available to shareholders in this situation. Instead, the cases cited by the Board's counsel all address the situation where either: (a) the Section 220 request pertains to the Board's refusal of a

previous shareholder demand to bring derivative claims and the Section 220 request has been made *after the commencement of a shareholder derivative suit relating to that same refusal of the shareholder demand*,[14] or (b) a Section 220 request pertains to whether pre-suit demand on the Board would have been futile because the Board is not disinterested and independent and the Section 220 request has been made *after the commencement of a shareholder derivative suit alleging that the demand on the Board would have been futile*.[15]   Here, unlike those cases, Plaintiffs seek Section 220 inspection rights, *not* to support a claim of demand futility (thus not implicating the *King* line of cases), and *not* after having commenced (or to support) an already-filed derivative case premised on wrongful refusal (thus not implicating the *Scattered* line of cases).  If the holdings of those cases are to be extended to (and overrule the result of) *Grimes v. DSC Communications* (which involves the same fact pattern as here), the issue is one that, in all events, should be decided by the Chancery Courts—which they will have an opportunity to do now that Plaintiffs herein have filed their Delaware Section 220 Action.

*Id*. at 11.

47.     Defendants filed a response to Plaintiffs' response to the order to show cause on August 19, 2010.  [Docket #42]

48.     On September 14, 2010, this Court issued an order granting LMPERS's request to hold this Action in abeyance pending further developments with respect to Plaintiff's Section 220 request.  [Docket #43]

49.     Morgan Stanley thereafter moved to dismiss the Section 220 Action in Delaware.  Principal briefing involved a moving brief, an opposition brief, and a reply brief.  The arguments focused on:  (i) whether the Board, in responding to the Litigation Demand, had engaged in an

---

[14]     *See, e.g.*, *Scattered Corp.*, 701 A.2d at 77-79 (members of exchange bringing derivative action alleging wrongful refusal of their pre-suit demand were not entitled to Section 220 inspection regarding board's rejection of their demand, where members had not utilized opportunity to bring statutory action to inspect minutes, reports, and other books and records of exchange prior to filing lawsuit premised upon wrongful refusal of demand).  [Footnote in the original]

[15]     *See, e.g.*, *King v. Verifone Holdings, Inc.*, 994 A.2d 354, 360 (Del. Ch. 2010) ("King's only stated purpose for examining the books and records of Verifone is to seek books and records that will help him plead a viable claim for demand excusal in the pending derivative action in Federal Court"). [Footnote in the original]   *King v. Verifone* was reversed by the Delaware Supreme Court.  *See King v. Verifone Holdings, Inc.*, 12 A.3d 1140 (Del. 2011).

adequate process and, if so, whether that should end the inquiry; (ii) whether, by making the Litigation Demand, LMPERS had conceded the Board's independence for purposes of adjudging its response to that demand; (iii) whether Plaintiffs, despite having filed a shareholder derivative claim premised upon demand futility, were entitled, following the Board's rejection of the subsequent Litigation Demand, to make a Section 220 books and records request concerning the Board's rejection of demand; and (iv) whether LMPERS's only purpose in the Books and Records Demand was merely to investigate corporate wrongdoing.[16]

50.     Oral argument on Morgan Stanley's motion to dismiss the Delaware Action was heard on January 12, 2011.  On March 4, 2011, Vice Chancellor J. Travis Laster issued a Memorandum Opinion holding that LMPERS had stated a claim under Section 220 to obtain various books and records.  The decision is available on WESTLAW at 2011 WL 773316, and is attached hereto as Exhibit 14.[17]

51.     In its 17-page written opinion, the Chancery Court held, among other things, that:

(i)     "Delaware precedents establish that a stockholder plaintiff who filed a demand-excused case and had its complaint dismissed under Rule 23.1 can subsequently make a litigation demand, then use Section 220 to explore whether the demand was wrongfully refused."  *Id.* at *4.

(ii)    "Morgan Stanley cannot rely on the Demand Refusal Letter to foreclose LAMPERS's right to use Section 220.  The letter describes the Board's process, but it does not provide any substantive insight into the Board's decision.  In form, the Demand Refusal Letter is longer than the peremptory refusal found insufficient in *Grimes II*.  In substance, the two letters are identical. . . .  Whether the Board in fact acted wrongfully is not currently at issue.  Rather, the question is whether LAMPERS's purpose for inspection is proper.  It is."  *Id.* at *8.

---

[16]     The principal briefs of both parties on the motion to dismiss are attached hereto as Exhibits 15, 16, and 17, respectively.  In addition, at the Chancery Court's request, two supplemental briefs were filed.  *See* Exhibits 18 and 19.

[17]     As to the specific Section 220 requests made by LMPERS, the Delaware granted in part and denied in part the motion to dismiss.  As to certain requests that were dismissed, the court held that "LAMPERS [sic] remains free to attempt such a showing [of need] by way of a future Section 220 demand . . . ."  *Id.* at *9.

(iii) "Contrary to Morgan Stanley's position, . . . a stockholder who makes a demand does *not* concede the independence or disinterestedness of the board for purposes of demand refusal (as opposed to demand futility) . . . ." *Id*. at *5.

(iv) "Morgan Stanley recasts LAMPERS's purpose as seeking to investigate corporate wrongdoing. . . .   More importantly, exploring corporate wrongdoing is not the only proper purpose that will support a Section 220 investigation. . . .   Here, LAMPERS seeks to investigate why the Board refused its Litigation Demand.   The question of whether a corporation should sue its directors and senior officers puts directors in a difficult position where they are subject to potentially subtle influences and pressures. . . . Basic notions of accountability require that stockholders be able to use Section 220 to evaluate whether the demand-refusal decision was made in good faith, after a reasonable investigation, 'or whether the Board had some different, ulterior motivation.'" *Id*. at *5, *6, *7.

(v) "In substance, the [letters in *Grimes* and by Morgan Stanley] are identical. A board cannot defeat the use of Section 220 that the Delaware Supreme Court contemplated in *Grimes I*, *Scattered*, and *Spiegel* by sending a self-serving letter describing process *sans* content.   Such an approach would render nugatory the right to use Section 220 to investigate demand refusal. *Id*. at *8.

52.   Accordingly, the Chancery Court held that LMPERS had stated a claim under Section 220 to obtain various books and records, and that these books and records included, but were not limited to, Board and Audit Committee minutes where the Litigation Demand was discussed, STB's report to the Audit Committee, the Audit Committee's report to the Board, and the Skadden report and other documents relied upon by the Board.  The Chancery Court ordered the parties to bring the matter to final hearing within 60 days.  *Id*. at *8-*9.

53.   Following entry of Vice Chancellor Laster's Order, on March 10, 2011, Lead Counsel corresponded with counsel for Morgan Stanley requesting, by a date certain, the production or inspection of certain of the requested books and records as to which a claim had been found to have been stated.  Counsel for Morgan Stanley initially resisted this request and reserved its right to appeal the Chancery Court order.  Later, counsel for Morgan Stanley and

defendants indicated its willingness to discuss a global settlement of all litigation brought by Plaintiffs in this Action or the Section 220 Action.

54.     After the exchange of confidential settlement communications, counsel for defendants and Morgan Stanley made certain materials related to the Board's actions in response to the Derivative Action and its refusal of the Litigation Demand available for review by Lead Counsel for Plaintiffs, through the medium of a secure Internet connection.  These materials concerned Board and Audit Committee meetings in late 2008 following the filing of this Action, including presentations by Morgan Stanley officers concerning corporate changes to avoid incorrect disclosure and customer confusion concerning derivative or otherwise complex securities like ARS, and to enhance the Company's compliance and risk management with respect to all products sold to customers.  Lead Counsel reviewed these materials on several occasions between June and September 2011 to determine whether a good-faith basis existed to settle this Action and dismiss the Section 220 Action, subject to confirmation through additional discovery.  Lead Counsel determined that such a basis, in fact, existed.

55.     Thereafter, Lead Counsel and counsel for Morgan Stanley and defendants engaged in good-faith, arm's-length negotiations and reached an agreement in principle for the settlement of this Action and the dismissal of the Section 220 Action, which agreement was memorialized in a Memorandum of Understanding ("MOU") dated November 3, 2011.  The MOU set forth changes in Morgan Stanley's policies and procedures concerning the marketing of ARS and other securities that had been made or confirmed to function effectively at the Company as a result of this Action and that conferred benefits on the Company and its shareholders.

III.    **CONFIRMATORY DISCOVERY AND EXECUTION OF SETTLEMENT STIPULATION**

56.    After the MOU was signed, Morgan Stanley provided Lead Counsel for Plaintiffs with confirmatory discovery to confirm the fairness and adequacy of the Settlement.

57.    To confirm the fairness and adequacy of the terms of the Settlement as reflected in the MOU, and as to be embodied in a formal Stipulation, Lead Counsel for Plaintiffs were given the opportunity to conduct confirmatory discovery.  Lead Counsel utilized this opportunity to review approximately 2,500 pages of documents provided by Morgan Stanley and defendants. This information was provided in the form of hard copies and included, among other things:  (1) the STB Report and certain exhibits thereto; (2) contemporaneous e-mails and other primary documents concerning the Company's marketing and sales of ARS, and its exposure thereto; (3) documentation of the corporate changes occurring as a result of the litigation; and (4) minutes of Board and Audit Committee meetings discussing the Company's practices with respect to ARS and changes thereto.  To preserve confidentiality, Lead Counsel for Plaintiffs inspected such documents in person—and were provided other pertinent information by counsel for Defendants—on multiple occasions between early November and late December 2011.[18]

58.    In reviewing the documents and other information provided by Defendants, including the STB Report and associated materials, Lead Counsel formed the professional opinion that, while grounds existed to continue this Action in the form of derivative claims for breach of fiduciary duty in the context of a wrongful-refusal-of-demand complaint, there were many risks to pleading and proving both wrongful refusal of demand and liability on the

---

[18]    It is important to note that the 2,500 pages of documents, while small in comparison to the documents that might be expected from formal discovery, included key documents, e.g., internal e-mails identified during the Skadden and STB investigations and cited in the STB Report concerning ARS. Moreover, the absence of formal discovery is not a bar to approval of a settlement.  *In re Baldwin-United Corp.*, 105 F.R.D. 475, 483 (S.D.N.Y. 1984).

underlying claims.  The bases for this opinion included:  (i) the primary materials concerning representations to customers on the subject of ARS and their features; (ii) the involvement or lack of involvement by directors and officers with respect to particular representations and materials; and (ii) the materials which the Board and Audit Committee considered and did not consider in determining to reject the Litigation Demand.

59.     During confirmatory discovery, Lead Counsel also verified that the corporate changes acknowledged by Morgan Stanley to have been made as a result of this Action had been implemented, or were in the process of being implemented.

60.     Based on the foregoing considerations, I, together with other attorneys for Plaintiffs, formed the overall professional opinion that:  (i) the corporate changes at Morgan Stanley reasonably could be expected to avoid or reduce the likelihood of a recurrence of the circumstances upon which the allegations of misconduct in the ARS market had been asserted; and (ii) the proposed Settlement was fair, reasonable, and adequate to Morgan Stanley and its shareholders.  Based on the recommendation of Lead Counsel, LMPERS determined to execute the final Stipulation of Settlement.

61.     Accordingly, on January 17, 2012, the parties executed a formal Stipulation of Settlement.  Docket #60, Attachment #1.

## IV.     THE TERMS OF THE SETTLEMENT

### A.     Enhancement of Client Suitability Standards, Mandatory Product Training for Financial Advisors, and Review of Risk Management, Compliance, Surveillance, Oversight, and Sales Practices in Connection with Retail Products

62.     By the terms of the Settlement, Morgan Stanley has acknowledged that the following benefits were conferred on the Company as a result of the filing and prosecution of this Action:

1. <u>Enhancement of Morgan Stanley's suitability standards to help control risk and ensure that clients are not offered products that are inconsistent with their risk tolerance and financial profile</u>.  Morgan Stanley enhanced its suitability standards for clients for various products, including ARS, structured products, and derivatives.   The Compliance Department was tasked with:   (a) conducting an ongoing review of existing products; (b) imposing and enforcing eligibility and enhanced suitability requirements for potential buyers of various products; (c) imposing branch manager pre-approval requirements for client access to certain products; (d) reviewing and overseeing activities to help control risk and enforce client safeguards; (e) conducting inspections; and (f) conducting product surveillance review.   A process was instituted through which a member of the Compliance Department served on the New Products Committee to advise the Committee on new products, including regarding matters such as complexity, inherent risk, regulatory environment, relevant litigation and customer compliance history, and required surveillance.

2. <u>Development of additional mandatory product training for financial advisors ("FAs")</u>.  Morgan Stanley instituted mandatory training for its FAs in the areas of alternative investments, annuities, and structured products, as well as the Company's proprietary products and services.   The Company also developed a training module for financial advisors concerning what Morgan Stanley learned from instability in the securities markets and the product risks that may exist in markets that may not be readily apparent.  These training modules were given in addition to, but not in replacement of, industry series or required regulatory training courses.  The updated training included:  (a) interactive training programs; (b) mandatory webcasts on higher-risk products and other topical areas, including a required attendance acknowledgement by attendees; (c) an annual compliance training webcast; and (d) global compliance training courses.

3. <u>Review of Morgan Stanley's risk management, compliance, surveillance, oversight, and sales practices in connection with its retail products</u>.  Morgan Stanley conducted an exhaustive review, and confirmed the effectiveness, of protocols with respect to the Company's retail products, including in each of the above areas.  In the area of sales practices, in addition to changes set forth in Item 1 above, the Company reviewed and confirmed the effective functioning of protocols concerning:  (a) listed equities solicitation policies; (b) comprehensive risk disclosures to clients; (c) concentration of products within portfolios; and (d) a matrix of the risk versus complexity of all principal products offered to clients.  The results of this review were presented to and considered by the Audit Committee and the full Board of Directors during separate meetings.  The presentation to the Audit Committee was made by James P. Gorman, then Co-President (and now Chief Executive Officer); Stuart Breslow, Chief Compliance Officer; Ellyn A. McColgan, then President and Chief Operating Officer of Morgan Stanley's Global Wealth Management Group; and Michelle Oroschakoff, then Managing Director and Director of Compliance of the Company's Global Wealth Management Group.

Docket #60, Attachment #1, ¶¶ 2.1(a)-(c).

63.     The Settlement also calls for a release of claims against Defendants or Morgan
Stanley that were or could have been asserted in this Action concerning the marketing and
selling of ARS during 2007 and 2008; a denial of liability and a statement of basis for
determining to settle; a release of Plaintiffs; the payment of attorneys' fees and expenses and a
plaintiff's incentive award; the dismissal of the Section 220 Action; and provisions regarding
notice and hearing of a final Settlement proceedings.  Docket #60, Attachment #1, ¶¶ HH-JJ, 2.4-
2.5, 3.1-3.4.

## B.     The Settlement is Far Preferable to Continued Litigation.

64.     Plaintiffs and Lead Counsel faced substantial hurdles to plead and prove a
sustainable claim.  From the outset, we recognized—notwithstanding the significant civil fine
paid by Morgan Stanley to the State of New York—the particular legal challenges associated
with bringing breach of fiduciary duty claims against a blue chip Board of Directors, and
recovering damages from Defendants who may not have the resources to pay Morgan Stanley's
damages.  Accordingly, this Action presented a very real possibility that Morgan Stanley would
be unable to obtain meaningful relief.

65.     Plaintiffs maintained this Action vigorously and facing long odds at several
points—including retaining jurisdiction over the claims notwithstanding dismissal for failure to
establish demand futility and prevailing on a sharply contested motion to dismiss in the Section
220 Action.  Absent the Settlement, however, we have no doubt that Plaintiffs would face a long
and uncertain road towards a recovery for Morgan Stanley, including successfully overcoming
the presumptions of the business judgment rule in showing wrongful refusal of demand, an
inevitable motion to dismiss under Rule 12(b)(6) on renewed claims for breach of fiduciary duty

separate and apart from the wrongful refusal issues, a summary judgment motion at the close of discovery, pretrial challenges to experts and other pretrial motions, a lengthy trial with many fact and expert witnesses to establish liability and damages, post-trial motions, and likely appeals.

66.     The relative absence of personal self-interest would also complicate any analysis of the potential monetary recovery that Plaintiffs could achieve.  Specifically, although the amount of Morgan Stanley's fine and its losses arising from the repurchase of ARS were significant, we could not expect a liability verdict against the individual defendants of that amount.  In order to prove liability at trial in the first instance, we potentially had to detail precisely how and why dozens if not hundreds of Morgan Stanley sales employees engaged in misrepresentations to retail customers concerning the safety and liquidity of ARS.  While we believed we could do so, we also recognized that a jury awarding damages for breach of fiduciary duty would likely be asked to apportion responsibility for the damages among all potential wrongdoers, including many unnamed third parties.  When all was said and done, we faced a very real risk that even a successful liability verdict could mean a monetary award against defendants constituting only a small fraction of the total potential damages.

67.     Taking this case through trial would create a substantial risk that one or more insurance carriers would invoke a policy exclusion to deny coverage, particularly because liability requires findings that could trigger insurance policy exclusions.  Any such denial of coverage would likely require protracted coverage litigation, further delaying any recovery by Morgan Stanley.

68.     In short, while Lead Counsel believes that the claims asserted in the Complaint have substantial merit, if the litigation is continued, Morgan Stanley would bear the risk of incurring substantial additional costs and expenses, including through diverted resources and the

distraction from its business, without a substantial monetary recovery.  We firmly believe that this Settlement is in the best interests of Morgan Stanley and its shareholders, and that Morgan Stanley has experienced and will experience significant corporate governance changes as a result of this Action—thereby safeguarding the Company and its shareholders from future problems arising from ARS or similar complex securities.

## V.      LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

69.      The Complaint contained allegations concerning efforts to market ARS to Morgan Stanley customers regardless of the customer's suitability in the form of incorrect claims as to "safety," "liquidity," and "cash equivalence" of such securities.  Although Morgan Stanley neither admitted nor denied similar allegations made by the New York Attorney General, the Company was able to settle with the New York Attorney General and other regulators only by $35 million fine and agreeing to repurchase $4.5 billion in par value of such securities—a feature which Plaintiffs believe makes that settlement stand out even from other recent regulatory settlements with fine components.  Investigating and understanding the alleged wrongdoing and Defendants' role and alleged culpability, as well as prosecuting both this Action through several distinct phases including the Books and Records Demand and the Delaware Action, required intensive research, advocacy skills, and tenacity.

70.      My firm's compensation for the services we rendered in this case was wholly contingent on the success of this litigation, and was totally at risk.  From the outset, Lead Counsel understood that it was embarking on a complex and expensive litigation with no guarantee of being compensated for the significant investment of time and efforts the case would require.  Lead Counsel's commitment of time, financial and other resources to this derivative

litigation in two courts obliged them to forego other, potentially remunerative work on a contingency basis.

### A.      Billing and Expense Records

71.      The complete billing records of Lead Counsel and other counsel, based on contemporaneous time entries in chronological order, are set forth herein in Exhibits 12, 13, and 20.[19]  In addition, with respect to Lead Counsel's efforts, we present an alternative index of time entries that is broken down according to the principal phases of the litigation (Complaint, Motion to Dismiss, Demand, Books and Records Demand, etc.).  *See* Exhibit 21 hereto.  Lead Counsel also presents an alternative index of time entries that is broken down by timekeeper.  *See* Exhibit 22 hereto.    Finally, we present a summary of the total hours expended by Lead Counsel, including the hourly rates charged for each attorney at the firm's standard rates, and a summary of the total lodestar fee charged.  *See* Exhibit 23.

72.      In the case of Lead Counsel's efforts, a listing of hours written off as inefficient in the circumstances of this litigation is also included.  *See* Exhibits 20, 21, 22.[20]  In addition, due to staffing shortages at relevant times, partners at Lead Counsel in certain circumstances were required to perform services that in normal situations would be performed by associates or senior associates.  Where this occurred, and so as to ensure that any fee award is based on as clean a slate as possible, Lead Counsel have adjusted their billing through reducing the hours expended on the particular tasks involved by one-third to one-half.  *See id.*

---

[19]      Where applicable, these records also contain a reasonable estimate of the additional hours that will be necessary for work done through entry of final judgment.  *See id*.

[20]      The write-off of certain time should not be construed as an indication that Lead Counsel attorneys "ran up their hours" or incorrectly recorded their time, but only as a recognition of the reality that in a case as lengthy as this one, involving related proceedings in two fora, certain efforts and expenditures of time, in hindsight, were recognized not to contribute to the prosecution of particular litigation efforts in proportion to their recorded durations.

73.    The hourly rates charged by lawyers and paraprofessionals ranged from $195 per hour to $240 per hour for paraprofessionals, $295 per hour to $575 per hour for associates and other non-partner attorneys, and $625 per hour to $695 per hour for partners.

74.    Significantly, while Lead Counsel provides some measure of the number of hours it expended on preparing the attorneys' fee application in this case, *see* Exhibits 20, 21, and 22 hereto, such hours were in no way included in the total for which it seeks recompense.

75.    The total of Lead Counsel's hours is as follows:

| Staff | Seniority | Duration | Rate | Lodestar |
|---|---|---|---|---|
| Albert Myers | Partner | 548.6 | $675 | $370,305.00 |
| Melinda Nicholson | Associate | 58.1 | $510 | $29,631.00 |
| Lewis Kahn | Senior Partner | 93.3 | $695 | $64,843.50 |
| Paul Balanon | Associate | 3.0 | $575 | $1,725.00 |
| Christopher Kaul | Associate | 17.3 | $325 | $5,622.50 |
| Bruce Dona | Associate | 52.6 | $350 | $18,410.00 |
| Catherine Gauthier | Associate | 10.8 | $400 | $4,320.00 |
| Sarah Cate Boone | Associate | 9.3 | $425 | $3,952.50 |
| Geoff Rodriquez | Of Counsel | 5.7 | $575 | $3,277.50 |
| Kim Miller | Partner | 2.0 | $675 | $1,350.00 |
| Melissa Clark | Associate | 1.8 | $495 | $891.00 |
| Michael McGuane | Associate | 9.0 | $460 | $4,140.00 |
| Patty Lin | Attorney | 0.2 | $295 | $59.00 |
| Nicole Otero | Paralegal | 0.8 | $195 | $156.00 |
| Don Cisternino | Paralegal | 6.5 | $240 | $1,560.00 |
| Kevin Oufnac | Partner | 60.5 | $665 | $40,232.50 |
| Celia Rutherford | Associate | 75.8 | $575 | $43,585.00 |
| Michael Swick | Senior Partner | 61.1 | $695 | $42,464.50 |
| **Totals** | | 1,016.4 | | $636,525.00 |

**B.      Expenses**

76.      Lead Counsel incurred $46,247.86 in out-of-pocket expenses.   Below is a summary of these expenses by category:

**EXPENSES**

From Inception to April 2, 2012

| Costs (Paid or Accrued) | Amount |
|---|---:|
| Meals, Hotels & Transportation[21] | $ 17,868.71 |
| Working Meals | 414.33 |
| Outside Printing and Binding Costs | 287.16 |
| Postage, Delivery, Federal Express | 266.02 |
| Court Reporter Transcript Fees | 133.62 |
| Expert | 11,875.00 |
| Pacer Research | 57.68 |
| Westlaw/Lexis Nexis – Courtlink- Research | 3,305.01 |
| Court Costs – Filing Fees, Pro Hac Motions, DE Retrievals | 2,040.33 |
| Plaintiffs' share of Notice costs | 10,000.00 |
| **TOTAL** | $ 46,247.86 |

77.      The foregoing expenses were reasonable and necessary for the prosecution of this Action, and are the types of expenses that Lead Counsel typically incur in complex litigation, and for which Lead Counsel are typically reimbursed when the litigation gives rise to a corporate benefit.

78.      One of the most significant litigation expenses for which reimbursement is sought is travel.  With respect to that category, attorneys for Lead Counsel made (or will make) the following trips, each directly related to an important phase of this litigation:[22]

---

[21]  Includes an estimate of $1,668.00 for expenses for air transportation, ground transportation, and meals that will be incurred in connection with travel for two attorneys from New Orleans to New York City to represent the Plaintiffs at the Final Settlement Hearing.

| Trip | Purpose |
|---|---|
| June 23, 2009 | Motion to Dismiss |
| October 26, 2009 | Demand Presentation to STB and Skadden |
| January 12, 2011 | Motion to Dismiss in Delaware |
| November 10, 2011 | Confirmatory Discovery |
| November 29, 2011-December 1, 2011 | Confirmatory Discovery |
| December 7, 2011 | Confirmatory Discovery |
| December 19, 2011 | Case Management Conference[23] |
| February 9, 2012 | Preliminary Approval Hearing |
| April 23, 2012 | Final Approval Hearing |

79.     Another significant category of expense is professional expert fees.  These fees relate to the compensation to Plaintiffs' corporate governance consulting expert in connection with the Settlement, who spent significant time analyzing Morgan Stanley's corporate governance processes and the improvements acknowledged in the Settlement.  These services, performed by Professor Dalton, comprised 25 hours for a total of $11,875.00.

---

[22]     Although Lead Counsel maintains a New York office, that office comprised only two or three attorneys at any point in this litigation, none of whom were actively involved in this litigation, and none of whom prosecutes shareholder derivative litigation except in very limited capacities and circumstances. In addition, it should be noted that wherever possible, in-person meetings were avoided or conducted by telephone or Internet—e.g., settlement negotiations, postponement of case management conferences, review of documents during preliminary settlement negotiations over a secure Internet connection.

[23]     This conference was postponed by Court, at the parties' written request three days before the hearing, but notice of postponement was not posted to PACER or otherwise communicated to counsel until after the hearing time.

**D.      Client Relationships**

80.      Lead Counsel had a forthright, professional relationship with its institutional shareholder client, LMPERS, involving regular communications and consultations.  A LMPERS officer and/or attorney representative (Paul Brannon, Esq.) were kept regularly apprised of developments in the litigation, and participated in developing strategy for various litigation phases and settlement.  Lead Counsel's fee arrangements with LMPERS were on a wholly contingency basis, with no fees required to be advanced by the client.  Moreover, Lead Counsel had in place an express agreement with LMPERS that attorneys' fees on cases can be recovered up to a reasonable amount allowable by law.

**E.      Attorney Staffing and Lodestar Analysis**

81.      For purposes of analytical rigor, and to assist the Court, Lead Counsel has grouped all of its individual time entries into one of nine principal categories of work that characterized this case and created especially for it.  For purposes of ease of analysis, the results of this breakdown for all Plaintiffs' counsel is also set forth in a chart constituting Exhibit 24 hereto (the "Lodestar Totals by Category of Work"), which was prepared using accurate figures from each firm's individual time entries.  In addition, the aggregate totals for all firms are set forth in the table below:

| Case Activity Category | Hours by All Firms |
|---|---|
| 1    Complaint—Investigation, Research, Drafting, Filing | **138.55** |
| 2    Case Organization, Scheduling, Monitoring, Updating News, and Client Communications | **67.45** |

| 3 | Motion to Dismiss | 185.85 |
|---|---|---|
| 4 | Litigation Demand | 64.00 |
| 4a | Freedom of Information Act Requests | 5.50 |
| 5 | Books and Records Demand and Delaware Action | 197.35 |
| 5a | Show Cause Order | 27.80 |
| 6 | Initial Settlement Negotiations and MOU | 248.45 |
| 7 | Final Settlement Negotiations, Confirmatory Discovery, and Stipulation of Settlement | 178.65 |
| 8 | Preliminary Approval Motion | 45.40 |
| 9 | Final Approval Motion | 41.45 |
| **TOTAL** | | **1,210.45** |

82.    As reflected in the Lodestar Totals by Category of Work, the total hours actually logged by all firms is 1,210.45.  If reasonably estimated future hours for each firm are added, the total hours by all firms is 1,262.70.  The firms collectively wrote off a total of 163 hours of time, which represented 13 percent of total pre-write-off hours.  The adjusted total hours for all firms is 1,099.70.

83.    Attached as Exhibit 25 hereto is another analytical chart which counsel believe will assist the Court in its assessment of the reasonableness of the total fee and expense amount requested (the "Lodestar Analysis").  The Lodestar Analysis sets forth each Plaintiffs' counsel's total hours (summed up with a group total) and each firm's aggregate logged lodestar amounts at the firm's standard rates (summed up with a group total).  To these amounts are added each firm's logged expenses and disbursements (summed up with a group total), yielding each firm's total fees and expenses (summed up with a group total).  The Lodestar Analysis confirms that the

total adjusted hours logged by all firms (including write-offs and each firm's estimate of future hours) is 1,099.70, the same number appearing in the Hourly Time Grid. The total lodestar amount logged by all firms at their standard billing rates is $675,522.50.

84.     The Lodestar Analysis at Exhibit 25 allows the Court to be aware of the total lodestar each firm, and the group, would bill at its standard rates. Lead Counsel have started with the $775,000 total fee and expense award requested, and they have first subtracted total expenses of $46,947.86 among all firms. Such expenses, of course, are sunk costs which each firm's share of any fee will simply go towards crediting. Doing this yields an "implied" fee award—i.e., the portion of the total award actually earned as a fee instead of a recoupment of costs—of $728,052.14. When the total lodestar of $675,522.50 is compared to the $728,052.14 in requested fees (net of expenses), this yields a "multiplier" of 1.078. For reasons set forth in the Motion for Final Approval, this multiplier is well within the range commonly awarded or relied upon by courts in the Second Circuit and, in fact, is on the lowest end of the range. The multiplier thus fully supports a total award of fees and expenses in the amount of the $775,000 requested.

### F.     LMPERS's application for a plaintiffs' incentive award

85.     Plaintiff LMPERS seeks up to $3,000 in the form of a plaintiff's incentive award for its efforts in assisting in the prosecution of the Derivative Action. Defendants have agreed not to oppose this award, which would be paid entirely out of Lead Counsel's share of the attorneys' fees awarded, if any. LMPERS stepped forward to bring the Derivative Actions on the Company's behalf. Moreover, a LMPERS officer and/or attorney were kept regularly apprised of developments in the litigation, and participated in developing strategy for various litigation phases and settlement. LMPERS was ready and willing to produce documents, testify

at deposition, and at trial, if necessary.  We respectfully submit that this request, agreed to by Morgan Stanley, is reasonable and should be authorized.  *See, e.g.*, Exhibit 29 (final order in *Weil v. Baker*, No. 08-CA-00787-SS (W.D. Tex. Dec. 8, 2011) (approving $5,000 incentive award to each of several plaintiffs, to be paid from attorneys' fees).

### G.    Lead Counsel's Experience and Qualifications

86.    Lead Counsel are experienced in prosecuting complex litigation and derivative actions, and worked diligently and efficiently in prosecuting this Action.  As demonstrated by the firm resume of KSF, attached as Exhibit 26, Court-appointed Lead Counsel are highly skilled and experienced in the securities and derivative litigation field, with a demonstrated track record in prosecuting derivative actions and other securities litigation.  KSF has served as Lead Counsel or Co-Lead Counsel in several high-profile derivative litigations, including the *Bank of America* derivative litigation addressing the Merrill Lynch merger (S.D.N.Y., Interim Co-Lead Counsel, won motion to dismiss), the *Moody's* derivative litigation addressing credit ratings practices (S.D.N.Y., Lead Counsel for Demand Excused Cases), the *Barnes & Noble* derivative litigation involving the acquisition of College Books from company CEO Leonard Riggio (Del. Ch., Co-Lead Counsel), the *Sirius XM Satellite Radio* derivative litigation addressing alleged misrepresentations to regulators and shareholders in connection with competitive practices and the Sirius-XM merger (S.D.N.Y., won motion to dismiss), the *AIG* derivative litigation addressing credit default swaps and related insolvency of the world's largest insurer (S.D.N.Y., Co-Lead Counsel), and the *Arthrocare Corporation* derivative litigation (W.D. Tex., Co-Lead Counsel, obtained $8 million settlement and corporate governance reforms).

### H.    Narrative of Lead Counsel's Prosecution of the Claims

87.    As reflected above, litigation of this Action, and the Delaware Action in support of it, involved many distinct phases and sub-phases.   With the exception of settlement, confirmatory discovery, and settlement approval motions, none of these phases or sub-phases were other than very vigorously contested by the parties.   To achieve the Settlement, Lead Counsel were required to have and deploy a high level of professional skill.

88.    As Lead Counsel for Plaintiffs, KSF rendered the following services:

(a)    **July 17, 2008 to August 27, 2008:   Complaint—Investigation, Research, Drafting, Filing.**  (Phase 1–138.55 hours total among all Plaintiffs' firms)[24] This phase involved:  (i) investigation of ARS practices at Morgan Stanley, review of history of regulatory proceedings against Morgan Stanley involving ARS, and other research; (ii) discussion about possible derivative claims with representatives of LMPERS; (iii) drafting and filing of the initial complaint by LMPERS in this Court in August 2008; and (iv) discussion of possible claims by other shareholders, review of complaint by Terry Thomas, and the research, drafting, and filing of updated, consolidated Complaint.

(b)    **August 28, 2008 to March 17, 2009 (and ongoing):   Case Organization, Scheduling, Monitoring, Updating News, and Client Communications.**  (Phase 2–67.45 hours total among all Plaintiffs' firms)  This phase involved, among other thing, discussion with Jacobs Firm on behalf of shareholder Thomas and negotiation with defendants' counsel of an agreement to accept service, consolidate the actions, and appoint leadership.   Various Lead Counsel attorneys played

---

[24]    The time total in this paragraph are before write offs.

roles thereafter in routine filings, monitoring of dockets in this Action, the Delaware Action, and related ARS litigation nationwide; updating news stories concerning ARS and related alleged misconduct; and communications with LMPERS representatives.

(c)     **March 18, 2009 to July 23, 2009:  Motion to Dismiss.**   (Phase 3–185.85 hours total among all Plaintiffs' firms)  Lead Counsel took the lead in reviewing the defendants' motion to dismiss on grounds of failure to allege demand futility, and in researching and drafting LMPERS's opposition thereto.  Lead Counsel argued the motion before this Court on June 23, 2009.  Following a grant of the motion to dismiss which contained a ruling on the issue of single-Board-member independence which it believed was not consistent with Delaware law, Lead Counsel moved to reconsider the Court's order.   The Court granted reconsideration and revised its ruling, while confirming dismissal of the claims and retaining jurisdiction in order for Plaintiffs to make demand on the Board if desired.

(d)     **August 20, 2009 to April 27, 2010:  Litigation Demand.**  (Phase 4–64 hours total among all Plaintiffs' firms)  In August 2009, Lead Counsel investigated, researched, and drafted the Litigation Demand sent to the Chairman of the Board of Morgan Stanley.   In connection with it, Lead Counsel made a formal presentation to provide further information and further present the demand to counsel assisting with the Board of Directors' review of the Litigation Demand.   Thereafter, Lead Counsel negotiated extensions of deadlines for the formal response to the Litigation Demand.

(e)     **October 21, 2009 to January 29, 2010:  Freedom of Information Act Requests.**  (Phase 4a–5.5 hours total among all Plaintiffs' firms)  Lead Counsel noted that documents in the public record concerning Morgan Stanley's conduct with respect to

ARS were not as informative as similar document collections with respect to other broker-dealers. Accordingly, Lead Counsel made requests to government bodies, specifically the SEC and the New York Attorney General, under the Freedom of Information Act and the Freedom of Information Law, respectively. Such requests were ultimately rejected, and Lead Counsel determined not to litigate such rejections pending further developments in this Action.

(f)      **April 28, 2010 to April 30, 2011:   Books and Records Demand, Delaware Action, and Show Cause Order.**   (Phases 5 and 5a–197.35 hours and 27.8 hours, respectively, among all Plaintiffs' firms)  When the Board rejected the Litigation Demand, Lead Counsel further prosecuted Plaintiffs' claims by making the Books and Records Demand on the Morgan Stanley Board for corporate books and records concerning the rejection. When this demand was also rejected in a lengthy letter citing various Delaware statutes and caselaw, Lead Counsel pursued numerous avenues. First, Lead Counsel attempted to negotiate a resolution with Morgan Stanley's counsel, based on the holding of *Grimes II*. Company counsel vigorously opposed these efforts, citing *Freund*, *King v. Verifone*, and other Delaware authority. The import of the Company's cited cases required careful study and distinction, but Lead Counsel concluded that LMPERS's inspection rights were not called into question by these authorities, and pressed the issue. Second, Lead Counsel sought a case management conference with this Court to determine procedures for resolving the dispute under Section 220.

The Court denied Plaintiffs' request for a case management conference and, sua sponte, ordered Plaintiffs to show cause why, in light of the rejection of the Litigation Demand, the Action should not be dismissed. Lead Counsel, having determined that

consensual resolution of the Books and Records Demand could not be achieved, and with the clarity provided by the Show Cause Order, determined, in consultation with LMPERS, to further pursue the Books and Records Demand through litigation in Delaware.  Lead Counsel then researched and drafted the Delaware complaint, engaged local counsel (the Biggs Firm), and filed the Delaware Action.  Shortly thereafter, Lead Counsel prepared and filed a response to the Show Cause Order discussing the procedural history of the Action, notifying the Court of the Delaware Action, distinguishing Morgan Stanley's authority and arguments, and requesting that the Action be held in abeyance pending the Delaware Action.  The Court granted this request and put the Action in abeyance.

Thereafter, Lead Counsel vigorously litigated the Delaware Action.  This included briefing and oral argument before the Delaware Chancery Court of Morgan Stanley's motion to dismiss that action, and also involved supplemental briefing to discuss the import of the intervening reversal of *King v. Verifone.*

The Chancery Court issued its Order on March 4, 2011, denying in substantial part Morgan Stanley's motion to dismiss, and holding that LMPERS was entitled to inspect various books and records.  In the professional judgment of the undersigned, the decision was an important one, not only for Plaintiffs herein in pursuing their claims, but also for shareholders in general.  In the professional judgment of the undersigned, the decision clarified the law, holding—per *Grimes II* but in a factually unambiguous setting—that shareholders whose demand futility complaint had been dismissed, and who thereafter made a litigation demand which was rejected in a letter which did not address the Board's substantive reasoning, were entitled to use Section 220 to explore the reasons

for the Board's rejection.[25]  In the undersigned's professional judgment, the decision also

clarified Delaware law, neutralizing any lingering effect on wrongful-refusal books-and-

records requests by the lower court decision in *King v. Verifone* (which had addressed

books and records requests to support, not wrongful refusal of demand, but rather

demand futility, and which was reversed by the Delaware Supreme Court).[26]  In addition,

we believe that the decision expanded the scope of what constitutes a "peremptory

refusal" of a litigation demand.[27]  The decision received widespread coverage from the

legal press, shareholder rights groups, D&O insurers, and from the defense bar.[28]  It has

been cited at least 29 times by courts, litigants, or commentators.[29]

---

[25]     The procedural history of the *Grimes* litigation was relatively convoluted.  Originally, Grimes
made pre-suit demand on the Board of DSC Communications Corporation asserting that certain
employment contracts with its CEO were *ultra vires* under Section 141 of the Corporations Code and
must be abrogated.  When the Board refused this demand, Grimes filed a derivative action asserting
claims not only under Section 141, but also for waste, excessive compensation, and breach of the duty of
care.  *See Grimes I*, 673 A.2d at 1210-12.  In opposition to DSC's motion to dismiss under Rule 23.1,
Grimes argued that demand was wrongfully refused as to the Section 141 claim and excused as to the
other claims given the Board's refusal of demand.  *See id.* at 1210, 1220.  On the latter point, both the
Chancery Court (Allen, C.) and the Supreme Court disagreed, holding that by making demand concerning
the employment contracts, Grimes had conceded the need for demand as to all legal claims arising from
the contracts and thus, had waived his right to allege that demand was excused as those claims.  *See id.* at
1215, 1219-20.  *See also Grimes II*, 724 A.2d at 564.  In affirming, the Supreme Court noted that Grimes
was not barred from making another demand on the Board as to those claims for which he had not
originally made a pre-suit demand.  *See id.* at 1210.  *See also Grimes II*, 724 A.2d at 564; Stephen A.
Radin, *The New Stage of Corporate Governance Litigation:  Section 220 Demands—Reprise*, 28 Cardozo
L. Rev. 1287, 1341-43 (2006) (discussing *Grimes*).

[26]     *See supra* note 11.

[27]     The Board's refusal letter in *Grimes* briefly describes the DSC board's appointment of a special
committee, its receipt of a report, and its discussion and determination to reject demand; it comprised
three short paragraphs and less than 150 words.  *See Grimes II*, 724 A.2d at 564 n.2.  By contrast, the
Litigation Demand Refusal in this case discussed a lengthy process involving multiple outside counsel
and the review or re-review of 2.8 million pages of documents; it comprised seven lengthy paragraphs
and nearly 800 words   *See* Docket #33.

[28]     Examples of this coverage are set forth in Exhibit 27 hereto, and include articles, news releases,
client alerts, or weblog posts by Milbank Tweed, Skadden Arps, Association of Corporate Counsel, Potter
Anderson, Delaware Business Court Insider, Delaware Corporate and Commercial Litigation Blog,
Andrews Litigation Reporter, BNA Securities & Regulation Law (full report arguing the Chancery
Court's decision improperly increased burdens on corporations and jeopardized Delaware's status as a

(g)     **May 5, 2011 to November 4, 2011:  Initial Settlement Negotiations and MOU.**   (Phase 6–258.45 hours total among all Plaintiffs' firms)   As soon as the Chancery Court decision was handed down, Lead Counsel contacted Morgan Stanley's counsel to discuss procedures for obtaining the allowed books and records.  Company counsel resisted this request and reserved its right to appeal the Chancery Court order.  Thereafter, Lead Counsel conducted negotiations with defense counsel, and reviewed many internal document supplied by counsel for Morgan Stanley and defendants to determine what corporate compliance and governance changes had been made as a result of this litigation, as well as the terms of mutual releases and other consideration for a possible settlement.  This process lasted from approximately May 2011 to September 2011 and culminated in the MOU dated November 3, 2011.  The settlement terms and MOU were extensively negotiated.  Although the MOU contained a provision for attorneys' fees, this issue was the very last one negotiated, and it was only negotiated after full agreement as to all other terms of the settlement reflected in the MOU.[30]

(h)     **November 8, 2011 to February 9, 2012:   Final Settlement Negotiations, Confirmatory Discovery, Stipulation of Settlement, and Preliminary Approval Motion.**   (Phases 7 and 8–178.65 hours and 45.4 hours, respectively, among all Plaintiffs' firms)  The next phase in the process was confirmatory discovery, to afford Lead Counsel with a basis to affirm that the settlement was fair, reasonable, and adequate to Morgan Stanley and its shareholders in the circumstances.  This involved confirmation,

---

corporation home), AON, Race to the Bottom (a shareholder rights weblog), the Delaware Business Litigation Report, and the Stewart Law Firm.

[29]     *See* Exhibit 28 hereto.

[30]     The sole exception concerned the language to be contained in the Notice to shareholders of the Settlement, which was subject to continual refinement through the execution of the Stipulation and beyond.

among other things:  (i) that a good-faith basis had existed to assert the claims; (ii) that litigation of the claims presented risks such that the Settlement was appropriate; and (iii) that the corporate changes at Morgan Stanley had been or were in the process of being implemented.  These processes were undertaken by attorneys for Lead Counsel in November and December 2011.  The processes involved repeated viewings of internal documents at the STB offices in New York City.  For reasons of confidentiality, Morgan Stanley declined to provide copies of such documents.  Moreover, the volume of documents involved made their inspection through the medium of a secure Internet connection impracticable.  Following confirmation of the central points set forth above, Lead Counsel and defense counsel proceeded to the final negotiation and drafting of the Stipulation, all attachments (including two notices, preliminary order, and final order), and the preliminary approval motion.  The Stipulation was executed on January 17, 2012, and the preliminary approval motion—as researched and drafted by Lead Counsel—was filed the same day.  In early February 2012, Lead Counsel prepared for and argued the motion for preliminary approval, which the Court granted on Feb. 9, 2009.

(i)     **January 3, 2012 to Present:  Final Approval Motion.**  (Phase 9–41.45 hours total logged among all Plaintiffs' firms, and 52.25 estimated hours)  In the time since, Lead Counsel has worked with defense counsel to approve and verify the dissemination of the shareholders notices as ordered by the Court, to research and draft the instant motion and supporting papers, and to prepare for the final approval hearing on April 23, 2012.  Lead Counsel also responded to one shareholder inquiry for more information concerning the Settlement.  In addition, Lead Counsel has communicated with LMPERS, the Jacobs Firm, and the Biggs Firm, to obtain required information and,

at defense counsel's request, to verify continuous ownership of Morgan Stanley shares by all Plaintiffs.  It should be noted that the hourly totals for this phase of the litigation include an estimate of approximately 50 hours of attorney time following the filing of the instant motion, to be spent in preparation for the final approval hearing, drafting of responses to any objections, travel, and consummation of the Settlement and dismissal of all claims.

89.     Set forth below is a brief description of the services rendered for each person for whom fees are claimed:[31]

(a)     Albert M. Myers (partner—548.6 hours).   The undersigned was responsible for day-to-day management and supervision of all aspects of the case.  I served as the overall primary drafter and editor of major pleadings, supervised all other filings, conducted and oversaw confirmatory discovery,[32] and served as primary drafter of settlement papers.

(b)     Lewis Kahn (senior partner—93.3 hours).  Mr. Kahn provided leadership over strategy; supervised certain correspondence w/co-counsel, defense counsel, and client; reviewed and approved major pleadings; and exercised leadership over settlement negotiation and review of settlement papers.

---

[31]     The descriptions herein are for Kahn Swick attorneys only and reflect hours after write-offs of time.

[32]     Confirmatory discovery in the context of this Action involved the careful review of Board-level documents and a select, concentrated set of evidentiary documents which had already been identified in the course of at least two investigations by Morgan Stanley counsel as being important.  All of these documents, therefore, required assessment and oversight by very experienced, partner-level securities litigation attorney and could not—as in the usual confirmatory discovery setting, where a large cache of documents must be sifted to identify relevant or "hot" documents for senior-level review—be primarily reviewed by associates.

(c)   Michael Swick (senior partner—61.1 hours).   Mr. Swick provided leadership in case origination and analysis, and monitoring of ARS and regulatory developments affecting Morgan Stanley; reviewed and approved major pleadings; exercised leadership over review and drafting of settlement papers.

(d)   Bruce Dona (associate—52.6 hours).   Mr. Dona provided research assistance and assistance with confirmatory discovery.

(e)   Catherine Gauthier (former associate—10.8 hours).   Ms. Gauthier provided assistance in preparation, filing, and service of complaint and routine pleadings.

(f)   Celia Rutherford (associate—75.8 hours).   Ms. Rutherford provided research concerning settlement analysis, obligations of Lead Counsel, validity of privilege claims with respect to confirmatory discovery; assisted in research, preparation, and filing of final settlement and preliminary approval papers.

(g)   Christopher Kaul (associate—17.3 hours).   Mr. Kaul provided research concerning settlement analysis and obligations of Lead Counsel; assisted in research, preparation, and filing of various pleadings; analysis and updating of relevant dockets; and factual research regarding settlement.

(h)   Geoff Rodriguez (of counsel—5.7 hours).   Mr. Rodriguez provided research and analysis regarding Section 220 Demand and assistance with respect to certain pleadings.

(i)   Kevin Oufnac (former partner—60.5 hours).   Mr. Oufnac provided research and drafting of the complaint and consolidated complaint, motion to dismiss, motion for reconsideration, Litigation Demand, and response to the Show Cause Order.

(j)      Kim Miller (partner—2 hours).   Ms. Miller consulted regarding strategy following dismissal of Complaint.

(k)      Melinda Nicholson (associate—58.1 hours).    Assisted substantive preparation for hearings; assisted in preliminary settlement investigation and analysis and negotiation and drafting, and assisted in confirmatory discovery.  Ms. Nicholson also will assist in the preparation and presentation of the final approval hearing.

(*l*)      Melissa Clark (former associate—1.8 hours).    Assisted with motions filing.

(m)      Michael McGuane (former associate—9 hours).  Assisted with Litigation Demand and Board presentation and in meeting with Delaware counsel.

(n)      Paul Balanon (former associate—3 hours).  Provided docket control and assistance.

(o)      Sarah Cate Boone (former associate—9.3 hours).  Provided assistance with calendaring, docket control, and document filekeeping.

(p)      Nicole Otero (former paralegal—0.8 hours), Don Cisternino (former paralegal—6.5 hours), and Patty Lin (former attorney—0.2 hours).  These professionals provided paralegal and minor pleading-related services.

90.      Set forth as Exhibit 30, 31, and 32 are the final settlements approved in the *Home Depot*, *Shell*, and *Eli Lilly* derivative litigations, respectively.

\*   \*   \*

I declare under penalty of perjury of the United States that the foregoing is true and correct.

Dated:  April 2, 2012

                                   */s/ Albert M. Myers*
                                    ALBERT M. MYERS

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on April 2, 2012, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

             _____*/s/ Albert M. Myers*_____
               Albert M. Myers